COZEN O'CONNOR
A PENNSYLVANIA PROFESSIONAL CORP.
Peter J. Fontaine, Esquire
Lawrence F. Walker, Esquire
Matthew J. Coughlin, Esquire
1010 Kings Highway South
Cherry Hill, NJ 08034
Telephone: 856-910-5000
pfontaine@cozen.com
lwalker@cozen.com
matthewcoughlin@cozen.com
*Attorneys for Individual Plaintiffs named herein &*
*Gatherings At Bel Aire Lakes Homeowners Association*
*and Individually Named Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| GATHERINGS AT BEL AIRE LAKES HOMEOWNERS' ASSOCIATION, INC., *et al.* | : : : | |
| Plaintiffs, | : : | |
| vs. | : : | Civil Action No. _____ |
| | : : | JURY TRIAL DEMANDED |
| ATLANTIC COUNTY UTILITIES AUTHORITY, MATTHEW DENAFO, RICHARD DOVEY, and GARY CONOVER | : : : | |
| Defendants. | : | |

### COMPLAINT

Plaintiffs, the Gatherings at Bel Aire Lakes Home Owners' Association, Inc. (the

"Association" or "BALHOA") and the below named individuals living at the Gatherings at Bel

Aire Lakes (the "Members" or "BAL Residents") and, by and through their attorneys, Cozen

O'Connor, in support of their Complaint against Defendant, Atlantic County Utilities Authority

("ACUA") and the above-named individuals alleges as follows:

1.      This action concerns past and continuing violations by the ACUA of the
Resource Conservation and Recovery Act ("RCRA")[1], Clean Air Act ("CAA")[2], the New
Jersey Environmental Rights Act ("ERA")[3], the New Jersey Solid Waste Management Act
("SWMA")[4], and  the New Jersey Air Pollution Control Act ("APCA")[5] in connection with a
municipal solid waste landfill (the "Landfill") which has released and continues to release
noxious gases, and repeatedly fails to control birds, both presenting an imminent threat to
BALHOA and the BAL Residents.

**PARTIES**

2.      Plaintiff BALHOA is the homeowners' association of the Gatherings at Bel
Aire Lakes ("BAL"), a 125 unit planned real estate retirement community in Absecon, New
Jersey and is a New Jersey nonprofit business with its principle place of business located at 2
Delray Lane, Absecon.

3.      As the homeowners' association of BAL, BALHOA possesses authority under
New Jersey law to take all reasonable action necessary to protect and further the health, safety
and general welfare of the BAL Residents and the common elements and facilities within BAL,
including asserting the claims set forth herein concerning the common elements and facilities
of BAL as if those claims were asserted directly by the unit owners individually.[6]

---

[1] 42 U.S.C. § 6901 *et seq.*
[2] 42 U.S.C. § 7401 *et seq.*
[3] N.J.S.A. 2A:35A-1 *et seq.*
[4] N.J.S.A. 13:1E-1 *et seq.*
[5] N.J.A.C. 7:27-17 *et seq.*
[6] N.J.S.A. § 45:22A-44.

4.      The individual Plaintiffs[7] are the named unit owners or former unit owners residing in BAL, who are each a Member or former Member of BALHOA, and have been and/or continue to be exposed to and harmed by noxious air pollutants, bacteria and pathogens originating from the Landfill, in violation of law:

    a.   Michael Press and Theresa Press are Members of BALHOA residing at 3 Ables Run Drive, Absecon, New Jersey since 2021.

    b.   Renetta Morris are Members of BALHOA residing at 7 Ables Run Drive, Absecon, New Jersey 08201 since 2014.

    c.   Nicholas Fevola and Josephine Fevola are Members of BALHOA residing at 13 Ables Run Drive, Absecon, New Jersey 08201 since 2020.

    d.   Antonia Elvira Rodriguez is a Member of BALHOA residing at 17 Ables Run Drive, Absecon, New Jersey 08201 since 2021.

    e.   Robert DePasquale and Josette DePasquale are Members of BALHOA residing at 20 Ables Run Drive, Absecon, New Jersey 08201 since 2015.

    f.   Richard Romanelli was a Member of BALHOA residing at 21 Ables Run Drive, Absecon, New Jersey 08201 between 2021 and 2024.

    g.   Rene Haynes is a Member of BALHOA residing at 22 Ables Run Drive, Absecon, New Jersey 08201 since 2019.

    h.   Mabel Hagen is a Member of BALHOA residing at 25 Ables Run Drive, Absecon, New Jersey 08201 since 2008.

    i.   Rose McCarthy is a Member of BALHOA residing at 28 Ables Run Drive, Absecon, New Jersey 08201 since 2014.

    j.   James O'Brien and Rosemarie O'Brien are Members of BALHOA residing at 29 Ables Run Drive, Absecon, New Jersey 08201 since 2019.

    k.   Bonnie Cade is a Member of BALHOA residing at 35 Ables Run Drive, Absecon, New Jersey 08201 since 2022.

---

[7] Certain of the individual Plaintiffs are tenants of Members, who pursuant to the BALHOA By-Laws and Covenants, have been delegated the right to use and enjoyment of Common Areas subject to the same rules and or regulations applicable to the various recreation and other feature within the Common Areas.

l.  Amy Anderson and John Catona, Jr. are Members of BALHOA residing at 37 Ables Run Drive, Absecon, New Jersey 08201 since 2017.

m.  David Hannon and Kathleen Hannon are Members of BALHOA residing 38 Ables Run Drive, Absecon, New Jersey 08201 since 2016.

n.  Lily John is a Member of BALHOA residing at 39 Ables Run Drive, Absecon, New Jersey 08201 since 2020.

o.  Anthony Guido and Mary Guido are Members of BALHOA residing at 48 Ables Run Drive, Absecon, New Jersey 08201 since 2014.

p.  Gary Moten and Sherrise Moten are Members of BALHOA residing at 1 Halyard Drive, Atlantic City, New Jersey 08401  .

q.  Renee Sheekey is a Member of BALHOA residing at 54 Ables Run Drive, Absecon, New Jersey 08201 since 2014.

r.  Michong Beisser is a Member of BALHOA residing at 62 Ables Run Drive, Absecon, New Jersey 08201 since 2022.

s.  Mark Spatz is a Member of BALHOA residing at 64 Ables Run Drive, Absecon, New Jersey 08201 since 2015.

t.  Ann Vagts and Joe Brzuszkiewicz are Members of BALHOA residing at 68 Ables Run Drive, Absecon, New Jersey 08201 since 2021.

u.  Nick Konstantos and Efi Lazaridou are Members of BALHOA residing at 70 Ables Run Drive, Absecon, New Jersey 08201 since 2014.

v.  Jodi McPherson is a Member of BALHOA residing at 72 Ables Run Drive, Absecon, New Jersey 08201 since 2019.

w.  Jerome Tredanari is a Member of BALHOA residing at 74 Ables Run Drive, Absecon, New Jersey 08201 since 2018.

x.  John Hannigan and Annie Marlow are Members of BALHOA residing at 86 Ables Run Drive, Absecon, New Jersey 08201 since 2022.

y.  Kevin Blevin and Kathleen Blevin are Members of BALHOA residing at 4 Delray Lane, Absecon, New Jersey 08201 since 2016.

z.  Josephine Adams is a Member of BALHOA residing at 5 Delray Lane, Absecon, New Jersey 08201 since 2015.

aa. Richard Schwartz and Lissa Goldberg are Members of BALHOA residing at 15 Delray Lane, Absecon, New Jersey 08201 since 2020.

bb. Michael Dear and Jeanne Dear are Members of BALHOA residing at 19 Delray Lane, Absecon, New Jersey 08201 since 2013.

cc. Lee Lawrence and Sandra Young are Members of BALHOA residing at 21 Delray Lane, Absecon, New Jersey 08201 since 2018.

dd. Carolyn Caldwell is a Member of BALHOA residing at 23 Delray Lane, Absecon, New Jersey 08201 since 2010.

ee. Peter Carfagno is a Member of BALHOA residing at 24 Delray Lane, Absecon, New Jersey 08201 since 2021.

ff. Bret Hamilton and Paul McDevitt are Members of BALHOA residing at 31 Delray Lane, Absecon, New Jersey 08201 since 2019.

gg. Sandra Golden is a Member of BALHOA residing at 32 Delray Lane, Absecon, New Jersey 08201 since 2020.

hh. Lena Lang is a Member of BALHOA residing at 33 Delray Lane, Absecon, New Jersey 08201 since 2009.

ii. Dorothy Williams is a Member of BALHOA residing at 36 Delray Lane, Absecon, New Jersey 08201 since 2017.

jj. Edward Trout and Shirley Trout are Members of BALHOA residing at 52 Delray Lane, Absecon, New Jersey 08201 since 2017.

kk. Dan Kirby and Kvovng Ja Kirby are Members of BALHOA residing at 54 Delray Lane, Absecon, New Jersey 08201 since 2016.

ll. Elwood King Luke and David Luke are Members of BALHOA residing at Delray Lane, Absecon, New Jersey 08201 since 2017.

mm.   Robert Fluehr and Jami Field are Members of BALHOA residing at 60 Delray Lane, Absecon, New Jersey 08201 since 2023.

nn. Marie Carhart and Matthew Powals are Members of BALHOA residing at 66 Delray Lane, Absecon, New Jersey 08201 since 2020.

oo. Margaret Kostrzewski is a Member of BALHOA residing at 68 Delray Lane, Absecon, New Jersey 08201 since 2019..

pp. Sandra Rodriguez is a Member of BALHOA residing at 74 Delray Lane, Absecon, New Jersey 08201 since 2021.

qq. Nancy Holmes and William Holmes are Members of BALHOA residing at 76 Delray Lane, Absecon, New Jersey 08201 since 2018.

rr. Lewis Needles and Marie Needles are Members of BALHOA residing at 44 W Delray Lane, Absecon, New Jersey 08201 since 2016.

ss. Mark Petti and Maryellen Petti are Members of BALHOA residing at 46 W Delray Lane, Absecon, New Jersey 08201 since 2020.

tt. Jim Ward and Debbie Ward are Members of BALHOA residing at 56 W Delray Lane, Absecon, New Jersey 08201 since 2017.

uu. Lynne Tyner Washington is a Member of BALHOA residing at 64 W Delray Lane, Absecon, New Jersey 08201 since 2020.

vv. Katherine Panagakos and Michael Sokoloski are Members of BALHOA residing at 70 W Delray Lane, Absecon, New Jersey 08201 since 2014.

ww. Barbara Mason is a Member of BALHOA residing at 10 Ables Run Drive, Absecon, New Jersey 08201 since 2008.

xx. Rosemary Griffin is a Member of BALHOA residing at 16 Ables Run Drive, Absecon, New Jersey 08201 since 2007.

yy. Maria Graves is a Member of BALHOA residing at 32 Ables Run Drive, Absecon, New Jersey 08201 since 2008.

zz. David Devlin and Kathleen Devlin are Members of BALHOA residing at 36 Ables Run Drive, Absecon, New Jersey 08201 since 2007.

aaa. Raymond Hyson and Peggy Hyson are Members of BALHOA residing at 49 Ables Run Drive, Absecon, New Jersey 08201 since 2005.

bbb. Gordon Rogers and Winifred Rogers are Members of BALHOA residing at 52 Ables Run Drive, Absecon, New Jersey 08201 since 2006.

ccc. Kraig Friedman and Susan Faunce are Members of BALHOA residing at 60 Ables Run Drive, Absecon, New Jersey 08201 since 2006.

ddd. Kenneth Kaye and Ellen Kaye are Members of BALHOA residing at Ables Run Drive, Absecon, New Jersey 08201 since 2005.

eee. Len Santangelo and Joanne Santangelo are Members of BALHOA residing at 76 Ables Run Drive, Absecon, New Jersey 08201 since 2007.

fff. Scott Alten and Andrea Alten are Members of BALHOA residing at 82 Ables Run Drive, Absecon, New Jersey 08201 since 2008.

ggg. Robert Snodgrass and Cindi Snodgrass are Members of BALHOA residing at 9 Delray Lane, Absecon, New Jersey 08201 since 2008.

hhh.   Bharati Shah and Pratul Shah are Members of BALHOA residing at 11 Delray Lane, Absecon, New Jersey 08201 and 13 Delray Lane, Absecon, New Jersey 08201 since 2003.

iii.   Mary Ann McGowan and James McGowan are Members of BALHOA residing at 17 Delray Lane, Absecon, New Jersey 08201 since 2005.

jjj.   Saba Pullella is a Member of BALHOA residing at 25 Delray Lane, Absecon, New Jersey 08201 since 2005.

kkk.   Mortimer Mills and Tracey Mills are Members of BALHOA residing at 26 Delray Lane, Absecon, New Jersey 08201 since 2006.

lll.   Eileen Barag, Michael Barag, and William Rock are Members of BALHOA residing at 42 Delray Lane, Absecon, New Jersey 08201 since 2005.

mmm.   Joseph Sanchez and Sandra Sanchez are Members of BALHOA residing at 72 Delray Lane, Absecon, New Jersy 08201 since 2007.

nnn.   Diana Guilmartin and Thomas Guilmartin are Members of BALHOA residing at 34 W Delray Lane, Absecon, New Jersey 08201 since 2006.

ooo.   Cupid Mitchell and Pearly Mitchell are Members of BALHOA residing at 62 W Delray Lane, Absecon, New Jersey 08201 since 2007.

5.   Defendant ACUA is a "public authority" within the meaning of the SWMA and the Municipal and County Utilities Authorities law, N.J.S.A. 40:14B-1 et seq.  with its principal office at P.O. Box 996 Pleasantville, New Jersey.  At all times material hereto, the ACUA was the owner and operator of the 102-acre sanitary landfill located at 6700 Delilah Road, Egg Harbor Township, New Jersey (the "Landfill").

6.   Matthew DeNafo, is the current President of the ACUA and is the Responsible Official designated in the Landfill's Air Pollution Control Operating Permit issued pursuant to the CAA and APCA (hereinafter the "Title V Permit") and Solid Waste Facility Permit issued pursuant to RCRA and the SWMA (hereinafter the "SWF Permit").

7.    Matthew DeNafo resides at 1740 Arrowhead Drive, Waterford Works, New Jersey 08089.

8.    Gary Conover, is the current Vice President of Solid Waste at the ACUA and the Responsible Facility Representative for the ACUA's Fenceline Air Monitoring Plan for Hydrogen Sulfide.

9.    Gary Conover resides at 480 Poplar Avenue, Galloway, New Jersey 08205.

10.    Richard Dovey is the former President of the ACUA and the former Responsible Official under the ACUA's Title V Permit and SWF Permit.

11.    Richard Dovey resides at 539 Boston Avenue, Egg Harbor City, New Jersey 08215.


### JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to Article III, Section 2 of the United States Constitution conferring jurisdiction to federal courts over "all cases, in law and equity, arising under this Constitution, [and] the laws of the United States."

13.    This Court also has jurisdiction over this case pursuant to 28 U.S.C. § 1331 which confers subject matter jurisdiction over cases that "arise under" federal law, namely the claims set forth in this Complaint pursuant to the Resource Conservation and Recovery Act ("RCRA") - 42 U.S.C. §§ 6972(a)(1)(A), (B); Clean Air Act ("CAA") - 42 U.S.C. § 7604(a)(1); and 42 U.S.C. § 1983.

14.     This Court also has jurisdiction over this case pursuant to 28 U.S.C. § 1367(a) which confers "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."

15.     On September 29, 2023, Plaintiffs gave notice of their intent to file suit under RCRA and the CAA to the ACUA, the Administrator of the Environmental Protection Agency ("USEPA"), and the New Jersey Department of Environmental Protection ("NJDEP"), as required by 42 U.S.C. §§ 6972(b)(1)(A), (b)(2)(A) and 42 U.S.C. § 7604(b)(1). A copy of this notice letter is attached to this complaint as Exhibit A and is incorporated herein by reference.

16.     To date, the ACUA, USEPA, or NJDEP have not responded to the September 29, 2023 notice letter.

## INTRODUCTION

17.     On a Wednesday morning of the last week of October 1948, a fog settled into a small town in Western Pennsylvania on the banks of the Monongahela River.  The fog persisted for several days. The gaseous plume was everywhere—in the outside air and the inside air of people's homes, workplaces and shopping venues.  There was no place in the community where a person could escape it.  When it finally lifted twenty (20) people were dead. And some 6,000 others were sickened with severe respiratory illness.  Among the 20 who died, 19 were 55 and older, and the median age was 65.[8]

---

[8] U.S. Public Health Service, "Air Pollution in Donora, PA: Epidemiology of the Unusual Smog Episode of October 1948," Pub. Health Bull. No. 306 (1949), pp. 47-54.

18.     A six month investigation by the U.S. Public Health Service, which dispatched a 25-person team of medical, epidemiological, and sanitary engineering experts to study the catastrophic event, concluded that the deaths and illnesses were caused by exposure to plumes of industrial air pollutants, primarily sulfur-based compounds, which became trapped at ground level during an atmospheric air inversion event.[9]

19.     The common symptom among those sickened or killed was a persistent cough, sore throat, shortness of breath (i.e. "dyspnoea"), constriction of the chest, eye irritation, nausea, headache, and weakness. And people were not the only ones affected.[10]  Hundreds of dogs also were sickened and ten (10) died, most were either very young or old, and they had many of the same symptoms as the people—cough, sneezing, dyspnoea, and nasal discharge.[11]

20.     Even after the episode ended, the acute health effects of the exposures, including the cough, lingered for days mostly among those over 55 years of age.[12]

21.     Autopsies of the 20 people who died showed the victims' respiratory tracts were irritated, not by air pollutants which killed them instantly but essentially by pollutants that irritated their respiratory tracts over time:

> The data presented in the biological studies indicate that the clinical syndrome was characterized essentially by irritation of the respiratory tract which was especially severe in elderly persons and those with known chronic cardiorespiratory disease. The data indicate, furthermore, that the episode was not due to an accidental occurrence but rather resulted from the accumulation of

---

[9] Ibid. pp. iv, 161..
[10] Ibid. Figure 7.
[11] Ibid. p. 58.
[12] Ibid. Table 12.

atmospheric pollutants during an unusually intense and prolonged stable air condition.[13]

22.     The report of the Public Health Service (the federal agency which now houses the Agency for Toxic Substances and Disease Control, "ATSDR") likened the observed effects to exposure to a gaseous air pollutant with a low irritating capacity which caused respiratory congestion and eventually death:

> The evidence derived by autopsy discloses that the larynx, trachea and bronchi of the first order were little affected. Apparently, the irritating agent was carried into the lung and exerted its primary effect upon the terminal bronchi, the bronchioles and the pulmonary parenchyma. *However, that agent must have had a low irritating capacity since none of the cases exhibited a degree of hemorrhage, oedema or necrotizing process commonly associated with the inhalation of lethal irritating substances. Analogy might be made here with certain war gases. Phosgene, for example, has little effect upon the upper respiratory tract. The finer bronchi and lungs undergo an intense oedema and congestion during the acute phase of the poisoning. Later, a purulent bronchiolitis supervenes with spread of the exudate for a variable distance into the surrounding alveoli.*[14]

23.     The Denora tragedy illustrated the brutal efficiency of air pollution, which is categorically more dangerous than all other forms of environmental pollution.  When the water we drink is polluted we can avoid it by finding another source or by treating it before it is consumed. The same goes for contaminated soil, which we can avoid by capping it or by removing it.  But when the air we breathe is polluted there is no avoiding it.  No matter where we go it will find us.  Inside our homes. Upstairs in our bedrooms. Under our bed covers. Behind scented candles, air fresheners, and air filters.

---

[13] Ibid. p. 161.
[14] Ibid. p. 45.

24.     The tragedy in Donora, Pennsylvania was a watershed moment in the Nation's efforts to protect the public health and welfare from the dangers posed by air pollution.  It catalyzed state legislatures and the U.S Congress to enact a series of new state and federal laws, each building on collective experience and evolving over time, to protect people from the dangers of air pollution.

25.     Denora was the impetus for the rise of the system of cooperative federalism in the sphere of environmental protection in which federal laws establish minimum national standards implemented by the states through their own laws and regulations, with parallel enforcement by both USEPA and state agencies with expertise in pollution, including the NJDEP.

26.     The laws and regulations which have been enacted to govern the siting, design, permitting, and operation of solid waste landfills represents the accumulated wisdom of USEPA, NJDEP, and countless other state and local agencies responsible for protecting people from the pollution dangers posed by solid waste.  It is the sum of collective experience mitigating the risks to public health and welfare posed by the pollution created by sanitary landfills—a safety net, if you will, to protect people and the environment from the mistakes of the past.

27.     This case is about how the administrative agencies primarily responsible for implementing that safety net—the NJDEP, the ACUA, and the Atlantic County Division of Public Health ("ACDPH")—have failed to protect a defenseless elderly community from horrible and repeated exposures to noxious landfill air pollution which has sickened their bodies and severely diminished the quality of their lives.

## New Jersey's Air Pollution Commission of 1950

28.     In 1950, in the wake of the Denora tragedy, the New Jersey Legislature created an Air Pollution Commission to study the air pollution problems in New Jersey and to make recommendations to protect public health from its dangers.[15]

29.     The Air Pollution Commission studied air pollution problems in the state for more than two years.  It surveyed air pollution control efforts in other states and municipal departments of health from across the state, and it inspected dozens of industrial sources of air pollution. The Commission found that about 20 percent of all air pollution complaints statewide concerned "facilities used in the disposal of sewage and garbage," and that city dumps released "some of our most odoriferous pollutants" and were "among the worst pollution offenders."[16]

## Acute Toxicity of Hydrogen Sulfide (H2S) Emissions

30.     The most common odoriferous pollutants associated with sewage and garbage disposal operations is Hydrogen Sulfide (H2S), a highly toxic sulfur-based air pollutant produced by sulfur-reducing bacteria which feed on sulfur-containing wastes in sewage and refuse disposal facilities.

31.     H2S has a distinctively offensive odor of rotten eggs and feces, which readily is produced by bacteria feeding on sulfur-containing wastes common in municipal solid waste

---

[15] N.J. Air Pollution Commission, "Report to the New Jersey Legislature on Air Pollution in New Jersey and Recommendations for Abatement," (March 19, 1952).
[16] Ibid. at 8, 10 & 25.

("MSW"), also known as "putrescible waste." This is the everyday trash and garbage produced by homes, restaurants, casinos, and the like.  It is called "putrescible" (from the Latin *putridus*, or *putrere* "to rot") because it contains organic matter that readily decays emitting a "putrid" smell.

32.     Sulfur-containing wastes also are common in construction and demolition ("C&D") waste, which is waste generated by building renovations and demolitions and typically contains large amounts of sulfur containing gypsum drywall.

33.     With a vapor density of 1.19, H2S is slightly heavier than air (vapor density of 1.0) and therefore it sinks once it is emitted into the atmosphere.  A release of H2S at higher elevation will travel downhill under the force of gravity, where it easily may be inhaled by humans.[17] And because it is only slightly heavier than air it will readily move in light winds or with upward velocity from insolation.

34.     The lifetime of H2S in the ambient air is affected by ambient temperature and other atmospheric variables including sunshine, humidity, and the presence of other pollutants.[18] It has a residence time in the atmosphere in the northern hemisphere during winter of up to 40 days due to decreased levels of hydroxide and decreased temperatures.[19]

---

[17] NJDEP, Division of Air Quality, "Adopted New Rules: N.J.A.C. 7:27-17.10 and 22.36, "Permit and Reporting Requirements for Fumigants and Other Hazardous Air Pollutants," 54 N.J.R. 560(a), 594-595 (April 4, 2022).
[18] Abdollahi, M., Hosseini, A., 2014. "Hydrogen Sulfide." In: Wexler, P. (Ed.), *Encyclopedia of Toxicology*, 3rd edition vol 2. Elsevier Inc., Academic Press, pp. 971–974. ISBN: 9780123864543
[19] Ibid. p. 971.

35.     Once emitted to the atmosphere, H2S eventually is oxidized by oxygen-containing radicals to sulfur dioxide and sulfates.[20]

36.     H2S is responsible for thousands of deaths, including perhaps "one of the largest mass poisoning episodes in history."[21]

37.     In 1878 a passenger vessel on the Thames River in London collided with another vessel at the point on the river where untreated sewage and industrial effluent from London's sewer system discharged.  About 780 people went into the Thames as the vessel sunk.  Only 130 were rescued.  Several survivors later died due to exposure to the foul water.  The survivors described confronting unusually foul odors which bubbled up from the raw sewage floating on the river's surface and "giving out a stench strong enough to leave even the hardiest boatman gagging."[22]

38.     Many public health experts and sanitation engineers believe a substantial number of the victims of the 1878 *Princess Alice* disaster died from inhalation of H2S emitted by the raw sewage, which a chemist described as:

> Two continuous columns of decomposed fermenting sewage, hissing like soda-water with baneful gases, so black that the water is stained for miles and discharging a corrupt charnel-house odour, that will be remembered by all ... as being particularly depressing and sickening.[23]

---

[20] Ibid.
[21] Rubright, et al., "Environmental Toxicology of Hydrogen Sulfide," *Nitric Oxide*. 2017 December 01; 71: 1–13. doi:10.1016/j.niox.2017.09.011; Wikipedia, "Sinking of SS *Princess Alice*", available at https://en.wikipedia.org/wiki/Sinking_of_SS_Princess_Alice (last accessed May 20, 2024).
[22] Evans, "Princess Alice Disaster: The Thames' 650 forgotten dead", BBC News, https://www.bbc.com/news/uk-england-london-44800309 (last accessed May 20, 2024).
[23] Wikipedia, "Sinking of SS *Princess Alice*", https://en.wikipedia.org/wiki/Sinking_of_SS_Princess_Alice (last accessed May 23, 2024).

tras

**New Jersey's Air Pollution Control Act ("APCA") of 1954**

39.     In 1954, the Legislature acted on the recommendations of the Air Pollution Commission to pass the APCA, which at the time was only the third state-wide air pollution control law to be enacted in the country.

40.     The APCA defines "air pollution" as "the presence in the outdoor atmosphere of one or more air contaminants in such quantities and duration as are, or tend to be, injurious to human health or welfare, animal or plant life or property, or would unreasonably interfere with the enjoyment of life or property throughout the State . . ."[24]

41.     The APCA authorized the NJDEP to promulgate rules and regulations preventing, controlling, and prohibiting air pollution based upon quantity or concentrations which poses a potential threat to public health, welfare or the environment.[25]

42.     NJDEP specifically has found that H2S emitted from sanitary landfills—including the H2S emitted by the Landfill at issue in this case—poses a special risk to public health and welfare in surrounding communities:

> Hydrogen sulfide, whether emitted from a stack or as a fugitive air contaminant, enters the ambient atmosphere and participates in reactions that lead to the formation of acidic compounds. Fugitive emissions can occur at or near ground level or above ground level. . . *Landfills are typically built up and fugitive emissions can be emitted from locations significantly aboveground. Hydrogen sulfide (at 34 g-mole-1) is only slightly heavier than the ambient mixture (~29 g-mole-1) of the compounds that make air.* **Therefore, with the lightest of winds or**

---

[24] N.J.S.A 26:2C-2.
[25] N.J.S.A 26:2C-8.

*upward velocity from insolation, a release of H2S can easily travel downwind at inhalation height*.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*H2S has become a contaminant of concern nationwide*. The Department identified H2S as a NJHAP and established the corresponding threshold that applies no matter the source operation. *The Department has issued notices of violation to both operating and legacy landfills in the State (such as the Fenimore Landfill in Roxbury Township), requiring those landfills to address H2S emissions both on-site and off-site. For example, the Department required the Warren County District Sanitary Landfill in Oxford Township, an operating landfill, to install an upgraded landfill gas extraction system and a sulfur removal control system that processed landfill gas prior to combustion.* **Other operating landfills have also had to address H2S emissions and resulting odors due to their use of alternate cover material and their acceptance and disposal of certain waste streams, including Hurricane Sandy debris. As another example, after the Atlantic County Utilities Authority accepted Hurricane Sandy debris for disposal, the Department required the Authority to install a removal and treatment system for H2S gas, as well as a synthetic landfill cap to assist in preventing fugitive H2S emissions. The Department's enforcement actions at each of these landfills were to mitigate the impacts of H2S emissions off site** . . . (emphasis added).[26]

43.     NJDEP also has promulgated regulations designating H2S as a hazardous air pollutant ("HAP"), based upon its toxicity profile.[27]  NJDEP found that H2S "may result in a significant health impact"[28] and that it is "just as toxic or more toxic than Federally regulated HAPs . . .[with a] higher potential to cause a significant health impact than many of the Federally designated HAPs."[29]

44.     Landfill owners opposed NJDEP's proposed regulation designating H2S as a hazardous air pollutant, claiming that the existing system by which the public can file odor complaints with the NJDEP Hotline provides them with sufficient protection against H2S

---

[26] 54 N.J.R. 560(a), 594-595 (April 4, 2022).
[27] Ibid.
[28] Ibid. at 594.
[29] Ibid. at 590-591.

exposures.  The NJDEP rejected this assertion, unequivocally, in light of the risks H2S exposures pose vulnerable, overburdened environmental justice communities:

> H2S cannot always be smelled before it becomes a health threat. *According to the ATSDR, H2S can be smelled at low levels, but with continuous low-level exposure or at higher concentrations, the ability to smell the gas is lost, even though the gas is still present.* At high concentrations, a person may instantly lose the ability to smell the gas. As a result, a person might falsely think that H2S is no longer present, which may increase the risk of exposure to air levels that may cause serious health effects. ***For these reasons, relying on odor complaints from citizens in order to protect them from H2S emissions is problematic. This is especially important in overburdened communities where many facilities that emit H2S are located (including, but not limited to, refineries, landfills, sewage treatment plants, and waste-related source operations)*** (emphasis added).[30]

45.    The NJDEP also promulgated regulations prohibiting any sanitary landfill in the state from emitting H2S greater than 30 ppb, averaged over any 30 minute period, at the landfill property line or beyond:

> No person shall cause, suffer, allow, or permit hydrogen sulfide to be emitted from a sanitary landfill, legacy landfill, or closed sanitary landfill facility, as defined in the Solid Waste rules at N.J.A.C. 7:26-1.4 and 2A.9(b), in a concentration greater than 30 parts per billion by volume (ppbv) averaged over any 30-minute period at or beyond the property line of the sanitary landfill.[31]

46.    When it promulgated the regulation, the NJDEP made clear that it "is a health-based standard that [is] necessary to protect the health and well-being of communities proximal to landfills."[32]

---

[30] 54 N.J.R. 560(a), 599 (Response to Cmt. 155).
[31] N.J.A.C. 7-27-7.3 Discharge of Hydrogen Sulfide from a sanitary landfill
[32] 49 N.J.R. 2935(a), 2939 (Sept. 5, 2017)

47.    NJDEP specifically determined that exposure to H2S, even at 2 ppb, adversely effects human health:

> Numerous studies show the effect of H2S on human health. For example, the U.S. Environmental Protection Agency's (EPA's) Integrated Risk Information System ***has established an H2S chronic health value of one parts per billion by volume (ppbv) (two micrograms per cubic meter-ug/m3). This is an estimate of an air concentration that would cause no significant health effects for the human population, including sensitive subgroups, even if inhaled for up to a lifetime. It is based on data that showed damage to the nasal cavities (mucous membranes) of rats. The California Office of Environmental Health Hazard Assessment established an H2S acute health value of 30 ppbv (42 ug/m3) based on data from humans exposed to increasing concentrations of H2S. Human exposure to this H2S level for more than an hour could result in mild adverse health effects to the central nervous system including headache and nausea. Other H2S health studies suggest that H2S exposure may have negative effects on the respiratory tract, cardiovascular system, and nervous system.*** (emphasis added).[33]

48.    New Jersey's 30 ppb H2S standard is part of the New Jersey State Implementation Plan under the CAA, which means that the standard is federally enforceable either by USEPA or by any aggrieved citizen pursuant to the CAA citizen suit provision discussed below.[34]

49.    A Landfill's obligation to comply with the 30 ppb standard is a continuous obligation.

50.    Each exceedance of the 30 ppb standard is a separate violation, regardless of the number of exceedances in any single day.

---

[33] Ibid. at 2937.
[34] 40 C.F.R. §52.1570.

51.     The 30 ppb standard is a strict liability standard, which means that the owner or operator of the sanitary landfill is liable if the evidence shows the landfill is releasing H2S in excess of 30 ppb averaged over *any 30 minute period* at or beyond its property boundary.[35]

52.     The APCA imposed on every owner of an air pollution source a duty to warn whenever there is a release of air contaminants in a quantity or concentration posing a potential threat to people:

> A person who ***causes a release of air contaminants in a quantity or concentration which poses a potential threat to public health, welfare or the environment or which might reasonably result in citizen complaints shall immediately notify the department.*** A person who fails to so notify the department is liable to the penalties and procedures prescribed in this section. (emphasis added).[36]

53.     The APCA made it a crime of the third degree to purposely or knowingly make any false material statement, representation, or certification in any form, notice, statement, or report required in connection with an operating permit, or to purposely or knowingly render inaccurate any monitoring device or method required by an operating permit.[37]

**New Jersey's Solid Waste Management Act ("SWMA") of 1970**

54.     In 1970, New Jersey enacted the SWMA, which declared that the collection, disposal and utilization of solid waste is "a matter of grave concern to all citizens and is an

---

[35] *See Dept. of Health v. Concrete Specialties, Inc*, 112 N.J. Super. 407, 411 (App. Div. 1970) (air pollution standards under the APCA are strict liability standards a violation of which is proven by a preponderance of the evidence demonstrating that the proscribed act was committed.)
[36] N.J.S.A 26 :2C-19.e.
[37] N.J.S.A 26 :2C-19.f.(3).

activity thoroughly affected with the public interest," and that "the health, safety and welfare of the people requires efficient and reasonable solid waste collection and disposal service."[38]

55.    The SWMA defined "solid waste" as garbage, refuse, and other discarded materials resulting from industrial, commercial and agricultural operations, and from domestic and community activities.[39]

56.    The SWMA defined a "sanitary landfill facility" as a solid waste facility at which solid waste is deposited on or in the land as fill for the purpose of permanent disposal or storage for a period exceeding six months. . ."[40]

57.    The SWMA designated each county in the State as a Solid Waste Management District mandated to develop and implement a comprehensive Solid Waste Management Plan to protect and preserve the public health, safety and welfare from the dangers posed by solid waste.[41]

58.    Many of New Jersey's counties opted for an "open market" for solid waste disposal, meaning that solid waste generated in those counties can be disposed of either at any in-state licensed disposal facility or an out of state facility.  This is the system implemented by Bergen, Camden, Cape May, Hunterdon, Middlesex, Monmouth, Ocean, Passaic, Somerset, and Warren Counties.

---

[38] N.J.S.A. 13:1E-2.
[39] N.J.S.A. 13:1E-3.
[40] N.J.S.A. 13:1E-3.
[41] N.J.S.A. 13:1E-2 and 35.

59.     In contrast, the Atlantic County Solid Waste Management Plan directs that all solid waste generated in Atlantic County be directed to the Landfill.

60.     The SWMA authorized the NJDEP to promulgate rules and regulations concerning solid waste collection and disposal in sanitary landfills, and standards for the construction and operation of sanitary landfills.[42]

61.     In 1974, the NJDEP promulgated rules governing the general design, operation, and permitting of solid waste facilities, including sanitary landfills, which since have been amended multiple times.[43]

62.     The NJDEP regulations governing solid waste facilities provide that a permit may be terminated for, *inter alia*, violations of any permit conditions, failure to disclose fully all relevant facts or misrepresentation of any relevant facts at any time, or if the facility is endangering human health or the environment, or has the potential to do so, or is being operated in an "environmentally unsound manner," which includes:

> any persistent or continuous condition resulting from the methods of operation or design of the solid waste facility which impairs the quality of the environment when compared to the surrounding background environment or any appropriate promulgated Federal. State county or municipal standard.[44]

---

[42] N.J.S.A 13:1E-6.
[43] N.J.A.C. 7:26-2, et seq.
[44] 7:26-2.6(c) and 7:26-1.4

63.     In the late 1970's, several New Jersey landfills operated during nighttime hours, which severely disrupted residential communities, including the Combe Landfill in Mt. Olive, Morris County, and the Kramer Landfill in Mantua, Gloucester County.

64.     The 1981, the SWMA was amended to strictly prohibit any sanitary landfill located within 1,000 feet of any area zoned residential from operating before 7:00 AM or after 7:00 PM:

> Notwithstanding the provisions of P.L.1970, c. 40 (C. 48:13A-1 et seq.) *or any other law, rule or regulation to the contrary*, *no solid waste disposal facility located in or within 1000 feet of any area zoned residential*, other than a resource recovery facility, a baling facility and its related operations, a transfer station, or a recycling facility, shall be operated on any day before 7:00 a.m. or after 7:00 p.m.; provided, however, the department, upon finding that the public health, safety or welfare so requires, is authorized to exempt any solid waste disposal facility from the provisions of this supplementary act.[45]

65.     The 1981 amendments to the SWMA also made "every owner and operator of a sanitary landfill facility . . . jointly and severally liable for the proper operation and closure of the facility, as required by law, and for any damages, no matter by whom sustained, proximately resulting from the operations or closure."[46]

66.     In 1987, NJDEP promulgated additional specific disposal regulations for sanitary landfills pursuant to its authority under the SWMA and APCA, which implemented the USEPA's minimum criteria for sanitary landfills, described below, and imposed a number of specific additional requirements upon sanitary landfills.[47]

---

[45] N.J.S.A. 13:1E-15.1. Hours of operation; facility within 1000 feet of residential zone.
[46] N.J.S.A. 13:1E-103.
[47] N.J.A.C. 7:26-2A.1, et seq.

67.     The regulations strictly prohibited any sanitary landfill located within 1,000 feet of any residential zone from operating at night, without exception:

> ***Access to the sanitary landfill for solid waste disposal*** shall be permitted only during the operating hours set by the Division of Sustainable Waste Management and ***shall be restricted to 7:00 A.M. to 7:00 P.M. in areas within 1,000 feet of a residential zone***.[48]

68.     The regulations also required each landfill owner/operator to construct a gas collection and control system ("GCCS") to prevent migration of landfill gases off-site, contain malodorous odors, and prevent degradation of the ambient air quality. Each sanitary landfill must install:

  a.   A landfill gas collection to prevent the migration of sanitary landfill gases off-site and specifically to contain malodorous gases on-site.[49]

  b.   an offsite H2S monitoring systems if deemed necessary based on:

   i.    H2S odors,

   ii.   history of odor violations and complaints attributed to the landfill,

   iii.  locations of off-site areas of human use an occupancy,

   iv.   material placed in the landfill,

   v.    monitored levels of H2S, and

   vi.   other factors related to H2S emissions from the sanitary landfill and their potential off-site impacts.[50]

---

[48] N.J.A.C. 7:26-2A.8(b)24.
[49] N.J.A.C. 7:26-2A.7(f)
[50] N.J.A.C. 7:26-2A.7(h)10.

69.     NJDEP's sanitary landfill regulations also prohibited the continued operation of a landfill within 10,000 feet of an airport if it is determined "to present a real or potential attraction for birds, ***until an effective deterrent plan is implemented***." (emphasis added).[51]

70.     New Jersey's sanitary landfill regulations are part of the New Jersey State Implementation plan which means that the standard is federally enforceable either by USEPA or by any aggrieved citizen pursuant to the CAA citizen suit provision discussed below.[52]

71.     In recent years, a number of sanitary landfills in New Jersey were permanently closed and capped because of chronic violations of the aforementioned H2S 30 ppb standard that posed an unreasonable threat to the public health.

72.     Permanent capping and installation of an effective gas collection and control system with H2S treatment virtually eliminates excessive H2S emissions.

73.     In 2019, the Hudson County Superior Court ordered the permanent closure and capping of a sanitary landfill owned by the New Jersey Sports and Exposition Authority, the Keegan Landfill in Kearney, New Jersey, because it was unable to continuously comply with the 30 ppb H2S standard and therefore was deemed to pose an unreasonable health threat to the surrounding community.[53]

74.     Today, the Keegan Landfill is permanently capped with an effective gas collection and control system which has eliminated the excessive H2S emissions.

---

[51] N.J.A.C. 7:26-2A.4(k).
[52] 40 C.F.R. §52.1570.
[53] *Town of Kearny v. Sports and Exposition Authority*, Civil Action Docket No. C-72-19 (Hudson Cty. Sup. Ct., Ch. Div.), (September 30, 2019).

75.     In 2013, the NJDEP ordered the permanent closure and capping of the Fenimore Landfill in Roxbury Township, New Jersey, because it was unable to continuously comply with the 30 ppb H2S standard and therefore was deemed to pose an unreasonable health threat to the surrounding community.

76.     Today, the Fenimore Landfill is permanently capped with an effective gas collection and control system which has eliminated the excessive H2S emissions.

### The Federal Clean Air Act ("CAA") of 1970

77.     In 1955, a year after New Jersey enacted the APCA, the U.S. Congress enacted the first of several progressively more comprehensive air pollution control laws which ultimately became the federal CAA.

78.     The CAA declares that the growth in the amount and complexity of air pollution has resulted in mounting dangers to the public health and welfare, and declares that the purpose of the CAA is to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population.[54]

79.     The CAA authorizes the USEPA to promulgate standards of performance for new sources of conventional air pollutants and emissions standards for sources of hazardous air pollutants.[55] USEPA has promulgated two such standards applicable to sanitary landfills: (1) the federal Standards of Performance for Municipal Solid Waste Landfills (the "Landfill

---

[54] 42 U.S.C. § 7401.
[55] 42 U.S.C. §§ 7411, 7412.

NSPS")[56] and National Emission Standards for Hazardous Air Pollutants: Municipal Solid Waste Landfills (the "Landfill NESHAP").[57]

80.     The Landfill NSPS and Landfill NESHAP both define a "municipal solid waste landfill" as "an entire disposal facility in a contiguous geographical space where household waste is placed in or on land, and may also include other types of waste, such as construction and demolition waste ("C&D"). The regulations require MSW landfills to capture and control "MSW landfill emissions," which is gas generated by the decomposition of organic waste deposited in an MSW landfill or derived from the evolution of organic compounds in the waste.

81.     Landfill gas is produced by the bacteria in the landfill.  Landfill gas includes methane,[58] more than 100 different non-methane organic compounds ("NMOCs"), and any other gases, such as H2S, produced by landfills and found to be toxic to humans, including benzene, ethylbenzene, and vinyl chloride.[59]

82.     The GCCS must capture and control the fugitive emissions of air pollutants generated by the bacteria in the landfill.  The regulations specifically define the meaning of a GCCS, which consists of a network of vertical gas collection wells and piping conveyances, which in conjunction with a soil cover system, is designed to create a sufficient vacuum to

---

[56] 40 C.F.R. Part 60, Subpart XXX, §§ 60.750-60.759.

[57] 40 C.F.R. Part 63, Subpart AAAA, §§ 63.1930-60.1990.

[58] Methane is a potent greenhouse gas ("GHG") 28–36 times more powerful at trapping heat than carbon dioxide ("CO2") with an atmospheric life of about 12 years. According to USEPA, because of methane's potency as a GHG and its atmospheric life, reducing methane emissions from landfills is one of the best ways to achieve near-term beneficial impacts to mitigate global climate change

[59] *See* USEPA, *National Emission Standards for Hazardous Air Pollutants: Municipal Solid Waste Landfills Residual Risk and Technology Review*, 84 Fed. Reg. 36670, 36674 (July 29, 2019).

capture fugitive emissions of landfill gas. The Landfill's soil cover system is part of the GCCS and it is required to include that portion which covers the waste, as well as the portion which borders the waste extended to the point where it is sealed with the Landfill liner or the surrounding land mass.[60]

83.     Not all of the gas generated by the landfill waste is collected by the GCCS. A portion of the landfill gas is not collected by the GCCS. This LFG is emitted to the ambient air and is the source of the BAL Residents' exposures. The efficiency of the ACUA's GCCS in collecting LFG before it is emitted to the ambient air depends on a number of factors, including most importantly the effectiveness of the daily, intermediate, and final cover in preventing LFG from passing through the cover into the ambient air. The Landfill's cover is part of the GCCS and it is required to include that portion which covers the waste, as well as the portion which borders the waste extended to the point where it is sealed with the Landfill liner or the surrounding land mass. Thus, the Landfill's cover includes the entire lateral extent of the Landfill surface, plus the Landfill's massive new retaining wall constructed along the Eastern and Northeastern quadrant, which allowed the ACUA to vertically expand the Landfill and accept more waste. Also, the aerial extent of the Landfill has grown with the construction of the 15-acre Cell #9 and the 60-foot retaining wall which wraps 3,000 feet around the Eastern and Northeastern quadrants of the Landfill and created a vertical face.

84.     At the Landfill's surface, intermediate and final cover are designed to provide a seal between the Landfill and the atmosphere. The intermediate and final cover is considered to

---

[60] 40 C.F.R. § 63.1990 (def. of "Cover Penetration . . . The landfill cover includes that portion which covers the waste, as well as the portion which borders the waste extended to the point where it is sealed with the landfill liner or the surrounding land mass.").

be part of the GCCS design. The more impermeable the seal on the surface of the Landfill the more vacuum can be applied to landfill gas collectors to minimize fugitive emissions. In turn, cover material that is too porous or thin, or is penetrated by poorly sealed objects—which includes any gaps in the Landfill cap—destroys the vacuum, causes the GCCS to lose efficiency, and increases fugitive emissions of LFG.

85.     Congress amended the CAA in 1990 to create an operating permit program for major sources of air pollution, including municipal solid waste landfills, in which all applicable air quality control requirements from other CAA programs and from state rules and regulations are contained in a single operating permit.[61]  Such permits are commonly called "Title V" permits.

86.     The NJDEP has issued a Title V permit pursuant to the APCA and the CAA to the ACUA Landfill, Air Pollution Control Operating Permit, BOP210001, NJDEP ID No. 70506 (July 13, 2021) ("Title V Permit").

87.     The ACUA's Title V Permit limits H2S emissions to 5.01 lb/hr,  12.9 tons/year, 30 ppb averaged over any 30-minute period at or beyond the property boundary, and VOC emissions to 3.38 lb/hr and 14.8 tons/year (VOCs).[62]

88.     The CAA made it a crime for any person to knowingly make any false material statement, representation, or certification in, or to omits material information from, or to knowingly alter, conceal, or fail to file or maintain any notice, application, record, report, plan, or other document required under the CAA to be either filed or maintained (whether with

---

[61] 42 U.S.C. §§ 7661-7661f.
[62] Title V Permit, Emission Unit U99 GCCS, OS Summary Ref## 3 & 5 and OS1 Ref## 1 & 3.

respect to the requirements imposed by the Administrator or by a State), or to falsify, tamper with, render inaccurate, or fail to install any monitoring device or method required to be maintained or followed under the CAA.[63]

89.     Upon finding a violation of any federal or state air pollution control standard contained in any Title V permit or in the state's approved State Implementation Plan, the CAA specifically authorized any person to bring suit in Federal District Court against any person alleged to have violated or to be in violation of any such emission standard or limitation.[64]

90.     "[C]itizen suits are a proven enforcement tool. They operate as Congress intended—to both spur and supplement … government enforcement actions. They have deterred violators and achieved significant compliance gains."[65]

91.     "Congress intended citizen suits to both goad the responsible agencies to more vigorous enforcement of the anti-pollution standards and, if the agencies remained inert, to provide an alternate enforcement mechanism."[66]

92.     In any citizen suit proceeding, the CAA provides that any credible evidence may be used to prove a violation of an emissions standard, not just the test method specified in a sanitary landfill's Title V Permit.[67]

---

[63] 42 U.S.C. § 7413(c)(2).

[64] 42 U.S.C. § 7604.

[65] S. REP. No. 50, 99th Cong. 1st Sess. 28 (1985).

[66] *Baughman v. Bradford Coal Co.*, 592 F.2d 215, 218 (3d Cir. 1979), citing S.Rep. No. 1196, 91st Cong., 2d Sess. 2, 35-36 (1970) and the comments of Senator Muskie and Senator Boggs in 116 Cong.Rec. (1970) at pp. 32902, 32918.

[67] *See* CAA Section 113(e), 42 U.S.C. § 7413(e) ("In determining the amount of any penalty to be assessed under this section or section 7604(a) of this title . . . the court, as appropriate, shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, *the duration of the violation as*

93.     Accordingly, a violation of the 30 ppb H2S standard by a sanitary landfill can be proven by any credible evidence demonstrating that the landfill released H2S above 30 ppb at or beyond its property line over any 30 minute period.

**Resource Conservation and Recovery Act of 1976**

94.     In 1965, the U.S. Congress enacted the first of several progressively more comprehensive solid waste laws which ultimately became the 1976 RCRA amendments, which established a comprehensive federal system to protect people and the environment from the dangers posed by the disposal of solid waste on the land.

95.     RCRA declared that disposal of solid waste in or on the land without careful planning and management can present a danger to human health and the environment, and that "inadequate and environmentally unsound practices for the disposal or use of solid waste have created greater amounts of air and water pollution and other problems for the environment and for health."[68]

---

*established by any credible evidence (including evidence other than the applicable test method)*, payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation."); 40 C.F.R. 51.12 (Source Surveillance) ("for the purpose of establishing whether or not a person has violated or is in violation of any provision of the plan, nothing in this part shall preclude the use, *including the exclusive use, of any credible evidence or information, relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test procedures or methods had been performed.*"); *see also*, USEPA, Credible Evidence Revisions, 62 Fed. Reg. 8314, 8315 (Feb. 24, 1997 ("various kinds of information other than reference test data . . . may be used to demonstrate compliance or noncompliance with emission standards. . . EPA, state agencies and industry routinely rely on many types of information, including engineering calculations, indirect estimates of emissions, and direct measurement of emissions by a variety of means, in order to assess compliance with CAA requirements. Where available, continuous emission monitoring (CEM) data and well-chosen parametric monitoring data, such as the operating temperature and air flow rate of a regenerative thermal oxidizer, generally provide accurate data regarding a source's compliance with emission limits and standards. These data also generally cover a greater percentage of a source's time in operation and are more representative of a source's ongoing compliance status.")
[68] 42 U.S.C. § 6901(a).

96.     RCRA declared that "open dumping" is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land.[69]

97.     RCRA established the national policy and objective of prohibiting future open dumping on the land and requiring the conversion of existing "open dumps" to facilities which do not pose a danger to the environment or to health.[70]

98.     RCRA defined "solid waste" as any garbage, refuse, or discarded material, including solid, liquid, semisolid, or *contained gaseous material* resulting from industrial, commercial, mining, and agricultural operations, and from community activities.[71]

99.     RCRA Subtitle D, "State or Regional Solid Waste Plans," required USEPA to develop national levels of performance for the disposal of solid wastes on the land that provided at a minimum for:

    a.  protection of public health and welfare;

    b.  protection of the quality of ground waters and surface waters from leachates;

    c.  protection of the quality of surface waters from runoff through compliance with effluent limitations under the Federal Water Pollution Control Act, as amended;

    d.  *protection of ambient air quality through compliance with new source performance standards or requirements of air quality implementation plans under the Clean Air Act*, as amended;

    e.  disease and vector control;

    f.  safety; and

---

[69] 42 U.S.C. § 6901(b).
[70] 42 U.S.C. § 6902.
[71] 42 U.S.C. § 6903.

g.   esthetics.[72]

100.    RCRA Subtitle D directed that the foregoing minimum criteria developed by USEPA be used by the States to define those solid waste management practices which constitute the "open dumping" of solid waste, which is prohibited under the Act.[73]

101.    RCRA Subtitle D prohibited the disposal of solid waste in any "open dumps," defined as any facility or site where solid waste is disposed which is not a "sanitary landfill," meeting the above-referenced minimum criteria established by USEPA for "sanitary landfills."[74]

102.    RCRA provided that a facility where solid waste is disposed can "be classified as a sanitary landfill and not an open dump only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility."[75]

103.    The regulations promulgated by USEPA to ensure that a facility qualifies as a sanitary landfill take the form of "minimum criteria."[76] If a solid waste disposal facility fails to comply with the minimum criteria established by USEPA, the facility is deemed to be an "open dump," which is prohibited under the statute.[77]

---

[72] 42 U.S.C. § 6907 (emphasis added).
[73] *Id.*
[74] 42 U.S.C. §§ 6903(14), 6944.
[75] 42 U.S.C. § 6944(a).
[76] 42 U.S.C. § 6907(a)(3).
[77] *Id.* §§ 6944, 6903(14).

104.     A solid waste disposal facility operating as an "open dump" (i.e., a facility out of compliance with EPA's criteria) must be "clos[ed] or upgrad[ed]" and is subject to citizen suits for "open dumping."[78]

105.     In 1979, USEPA promulgated the minimum criteria governing the siting and operation of sanitary landfills, which defined:

> the minimum criteria for determining what solid waste disposal facilities and practices pose a reasonable probability of adverse effects on health and the environment. Those facilities that violate the criteria are "open dumps" for purposes of the State Solid Waste Management planning effort supported by EPA under Subtitle D of the Resource Conservation and Recovery Act (RCRA).[79]

106.     The USEPA minimum criteria governing the siting and operation of sanitary landfills prohibited any facility or practice from violating applicable requirements developed under any State Implementation approved by USEPA under CAA Section 110.[80]

107.     The USEPA minimum criteria required sanitary landfills to minimize disease vectors through the "periodic application of cover material or other techniques as appropriate so as to protect public health."[81] The regulation defined "periodic application of cover material" as "the application and compaction of soil or other suitable material over disposed solid waste at the end of each operating day or at such frequencies end in such a manner as to reduce the risk of fire and to impede vector's access to the waste."

---

[78] *Id.* § 6945.
[79] USEPA, "Criteria for Classification of Solid Waste Disposal Facilities and Practices, 40 C.F.R. Part 257, 44 Fed. Reg. 53438, 53459 (Sept. 13, 1979).
[80] 40 C.F.R. 257.3-7(b) Air (1979).
[81] 40 C.R.F. 257.3-6 Disease (1979).

108.    The USEPA minimum criteria also prohibited landfilling of "putrescible waste" within 10,000 feet of any jet aircraft airport runway in any manner that posed a "bird hazard to aircraft," defined as "an increase in the likelihood of bird/ aircraft collisions that may cause damage to the aircraft or injury to its occupants."[82] The regulation defined "putrescible wastes" as solid waste which contains organic matter capable of being decomposed by microorganisms and of such a character and proportion as to be capable of attracting or providing food for birds.

109.    In promulgating minimum criteria for airport safety in connection with sanitary landfills, USEPA made clear that disposal of putrescible wastes, even with vector control efforts of covering the waste, still can unavoidably attract birds posing an increase risk to aircraft:

> Many reports and investigations show that disposal facilities and practices involving putrescible wastes often attract birds, in spite of vector control efforts (compaction and cover of wastes, etc.). When solid wastes are disposed in the vicinity of airports, the birds attracted to the area can present a significant risk of accidents due to collisions between birds and planes.[83]

110.    USEPA specifically relied upon Congressional intent which made clear based upon several aircraft disasters that sanitary landfills near commercial airports serving jet aircraft pose a grave risk due to the attraction of flocking birds.[84]

---

[82] 40 C.F.R. 257.3-8(c) Safety (1979).
[83] 44 Fed. Reg. 53438, 53459 (Sept. 13, 1979).
[84] *See* H.Rep. No. 94-1491, p. 38 (noting the DeKalb County Airport plane crash caused by a collision with a flock of starlings)

111.    In 1960, an Eastern Airlines passenger jet taking off at Boston's Logan Airport struck a flock of starlings known by airport authorities to frequent a nearby landfill. The plane crashed into Boston Harbor, killing 59 passengers and 3 crewmembers. In subsequent wrongful death litigation, the airport authority was held to be liable for failing to close-down the dumping area, knowing that it was a bird attractant that posed a risk to aircraft taking off and landing at the airport.[85]

112.    In 1973, a passenger jet taking off from DeKalb Peachtree airport near Atlanta ingested a flock of starlings near a landfill close to the airport. The jet aircraft crashed killing all seven passengers and crew. The FAA previously had identified the bird problem at the landfill and had been attempting to get the county to close the landfill since 1970.[86]

113.    In 1975, a passenger jet carrying 139 people attempted a take-off at John F. Kennedy International Airport in New York when it collided with a flock of sea gulls attracted by nearby dumps. One of the DC-10's engines ingested a "large number" of gulls causing a fire and forcing the pilot to abort the take-off. While none of the passengers died, 2 were seriously injured and the aircraft was completely destroyed by fire.[87]

114.    In 1991, USEPA amended its regulations establishing the minimum criteria for sanitary landfills.[88] The amended criteria specified new cover requirements mandating that sanitary landfills cover landfilled waste with at least six inches of "earthen material" at the end

---

[85] *See Rapp v. Eastern Air Lines, Inc*., 264 F. Supp. 673 (E.D. Pa 1967).
[86] *See* NTSB, Aircraft Accident Report (May 30, 1973).
[87] *See* NTSB, Aircraft Accident Report, Nov. 12, 1975 Overseas National Airways, JFK Airport (Dec. 16, 1976).
[88] 56 Fed. Reg. 50978 (Oct. 9, 1991).

of each operating day, or more frequently if necessary to control disease vectors, fires, odors, blowing litter, and scavenging.[89]

115.     The amended minimum criteria also made clear that landfills located within 10,000 feet of jet aircraft airports must affirmatively demonstrate that their operations do not pose a "bird hazard":

> Owners or operators of new MSWLF units, *existing MSWLF units*, *and lateral expansions* that are located within 10,000 feet (3,048 meters) of any airport runway end used by turbojet aircraft or within 5,000 feet (1,524 meters) of any airport runway end used by only piston-type aircraft *must demonstrate that the units are designed **and operated** so that the MSWLF unit does not pose a bird hazard to aircraft. . .  For purposes of this section . . . **Bird hazard means an increase in the likelihood of bird/aircraft collisions that may cause damage to the aircraft or injury to its occupants**.* (emphasis added).[90]

116.     In its rulemaking, USEPA made clear that if a landfill within 10,000 feet of an airport cannot demonstrate it will not "increase the likelihood of bird/aircraft collisions," it must be shut-down:

> Under today's rule, owners or operators of new MSWLF units, *existing MSWLF units*, and lateral expansions located within 10,000 feet (3,048 meters) of any airport runway end used by turbojet aircraft or within 5,000 feet (1,524 meters) of any airport runway end used only by piston-type aircraft *must demonstrate that the unit does not pose a bird hazard to aircraft* . . . the Agency also wishes to clarify that today's airport safety criteria do not prohibit the disposal of solid waste within the specified distances, ***unless the owner or operator is unable to make the required demonstration showing that the landfill is designed <u>and operated so as not to pose a bird hazard</u>**.* (emphasis added).[91]

---

[89] 40 CFR 258.21
[90] 40 C.F.R. 258.10 (Airport Safety).
[91] 56 FR 50978, 51004, 51043 (October 9, 1991).

117.    The NJDEP has issued to the ACUA a Solid Waste Facility permit pursuant to the SWMA and RCRA, Solid Waste Facility Permit SWF210001, NJDEP ID No. 143393 (Oct 17, 2022) ("Solid Waste Permit"), which imposes conditions upon the continued operations of the Landfill.

118.    In 1984, Congress amended RCRA to expand the right of citizens to enforce RCRA. Any person may bring suit in the Federal District Court to enjoin any owner or operator of a solid waste disposal facility alleged to be in violation of any permit, standard or regulation, condition, requirement, or prohibition or has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.[92]

119.    In its 1984 amendments to RCRA, Congress instructed that citizen enforcement "is intended to allow citizens exactly the same broad substantive and procedural claim for relief which is already available to the United States under section 7003."[93]

120.    The foregoing statutes and regulations are the basic architecture of the safety net of cooperative federalism developed over the past 70 years to protect New Jerseyans from the dangers posed by sanitary landfills.

121.    This case is about the unfortunate failure of that safety net to protect a vulnerable elderly community ravaged by uncontrolled landfill gas emissions from a publicly-

---

[92] 42 U.S.C. § 6972(a).
[93] S.Rep. No. 98-284, 98th Cong., 1st Sess., at 59 (1983).

owned landfill in chronic and continuing violation of its Title V and SWF Permits, which is being sanctioned by the very agencies sworn to protect them.

122.    Over the past 10 years the Residents and families in other communities surrounding the landfill in Absecon, Pleasantville, Galloway, and Egg Harbor Township have been frequently awakened by horrendous malodors.

123.    Many exposures occur late into the night when Residents are violently awakened by landfill gas intruding into their homes but with no place to go. The most basic of all defense mechanisms—flight—is not viable.

124.    That these exposures largely take place during sleeping hours, when the Residents are unable to flee and are most vulnerable, is a particularly cruel aspect of this matter.

125.    The exposures occur mostly at night because that is when the Landfill disposes of its putrescible waste.

126.    Many residents have considered selling their homes but there is a stigma associated with the BAL Community.  It is now widely known that the Community frequently is impacted by malodors from the Landfill.  For most of the Residents, selling is not viable.

127.    So, the Residents have endured the exposures to noxious landfill gas, night after night, month after month, and year after year, until one day they can take it no more.

**The BAL Community**

128.    BAL is an age-restricted retirement community in Absecon, New Jersey with 125 duplex style homes and common areas to support active, older adults.

129.    The land where the BAL Community rests was rezoned for residential use in 2000 and was improved between 2005 and 2006 with the construction of the retirement community.

130.    All of the BAL Residents are fifty-five years of age or older. Many purchased their homes using the savings from a lifetime of work so they could enjoy the amenities and tranquility of a planned retirement community.

131.    BAL offers a variety of amenities for older adults looking to socialize with friends and family and enjoy the outdoors. It has a large community clubhouse with an outdoor picnic area and patio, two freshwater ponds with fountains and sitting areas, a network of sidewalks for walking and biking, open space areas, and an estuarine stream named "Able's Run."

132.    The BAL community is a beautiful place to live except during the evening when noxious H2S gas from the Landfill seeps into the Residents' homes causing them to choke, vomit, and endure a host of other acute physical and psychological injuries, including sleep deprivation and depression.

**The Landfill**

133.    The Landfill is owned and operated by the ACUA, which is the solid waste agency for Atlantic County responsible for developing, implementing, and enforcing the Atlantic County Solid Waste Management Plan pursuant to the SWMA.[94]

134.    The Landfill is located in the 360-acre Atlantic County Environmental Park in Egg Harbor Township, New Jersey, which also includes the ACUA's 68,000 ft$^2$ transfer station for the storage of solid waste ("Transfer Station").

135.    The Landfill has never been visible at ground level from the BAL Community, even though the Southern property boundary of the community, located on the South side of Ables Run in a thick forested area, is approximately 250 feet from the property boundary of the Landfill along Block 603 Lot 10 in Egg Harbor Township and only approximately 750 feet from the Landfill's back gate at the end of Pleasant Avenue.

136.    A depiction of the property boundaries of the Landfill and the BAL Community are shown in the below 2020 aerial photograph from the NJDEP's NJ-GeoWeb GIS mapping program.

---

[94] *See* ATLANTIC COUNTY UTILITIES AUTHORITY RULES AND REGULATIONS FOR USE OF THE SOLID WASTE AND RECYCLING FACILITIES, effective January 1, 2024.



137.    When the BAL Community was built, the Landfill was smaller, lower, and produced less air pollution.

138.    Air pollution emissions from landfills, unlike typical air pollution sources, increases each year as more waste is added.  Landfill emissions peak shortly after the landfill closes, then gradually decrease over time.

139.    Over the intervening years, the Landfill has expanded multiple times to extend its useful life.  With each expansion of the Landfill, the impacts of its gaseous emissions on the BAL Community have progressively worsened.

140.    In 2005, without notice to the BAL Community, the ACUA initiated a lateral and vertical expansion, which added 15 acres of new disposal cells to the Landfill in the

direction of the BAL Community and increased the height of the Landfill by 80 feet to a maximum of 145 feet.[95]

141.    In 2014, without notice to the BAL Community, the ACUA expanded again with the construction of another new landfill cell (#9) in the eastern quadrant of the Landfill, which added another 19 acres of a new disposal area in the direction of the BAL Community.

142.    Between 2020 and 2022, without notice to the BAL Community, the ACUA expanded again with the construction of the first two phases of a three-phased, mile-long, 60-foot tall berm which enabled the ACUA to dispose of more waste in the Landfill by eliminating the side slopes of the Landfill on the side closest to BAL. This expansion moved the area of waste disposal ninety (90) feet closer to BAL and raised the elevation where solid waste is disposed another 36 feet.

143.    Upon information and belief, in anticipation of this action, the ACUA is improperly rushing forward with the construction of the last leg of the earthen berm at a cost of tens of millions of dollars so that it can argue that the investment tips the balance of interests in favor of the continued operation of the Landfill despite the ongoing health impacts to BAL.

### The BAL Residents Are Suffering from Acute and Chronic Adverse Health Impacts Caused by the Landfill's Air Pollution

144.    The BAL Community is much closer to the Landfill than any other residential community and it is low-lying, which unfortunately means that the community tends to collect heavier-than-air H2S pollution emitted by the Landfill, as shown in Figure 2 of the report

---

[95] *See In Matter of Amendments to Atlantic County Solid Waste Management Plan*, August 9, 2005.

prepared by John R. Gee, P.E., L.O., P.P., L.S.R.P. ("Gee Report"), attached hereto as Exhibit B.

145.    On hundreds of days and nights over the past 10 years, continuing to the present day, the BAL Residents are overwhelmed by malodorous H2S gas emitted by the Landfill, which a NJDEP investigator once described in 2014 is "*like walking into a wall of rotten odor suddenly. . . extremely objectionable odor –can almost taste.*"[96]

146.    Since 2014, the BAL Residents and other communities surrounding the Landfill have complained to the NJDEP "Hotline" more than 1,100 times, pleading for NJDEP to stop the continuing H2S emissions from the Landfill. A listing of these complaints, extracted from the NJDEP's database, is provided in Exhibit D.

147.    The complaints detail an array of acute injuries caused by H2S exposure, which includes difficulty breathing, nausea, vomiting, migraine headaches, eye, nose and throat irritation, persistent cough and other acute symptoms caused by exposure to H2S.

**The BAL Residents' Symptoms are Consistent with Acute H2S Exposure**

148.    The adverse health effects associated with the Residents' ongoing exposures to the Landfill's H2S emissions, which typically occur at night, is documented in the Residents' transcribed testimony at a public hearing on October 23, 2023, concerning the ACUA's proposed renewal of its Title V Permit:

> a.    "We wake up at about 3:00, 4:00, 5:00 in the morning and find it difficult to breathe, or feel nausea or headaches and find it difficult to get back to sleep. … Our noses get clogged. Like I said, we have headaches. We have lack of

---

[96] NJDEP ACUA Landfill Gas Odor Surveillance Data, Feb. 6, 2014 –March 24, 2014

sleep, and are tired all the time from waking up in the middle of the night not being able to get back to sleep."[97]

b.  "As a result of all of this, my speaking, my speech, my throat is constantly clogged up from the odors. I don't smoke, but, yet, I sound like I have a smokers voice. It was not like that before I moved to [BAL]. The illnesses, the coughing, the constant dry mouth … My health never had an issue until we moved into [BAL]. Blood pressure problems. I've been hospitalized."[98]

c.  "I never had a breathing problem whatsoever. I've never had a headache in my life, but all summer long I've been in and out of the Philadelphia VA Hospital. I got a stack of medical records like this from every time I've had to stop in the middle of the evening or early in the morning and I had to get rushed to the Philadelphia VA emergency room and didn't know whether or not I was going to stay for a week, two weeks, or four weeks. … [I]t got so bad where it felt like somebody had an ax at the top of my head. It felt like I had a vice just biting down on the bridge of my nose. I could not stop coughing. I could sit in this room and cough continuously over and over, and I'm taking cough pills and medicine, and nothing works."[99]

d.  "If by some grace of God we fall asleep, negating the odors, then at 5:30, 6:00 in the morning the cannons start, which is horrendous basically for us that live closest to there. It's an alarm clock that we don't need."[100]

e.  "The air quality in our master bedroom was so bad, it woke me up out of a deep sleep with the nausea which triggers a severe migraine."[101]

f.  "You can't sit outside and enjoy a nice evening with a fire roasting marshmallows because of the odors there. You just can't. It permeates inside the home, and the smell lingers and lingers. And long after the odor is gone eventually, if you're lucky, it will clear out."[102]

g.  "I get migraine headaches. I have migraine pills that I get. I've had MRIs. Sometimes just to go out and get the mail I get dizzy where I almost fall down."[103]

h.  "[E]xperiencing the eyes burning, different skin rashes unexplained, having to see a pulmonary specialist for my breathing, having to use an inhaler for the first time in my life. Walking out of the house and the smell is so strong, you become nauseated immediately, immediately, and the fear of the

---

[97] Title V Hearing Tr. Pg. 12:18-14:13 (hereinafter Tr.)
[98] Tr. Pg. 14:14-15:10
[99] Tr. Pg. 16:25-18:3.
[100] Tr. Pg. 20:11-15.
[101] Tr. Pg. 33:6-8.
[102] Tr. Pg. 34:18-23.
[103] Tr. Pg. 36:13-16.

45

chemicals that's being emitted through those smells going into our bodies is frightening."[104]

    i.   "One of the things that scares me the most is when I take my dogs out in the morning, and I come back and then I smell it in my house, and I realize that I've been inhaling this the entire evening through my sleep."[105]

149.    The Residents' testimony at the public hearing also documents their profound sense of isolation and depression caused by the repeated odor episodes, which deprive them of companionship of friends and family, including children and grandchildren, repelled by the odors:

    a.   "It's gas. And decomposing shellfish or -- or garbage that's been in a trash can for a couple days, or if you you've ever been fortunate to be behind a garbage truck in 90-degree weather, you know, and it smells a lot like that a lot of times. The effects when outsiders sometimes smell the odor and say what is that smell, we don't smell anything because we are accustomed to it. We say what are you talking about, but they smell it. It's embarrassing. The reputation of the residents is becoming known, and that's embarrassing. We can't have people over for dinner or festivities from about 4:00 p.m. for fear of them smelling the odor if it should present itself."[106]

    b.   "my family, they say we're not coming there. It stinks. And I don't like it. It hurts. It's because like you said, somebody will come over that hasn't been there in a long time and say to me, don't you smell it, don't you smell it? Yeah I smell it, but more so recently, I guess in the last year, it is so bad that we don't have animals, we don't have children, but you know what, would you live like that?"[107]

    c.   "I'm from Michigan. I have my family come over, because this is my first home, no one told me about the landfill. The first week I must have had that area full with cops, fire department and everything. I was like because I smelled gas. So they told me there's a landfill over here. I'm like what are you talking about, landfill. That's where the smell was coming from. I felt so embarrassed and hurt because no one told me that. The realtor, Pamela Stern from Re/Max, never told me that it was a landfill. And ever since then I feel depressed and --you know, just overall, this is my first home, you know. So I invited my family down this summer from Michigan, and they couldn't

---

[104] Tr. Pg. 38:14-21.
[105] Tr. Pg. 42:12-16.
[106] Tr. Pg. 13.
[107] Tr. Pg. 23.

even stay in my house two days. They had to get a hotel. They had to get a hotel. So I was just hurt."[108]

d.   "She's talking about the 8th, 9th, and 10th of October of this month. It was so bad those three days. For some reason it's the worst it's been since we lived there. We both called the DEP several times. We had a friend out for dinner and she left, and she said what is that smell. It was in her car. It's embarrassing."[109]

e.   "I don't want to live like this in this environment. It's killing me slowly. I'm in my 60s, late-60s. I didn't plan on this, you know, to have to -- I didn't plan to be here right now. I thought this has been going on for such a long period of time, they should have capped this a long time ago. It seems like we've been ignored. I don't know what it is, is it the money thing or whatever. Think about us on this side. Think about people in general, yes. I mean would you all want to live here, would you want to buy a house over here where we live, no. You don't want to live over here. You don't want to bring your family over here. I have my family from Michigan still calling me and asking me are you okay, how are you feeling. And then I call the number, and they come out, they come out to -- I call the environmental number, and they come out and smell probably in two days, a day later, and we don't smell anything. That's a joke. That is a joke calling them because they don't do anything."[110]

f.   "So many people have referenced the impact on their family members, and I am a family member that can speak to that. I want to make it clear that it would be bad enough if everything that we're sharing tonight was contained to their homes, and the reality is that it's not, because when my mom comes to our home, what is she talking about, the smell was so bad last night, the smell was so bad last week. I can't tell you how many times, I truly lost count, dozens of times in the last three years since she lived here how many times she's canceled plans because she wasn't feeling up to it because she doesn't want to be coughing in public, sneezing in public and have a runny nose in public. It's not like it stops when she leaves the development. Even if you wanted to leave, it's not like you can turn it off, the effects. She'll have friends of hers that want to visit, and instead of telling me I'm so happy my friends are coming, she says I hope it doesn't smell when they come. I don't know if I want them to come because I'm embarrassed. I don't want them to know that's what it's like where I live. Sometimes even when it's not so bad outside, I'll drive -- I have a two-year-old so I'll drive to the house and it will be okay, it's finally nice out. And as soon as I walk in the house, many people have said it's as bad walking in as when you leave. Sometimes it's

---

[108] Tr. Pg. 25.
[109] Tr. Pg. 33.
[110] Tr. Pg. 27.

just as bad when you enter your home at night, and she doesn't even smell it anymore, but I know she's breathing it in all night."[111]

**BAL Residents' Age Makes Them More Vulnerable to
Harmful Effects of the Landfill's Emissions**

150.   All of the BAL Residents are over fifty-five years of age and most are well into their seventies and eighties.

151.   The Residents advanced age makes them more vulnerable than the general population to the air pollutants emitted by the Landfill.

152.   ATSDR, an arm of the Public Health Service and our Nation's lead Agency for assessing the presence and nature of health hazards posed by exposures to hazardous substances at waste sites, has found that older adults are more sensitive to chemical exposures for a variety of reasons including that:

   a.   Their immune systems are often weaker;

   b.   They tend to have more sensitive lungs, making fighting off health effects from breathing contaminants harder;

   c.   They may socialize less and, therefore, be less aware of environmental emergencies;

   d.   They may have trouble moving to a safer place if a chemical release happens; and

   e.   They may suffer from poor nutrition, due to lack of appetite or less interest in cooking, which can impact the immune system.

153.   In general, older populations with preexisting lung and heart conditions make them more vulnerable to adverse effects of Landfill gas including H2S.

_____

[111] Tr. Pg. 39-40.

154.    Because of their advanced age, the Residents have a greater risk of disease, death, and depression from exposure to air pollution from the Landfill.

155.    Many of the BAL Residents also suffer from respiratory and other medical conditions either caused or exacerbated by exposure to air pollution emitted by the Landfill, in continuing violation of law described herein.

156.    Exposure to H2S irritates mucous membranes in the respiratory tract and produces edema. It has an asphyxiant effect that interferes with the supply of oxygen having health consequences.

157.    Once inhaled, the H2S and other co-pollutants contained in the Landfill's gaseous emissions are rapidly absorbed by the victims' lungs, distributed in their blood, and taken up by their brain, liver, kidneys, pancreas, and small intestines. It is at this point when a victim's body will begin to react to defend itself.

158.    The victim's eyes, nose, throat and lungs will begin to burn, releasing mucus, the body's first line of defense. Breathing may become more difficult, especially for those with respiratory disease, such as asthma and COPD.  The victim also will often become sick to their stomach with nausea sometimes progressing to the point of vomiting. And many will develop a headache, which sometimes progresses to a debilitating migraine. Sleep is impossible.

159.    A 2016 study published in the prestigious peer reviewed Oxford University Press journal, *International Journal of Epidemiology,* studied health outcomes of 242,409 people from 1996 to 2008 based upon their proximity to landfills.  The study found significant positive associations between exposures to H2S—a surrogate for all the pollutants co-emitted

from the landfills—and mortality for lung cancer and respiratory diseases as well as hospital admissions for respiratory diseases.[112]

160.     In 2017, another study published in the prestigious, peer-reviewed journal, the *New England Journal of Medicine*, found that exposure to air pollution (PM2.5 and ozone) at concentrations even below current national standards increases the risk of hospitalization and death among the elderly, based upon an analysis of deaths and hospital visits among the entire Medicare population (60,925,443 elderly Americans) between 2000 and 2012.[113]

161.     In 2023, another study published in the peer-reviewed *Journal of the American Medical Association*, found that long-term exposure to elevated levels of air pollution is associated with increased risk of late-life depression diagnosis based upon an analysis of 8,907,422 Medicare enrollees between 2005 to 2016.[114]

### BAL is Disproportionately Burdened by the Landfill's Pollution and is an Overburdened Environmental Justice Community

162.     Not only are the Residents particularly vulnerable to air pollution due to their advanced age, they are part of an overburdened environmental justice community that has experienced the disproportionate burden of environmental contamination from the Landfill.

163.     The failure of NJDEP and the ACDPH to enforce applicable air pollution standards is particularly egregious because the BAL community and surrounding areas

---

[112] Mataloni et al., *Morbidity and mortality of people who live close to municipal waste landfills: a multisite cohort study*, INT'L J. EPIDEMIOLOGY, June 2016, at 806-15.
[113] Qian, et al., *Air Pollution and Mortality in the Medicare Population,* 376 NEW ENG. J. OF MED. 2017, 2513-2522 (2017).
[114] Qiu, et al, *Association of Long-term Exposure to Air Pollution With Late-Life Depression*, JAMA NETWORK OPEN, Feb. 1, 2023, at 6.

impacted by the Landfill's air pollution are part of an overburdened environmental justice community.

164.    In 2021, the NJDEP designated the BAL Community and nearby portions of Absecon as an "overburdened community" under the New Jersey Environmental Justice Law ("EJ Law").[115]

165.    An overburdened community is a low-income and/or minority community that has been subject to a disproportionately high number of "environmental and public health stressors," including pollution from one or more industrial, commercial, and governmental "Facilities" located in those communities, specifically including any "major source of air pollution … transfer station or other solid waste facility, or recycling facility intending to receive at least 100 tons of recyclable material per day [and] landfill, including, but not limited to, a landfill that accepts ash, construction or demolition debris, or solid waste."[116]

166.    A "major source" means a major source of air pollution as defined by the CAA or the APCA.

167.    The Landfill is solid waste facility, landfill, and major source all within the meaning of the EJ Law.

168.    Environmental and public health stressors under the EJ Law include "concentrated areas of air pollution … transfer stations or other solid waste facilities … or

---

[115] N.J.S.A. 13:1D-157.
[116] N.J.S.A. 13:1D-158.

conditions that may cause potential public health impacts, including, but not limited to, asthma . . .”[117]

169.     The BAL Community is burdened by a variety of public health stressors directly related to the Landfill, including concentrated air pollution, persistent malodors, persistent noise at night, and truck traffic, among others.

170.     The EJ Law declares that no community should bear a disproportionate share of the adverse environmental and public health consequences that accompany the State's economic growth, that overburdened communities must have a meaningful opportunity to participate in any decision to allow continued operation of major facilities that are a source of environmental and public health stressors, and that in appropriate circumstances it is in the public interest to limit the future placement and expansion of such facilities in overburdened communities.[118]

171.     Before NJDEP may renew a solid waste facility permit or a Title V Permit for any landfill, the landfill must complete an environmental justice impact statement assessing the potential environmental and public health stressors associated with the facility, including any adverse environmental or public health stressors that cannot be avoided if the permit is granted, and the environmental or public health stressors already borne by the overburdened community as a result of existing conditions located in or affecting the overburdened community.

---

[117] *Id.*
[118] N.J.S.A. 13:1D-157.

172.    The Landfill's SWF Permit and Title V Permit are both pending renewal by the NJDEP, but the ACUA has not prepared an environmental justice impact statement.

**Impacts of the Landfill's H2S Emissions Extend Well Beyond the BAL Community**

173.    The BAL Community has borne the brunt of the Landfill's gaseous emissions as it is closer to the Landfill than any other community and lies in a low-lying area which collects the Landfill's heavier-than-air H2S pollution.

174.    But by no means are the BAL Residents the only victims of the Landfill's violations of law.  Many other families more distant from the Landfill also are suffering the consequences of the Landfill's emissions.

175.    Recently, in response to an Open Public Records Act ("OPRA") request, the ACUA produced a printout of complaints over the past 12 months tracked by the ACUA's internal Solid Waste Odor Complaint system implemented under the Landfill's Odor Control Plan, discussed more fully below. A true and correct copy of which is attached hereto as Exhibit F.

176.    The complaints illustrate the Landfill's adverse impacts upon the health and welfare of many people in the region well beyond the BAL Community.

177.    For example, there is a young girl in Galloway Township, a cancer survivor. On February 2, 2024, her father wrote to the ACUA pleading for the Landfill to stop emitting the horrible odors:

What was once a bad smell 2 or 3 times a year is now 2 or 3 times a week. This is unacceptable. *Please close the landfill.*[119]

178.     And when the odors continued, the father wrote again on February 10, 2024, at

11:25 PM, to implore the ACUA to stop its emissions because of the effects on his daughter's

breathing:

> The stench from the landfill is here in Galloway again tonight. *My daughter is a cancer survivor with breathing difficulties. The stench from the landfill exacerbates her breathing issues and gives her a sore throat.* Had I known this would become an issue 10 years ago when my family was deciding where to purchase a home, I would have stayed far away from this area.

179.     There is a sick medical patient in Pleasantville, whose hospital case manager

called the ACUA on July 5, 2023 to complain about illness caused by the Landfill's emissions:

> Samantha Jackson is a Case Manager who called on behalf of a patient who lives at 301 W. Delilah Road. She says they contacted us before. *She says that an odor at the patient's house is causing illness and they believe it is from the landfill. Samantha would like to speak with someone because she says this is urgent.*

180.     There is a teacher at the Pleasantville Middle School, who called the ACUA on

morning of March 13, 2024, to complain that the Landfill's emissions were coming into her

classroom and making it hard for her kids to breathe:

> *Traci Holland called to let us know that the odor is so bad they cannot open the windows. She said the smell is inside the classrooms and that it's hard for them to breathe.*

181.     There is a Director at the Kids Choice Academy daycare in Egg Harbor

Township, who called the ACUA on March 4, 2024 to complain about the smell:

> *Karah-Assistant Director called to say the school has a gassy smell in their building.* Would like a call back from someone.

---

[119] Citations within ¶¶171-180 were not provided so as to protect the complainants' identity. Plaintiffs will provide any complaint, if requested.

54

182.     There is a young Absecon mother with another baby on the way who wrote to the ACUA on February 9, 2024 expressing frustration and fear about the long term health effects to here kids:

> The smell near my house is getting worse and worse.  I can smell it inside my home especially on damp mornings.  I have a small child and a new baby on the way. What are the long term effects of breathing this in? It's absolutely horrible. We didn't move to Absecon to smell methane gas every godddamn day.

183.     There is another Absecon mother who wrote to the ACUA on February 8, 2024, expressing genuine fear for her kids:

> I realize that ACUA is taking action so I have been trying to be patient but last night and *this morning was the absolute worst the smell has ever been by my home. I felt physically ill last night and couldn't get to sleep. Putting the covers over my face to try to drown out the smell so I could stop gagging. And then again this morning stepping outside to take the kids to school was just disgusting. This is NOT normal. Something drastic needs to be done SOON. This can't be safe health-wise either. It's not just an inconvenience, it's actually affecting the lives and wellbeing of my family, as well as everyone else within an ever-expanding radius of the dump, and I almost can't even live in my own home most days anymore because of poor planning on your part.* Surely there's a faster solution.

184.     There is an Egg Harbor Township father who wrote to the ACUA on January 8, 2024 at 9:28 PM expressing concern about his family's health:

> I live in Egg Harbor Township and can clearly smell the landfill more often than not. It cannot be healthy to smell it and *I worry about my family's health. I would love to spend more time outside but don't like to since it smells awful frequently.* I wish the ACUA would address this. I don't think the ACUA would want to be sued when people start coming up with health problems from this mess . . .

185.     There is an Absecon father who wrote the ACUA on February 1, 2024, worried about his kids:

> After a brief respite, the smell is back and once again, getting INSIDE my home. I had to take my son to school day and after only a few seconds outside he asks with disgust, "Dad what's the smell?" What is a helpless father supposed to tell his parent in this situation? 15 minutes later my 2 year old son asks me the same thing while inside our living room. It pains me to no end to think I have just

purchased a house here and will be enduring this nightmare for who knows how long. If I had only known better I would have never subjected my wife and children to this. Once again, I must stress - this smell gets INSIDE the home. Before I hear the response you are trained to give, please understand the magnitude of this olfactory invasion. This is more than simply a nuisance.

186.   There is an Egg Harbor son caring for his grandmother with lung cancer, who wrote the ACUA on November 24, 2023, concerned about her health:

This is getting out of control.  I've worked at 1333 doughty road, EHT my entire life and the methane gas has never been this bad.  I live on 6 Atlantic Ave, EHT and get blasted by the smell all night. I take care of my grandmother who has lung cancer in Absecon and she gets blasted by it in the mornings. We've all lived in the area our entire lives and we're now inhaling these gases on a regular basis, what do you suggest we do?

**The NJDEP and the ACUA Have Improperly Delegated Enforcement of Applicable Regulations to the ACDPH, Which Has a Conflict of Interest**

187.   The safety net intended to protect people from the dangers of landfill pollution has utterly failed the BAL Residents.

188.   The Atlantic County Solid Waste Management Plan, which the ACUA prepared, designates the Atlantic County Division of Public Health ("ACDPH") as the entity primarily responsible for monitoring the operations of the Landfill and for investigating citizen complaints about odors and other violations of NJDEP regulations.[120]

---

[120] *See* NJDEP Certification of the February 28, 2012 Amendment to the Atlantic County District Solid Waste Management Plan. https://www.acua.com/ACUA/media/Acua/Certification-of-the-2-28-12-amendments-to-the-atlantic-county-district-solid-waste-mgt-plan-8-10-12.pdf

189.    The NJDEP has delegated to the ACDPH the responsibility to investigate odor complaints, pursuant to the County Environmental Health Act ("CEHA").[121]

190.    Thus, when a resident calls the NJDEP Hotline to complain about their exposure to the Landfill's malodorous emissions, the NJDEP dispatches the ACDPH to investigate.

191.    When the County employees in the ACDPH investigate a Resident's complaint about offensive Landfill emissions, it is usually at night.  The investigator typically arrives to perform the investigation hours after the complaint is made and the peak H2S concentration has passed.

192.    Moreover, while all three agencies, the NJDEP, the ACDPH, and the ACUA, know that when a BAL resident calls the NJDEP Hotline to complain about odors, those odors are caused by H2S emissions from the Landfill, the ACDPH investigators are equipped with nothing more than their own noses for deciding whether a violation has been committed.

193.    The County has not supplied the ACDPH investigators with standard equipment for measuring H2S in the air, the Jerome Meter.

194.    A Jerome meter instantaneously measures the concentration of H2S in the air and is the standard piece of equipment used by regulatory authorities and landfills to measure concentrations of H2S.  It looks like this:

---

[121] *See* NJDEP, County Environmental Health Act (CEHA), https://www.nj.gov/dep/enforcement/ceha.html (NJDEP "has delegated the administration of core pollution control programs in the areas of water, air, noise, solid waste and emergency response to county health agencies."); N.J.S.A. 26:3A2-21, et seq.



195.    Needless to say, the County health investigators rarely find the Residents' odor complaints about exposures to landfill gas emissions from the County Landfill to be "actionable," because this would require County employees to find that the odors from the County landfill "unreasonably interfere with [a BAL Resident's] enjoyment of life or property."[122]

196.    Accordingly, the Residents are trapped in an endless cycle of calling the NJDEP Hotline whenever they are being exposed to Landfill emissions, waiting for the ACDPH to come out to conduct an odor investigation which rarely, if ever, finds the emissions to be actionable.

197.    The ACUA also never uses its own Jerome meter to investigate odor complaints pursuant to its Odor Control Plan, a condition of its Title V Permit.

---

[122] N.J.A.C. 26:2C-19(g).

## The ACUA is in Violation of Its Odor Control Plan

198.    In 2016, the NJDEP required the ACUA to implement an Odor Control Plan and H2S Monitoring Protocol, as a condition for settling serious violations of the ACUA's Title V Permit caused by excessive H2S concentrations in the Landfill's collected gas and ongoing odor violations (a condition that continues to the present).[123]

199.    Pursuant to the ACUA's settlement with NJDEP, it paid a $63,250 civil penalty (negotiated down from $168,600) and was required to implement the Odor Management Plan and the H2S Monitoring Protocol.

200.    As discussed more fully below, the Odor Management Plan was supposed to be the ACUA's principal means of reducing the Landfill's excessive fugitive emissions of H2S, an objective that has utterly failed.

201.    Mr. Conover is the Responsible Official for the Odor Management Plan and the H2S Monitoring Protocol.

202.    Pursuant to the Odor Management Plan, the Landfill uses two methods for identifying odors that could lead to odor detections off site.  First, Landfill employees are required to monitor for odors using their sense of smell and identify any significant odors to management.  Second, Landfill employees under the direction of Mr. Conover conduct daily odor self-inspections, again using their sense of smell, at 11 designated off-site locations surrounding the Landfill, including in the BAL Community.

---

[123] NJDEP, Administrative Consent Order with EA ID# NEA150001, July 26, 2016.

203.    The Odor Management Plan calls for Landfill workers (individuals likely having reduced sensitivity to H2S odors) to drive to these 11 locations to determine if there are any offensive odors present.  Offensive odors are defined using NJDEP's odor classification system, which rates the degree of odor intensity on a range of 0 to 5, with:

    a.  Level 0 being no odor,

    b.  Level 1 being "Very light" (i.e. odor present but characteristics not distinguishable),

    c.  Level 2 being "Light" (i.e. odor present, distinguishable and definite but not necessarily objectionable for short durations),

    d.  Level 3 being "Moderate" (i.e. odor easily activates sense of smell, very distinct and clearly distinguishable and tends to be objectionable and/or irritating),

    e.  Level 4 being "Strong" (i.e. odor present, objectionable and causing person to attempt to avoid it completely, and may cause physiological effects during prolonged exposure); and

    f.  Level 5 being "Very Strong" (i.e. odor present which is so strong it is overpowering and intolerable for any length of time and causes physiological effects).[124]

204.    The Odor Monitoring Plan identifies monitoring location "SWE-2" as being located in the BAL Community at the end of the cul-de-sac of Delray Drive, across from the home at 70 Delray Drive.

205.    The Odor Management Plan calls for any Level 2 or higher odors detected at any of the off-site locations and determined to originate from the Landfill to be reported to ACUA management for "corrective action."

---

[124] ACUA Odor Management Plan, Rev. July 19, 2018.

206.    The Odor Management Plan calls for identifying the source of the odor through use of weather station data to determine wind direction and speed and barometric conditions, using aerial photographs to draw vectors along the wind path, and investigate any other potential odor sources.

207.    Over 7 years of implementation of the Odor Management Plan, the ACUA *has never detected a single Level 2 or higher odor at Location SWE-2*.

208.    Over 7 years of implementation of the Odor Management Plan, the ACUA *has never collected any ambient H2S samples using its Jerome Meter in the BAL Community*.

209.    The Odor Management Plan calls for minimizing aerial extents of any excavations into waste materials, minimizing time of any openings in the cover, using daily cover on any excavated waste, timing the drilling of new gas collection wells with high winds, rapidly repairing leachate seeps, using additional daily cover, increasing the vacuum on gas collection, adding horizontal gas collectors in odor source areas, and adding temporary or final capping to odor source areas.

210.    The ACUA does not follow the recommendations for minimizing odors contained in its Odor Management Plan. It routinely excavates into waste materials (See discussion on landfill mining below), fails to minimize the time of any openings in the cover, fails to use daily cover on any excavated waste, does not time the drilling of new gas collection wells with high winds, does not rapidly repair leachate seeps, never uses additional daily cover, and does not add temporary or final capping to odor source areas.

211.    The Odor Management Plan requires the ACUA to establish a system for receiving odor complaints from the public and to investigate all odor complaints to determine if an odor originates from the Landfill, and if so, identify the cause of the odor and remediate it.

212.    The ACUA has implemented a new system for investigating odor complaints using a state-of-the-art H2S monitoring system, which it uses strictly for defensive purposes.

213.    The Odor Management Plan also calls for the implementation of the H2S Monitoring Protocol, pursuant to which Landfill workers collect fence line readings of H2S concentrations over a 30 minute period using a Jerome Meter to demonstrate the Landfill's continuous compliance with the 30 ppb H2S standard.

214.    The H2S Monitoring Protocol is a condition of the ACUA's Title V Permit, which is used to verify the Landfill's compliance with the H2S 30 ppb standard health-based standard.[125]

215.    Mr. Conover is the Responsible Official for the H2S Monitoring Protocol.

216.    Under the H2S Monitoring Protocol, the Title V Permit requires the ACUA to collect H2S readings at the Landfill fence line in accordance with the H2S Monitoring Protocol.

217.    Pursuant to the H2S Monitoring Protocol, Landfill workers collect H2S samples at the "downwind" location along the Landfill's fence line using a Jerome Meter each morning,

---

[125] ACUA Landfill Title V Permit, Facility Specific Requirements, U100 Gas Control System (Flares) subject to NSPS WWW and MACT AAAA, Ref# 33.

usually between 5:00 AM and 6:00 AM, *which is several hours after the ACUA's nightly landfilling activities—the primary source of much of the Landfill's H2S emissions—are finished*.

218.    Since initiating the H2S Monitoring Protocol in 2017, at the direction of Mr. Conover, *the Landfill workers have never once collected an H2S sample during the nighttime landfilling activities.  Accordingly, the ACUA's H2S Monitoring Protocol does not collect H2S samples that are representative of the actual operations of the Landfill*.

219.    As a consequence, since initiating the H2S Monitoring Protocol in 2017, *the Landfill workers have never once recorded an exceedance of the 30 ppb H2S standard.*

220.    The ACUA management know that the manually collected H2S samples are not representative of actual emissions from the Landfill, yet they frequently point to the absence of any recorded exceedances using the H2S Monitoring Protocol as evidence the Landfill is operating in compliance with the 30 ppb standard and therefore does not pose a threat to public health.

221.    As discussed below, the H2S Monitoring Protocol generates grossly flawed data which is completely unreliable, and the ACUA knows this. The actual emissions of H2S from the Landfill routinely exceed 2,000 ppb, a level which poses a substantial threat to the health and welfare of the BAL Community and surrounding communities.

**Ambient Air Sampling by Landfill Expert John Gee, PE, Confirms the Landfill's Emissions of H2S Regularly Exceed the 30 ppb Standard within the BAL Community**

222.     In light of the NJDEP's and ACDPH's failure to enforce applicable air pollution standards against the Landfill, the BAL community was forced to retain its own landfill expert, John R. Gee of Weston Solutions, Inc., to evaluate the extent of the Landfill's H2S emissions and associated impacts at its own cost and expense. A true and correct copy of Mr. Gee's report ("Gee Report") is attached hereto as Exhibit B, and is incorporated herein by reference.

223.     Mr. Gee is a New Jersey Professional Engineer and Licensed Site Remediation Professional with 45 years of landfill experience, including as Solid Waste Engineer with the Pennsylvania Department of Environmental Protection, and Chief Engineer of the Chester County Pennsylvania Solid Waste Authority.

224.     Mr. Gee evaluated records related to the Landfill's design and operations and performed an air quality investigation in and around the BAL Community to measure the concentration, frequency and extent of Landfill H2S emissions within the community.

225.     Mr. Gee's air quality investigation consisted of the collection of H2S samples on six (6) different days and nights between October 2023 and January 2024 at eleven different locations in and around the BAL Community and the back gate of the Landfill and the continuous monitoring of H2S in the backyard of the BAL home closest to the Landfill.

226.     Mr. Gee's air quality investigation definitively confirmed that the Landfill routinely exceeds the H2S 30 ppb 30-minute average standard at and beyond its property line and is the source of elevated H2S emissions within the BAL Community.

227.    Gee's investigation determined that:

    a.  Between October 9, 2023 and January 23, 2024, the Landfill violated the H2S property line standard more than 285 times;

    b.  H2S concentrations in the BAL community exceeded 100 ppb for extended periods on 14 separate nights;

    c.  H2S concentrations exceeded 340 ppb over a four hour period on the early morning of January 23rd;

    d.  4,476 sampling events detected elevated H2S concentrations, with 1,611 (36 percent) greater than 30 ppb and 417 (9.3%) greater than 100 ppb;

    e.  Elevated H2S concentrations were detected 33.4% of the time;

    f.  The duration of continuously elevated H2S concentrations ranged from 40 minutes up to 36 hours 9 minutes;

    g.  The highest peak concentration of H2S at BAL was 1,766 ppb; and

    h.  The average H2S concentration at BAL was 17.8 ppb.

228.    Mr. Gee concluded the Landfill's emissions of H2S in violation of the applicable 30 ppb standard primarily originate at night from the landfilling operations at the working face of the Landfill, based on the following evidence.

    a.  Repetitive individual peaks or puffs of H2S concentrations measured at the Landfill fence line over time demonstrate the releases are mechanical in origin and not from normal biological or landfill related processes.

    b.  Weston's evening continuous and simultaneous H2S and CH4 measurements at the rear gate of the Landfill and H2S concentrations at BAL during active landfilling on January 11, 2024, which coincided with operation of trucks and heavy equipment operating on the working face of the Landfill near the rear gate.

    c.  Continuous regular timing of each H2S peak is consistent with the timing associated with active unloading of trucks at the working face.

    d.  ACUA's data collected by a new fence line H2S monitoring system contains 5,048 exceedances of the 30 ppb fence line standard from December 14,

2023 to April 17, 2024, predominantly during nighttime operations. The data shows the same pattern of repetitive H2S spikes up to 2,000 ppb coinciding with the period of active landfilling.

e.  Plots of H2S concentrations versus time at both the fence line (obtained by Weston and ACUA) and at the BAL residence closest to the Landfill showed a delayed repetitive pattern of H2S spikes similar to those measured at the Landfill fence line.

f.  More than 1,000 odor complaints submitted to the NJDEP hotline and ACUA complaint system over the past 10 years overwhelmingly relate to odors coinciding with the Landfill's nighttime waste disposal activities.

g.  Studies show that active dumping of MSW into landfills produces H2S concentrations in ambient air that are orders of magnitude higher than other areas of a landfill.[126]

229.    Mr. Gee also concluded that the ACUA's practice is to leave the MSW on the working face uncovered until 1-hour before sunrise regardless of when it completes landfilling each night, which is a violation of NJDEP standards which require continuous application of daily cover.[127]

**Analysis of the ACUA's Reported Data Demonstrates that the Landfill is Violating its Annual Title V Permit Emissions Limitations for H2S and VOCs By a Wide Margin**

230.    Mr. Gee also evaluated the Landfill's annual emissions of H2S and VOCs, which are subject to annual emissions limitations of 12.9 tons/year and 14.8 tons/year, respectively.

231.    Mr. Gee calculated the Landfill's annual emissions, based upon the ratios of methane to H2S and methane to VOCs, according to annual laboratory analysis of the concentrations of H2S and VOCs contained in the Landfill's collected gas, a condition of the

---

[126] Gee Report, Section 1-3.
[127] Gee Report, Section 10.3.

Title V Permit.  This ratio was then applied to the ACUA's annual *certified* volume of methane produced by the Landfill, and its annual *certified* volume of methane captured by the GCCS, as reported to the USEPA under 40 C.F.R. Part 98.  According to this reliable and credible data and analysis, Mr. Gee concluded that the Landfill is in continuing violation of its Title V Permit annual emissions limitations for H2S and VOCs over each of the past five (5) years, by a wide margin.[128]

232.    According to Mr. Gee's analysis, in 2022, the Landfill emitted 22.4 tons/year of H2S and 30.1 tons/year of VOCs.

233.    Mr. Gee's analysis is conservative.  **The ACUA's own internal estimate of H2S emissions form the Landfill, which it submitted to the NJDEP in 2022, is 25.92 tons/year, twice the Title V Permit limit.**[129]

### Toxicologist Dr. Deborah Barsotti, Ph.D., Confirms Landfill's H2S Emissions Regularly Exceed Health-Based ATSDR Minimum Risk Levels and Pose an Elevated Health Risk

234.    The BAL community also engaged a Board-Certified toxicologist, Dr. Deborah Barsotti, to evaluate the data collected by Weston and associated health risks. A copy of Dr. Barsotti's report ("Barsotti Report") is attached hereto as Exhibit C.

---

[128] Gee Report, Section 9.2 and Table 9-1.
[129] Gee Report, p. 9-2; Email dated April 14, 2022 from Mr. Gary Conover, ACUA Solid Waste Director, to Mr. Alexander Sung, NJDEP enclosing spreadsheet of actual estimated emissions for Emission Unit U99.

235.    Dr. Barsotti is a member of the American Board of Toxicology (ABT), former Assistant Professor of Toxicology with the University of the Sciences in Philadelphia, and former Director of the Division of Toxicology at ATSDR.

236.    Dr. Barsotti concluded based upon Weston's data that the concentration of H2S in the BAL Community routinely exceeds the ATSDR acute Minimum Risk Level ("MRL") of 70 ppb (24-hour period).

237.    Dr. Barsotti concluded that of the 68 days of testing data, there were 42 days where the acute MRL of 70 ppb was exceeded (61.8% of days measured).[130]

238.    Dr. Barsotti also concluded that the intermediate MRL (15-day period) of 20 ppb was exceeded seventeen (17) times.[131]

239.    Dr. Barsotti concluded that the BAL residents are exposed to concentrations of H2S that cause the adverse effects of which they are complaining, including eye, nose and throat irritation, persistent cough, difficulty breathing, headaches, poor memory, and tiredness. Dr. Barsotti also concluded that the Residents' exposure to H2S comes with multiple co-pollutants, including the VOCs, and that these ongoing exposures poses an increased risk of mortality and morbidity effects.

---

[130] Barsotti Report, p. 11.
[131] Barsotti Report, p. 12.

**ACUA's New H2S Monitoring System Confirms the Landfill Routinely Emits Elevated H2S Concentrations Posing a Serious Risk to Off-Site Communities**

240.    Documents obtained from the ACUA under OPRA confirm that on December 13, 2023, the ACUA installed, without notice to NJDEP, a continuous H2S monitoring system designed by a firm called Envirosuite, to monitor H2S emissions and model off-site exposures to H2S.

241.    Mr. Denafo executed the contract for the installation of the Envirosuite system to continuously monitor H2S emissions at 7 different perimeter locations using EVS Kunak Air Quality Monitor 5S sensors, which are capable of measuring H2S up to 20,000 ppb with an accuracy of +/- 50 ppb.[132]

242.    The Envirosuite scope of work acknowledges that local topography, prevailing winds, and meteorological conditions cause H2S emissions from the Landfill to impact BAL, which poses a risk that the Landfill might be investigated and shut-down:

> Atlantic County Utilities Authority (ACUA) is interested in proactively managing its impact on the environment and surrounding communities. *Recent developments of a residential community to the north of the landfill could potentially cause an upsurge in odor complaints over time. Odor issues risk triggering a local authority investigation which can lead to an operational shut down until the issue is investigated / mitigated.* Armed with factual emissions data AGUA can expedite or head off any investigation. Possessing factual data shows that ACUA cares about the issue, communicating it effectively improves the tolerance of communities , preventing emissions issues becoming protracted community problems inhibiting operation and/or growth . Given the landfills 24-hour operations and proximity to the Atlantic City International Airport, ACUA is interested in meeting their compliance objectives proactively using Envirosuite's SaasOmnis platform for continuous detection, monitoring and reporting . . . The ACUA Solid Waste Complex, particularly the permanent cap of the ACUA landfill is the highest point in the surrounding area. *The differences in terrain around*

---

[132] ACUA Agreement for Installation of Odor Monitoring & Detection System, dated Oct. 12, 2023, with attached Envirosuite Proposal for ACUA; Kunak Technologies, Hydrogen Sulfide Sensor Product Description, https://kunakair.com/doc/02.Datasheets/cartridges/H2S.pdf (last accessed May 21, 2024)

*ACUA along with changing weather may have an impact on neighboring communities; with potential odor pollutants that are emitted at higher elevations being transported downhill by changing wind conditions, favored by changes in elevation.* Failure to respond rapidly to unplanned changes in the weather and potential odor emission events can quickly lead to negative and costly consequences. When it comes to managing environmental risk and community impact, scheduling operations such as maintenance activities, unloading waste cargo based on changes in the weather has a direct impact on your bottom line. . . *Predominant wind data from the Atlantic City Intl. Weather Station, located around 3 miles northwest from ACUA indicates that for the last three years between January 1st, 2020 -August 21st, 2023, winds in the area came from the northwest (NW) and the south (S). This means that the weather predominantly will disperse any pollutant or odor emitted at the ACUA facility towards the southeast and the north potentially impacting nearby residential and commercial communities in those areas.* (emphasis added). [133]

243.    According to the Envirosuite scope, the system is intended to enable the ACUA to enhance its reporting of odor problems to regulators and local communities:

The solution provided in this proposal will ensure any future high readings of H2S are captured early or in the event of a complaint, ACUA will be able to support a source identification protocol and move to build trust and social equity by engaging transparently with surrounding communities.  . . . The key aspects of the proposed monitoring system for the ACUA are as follows:  . . . continuous monitoring data with on-site weather data provides clarity around your operations *in accordance with your local Authority*. . . [and to] generate odor reporting at a moment's notice with historical data . . .[and to] retrieve daily, weekly and monthly emissions reports as evidence of environmental performance reports *to supply regulators for environmental compliance with highly accurate data*" (emphasis added).[134]

244.    The BAL Community obtained the ACUA's H2S monitoring data collected by the new Envirosuite system between December 13, 2023 and April 17, 2024.

---

[133] Envirosuite Scope of Work.
[134] Ibid.

245.    The Envirosuite H2S data collected over the four month period (December 13, 2023 to April 17, 2024) shows that the Landfill's H2S emissions measured at Air Monitor 3, located at or near the back gate of the Landfill (closest to BAL):

    a.   exceeded 30 ppb, averaged over 30 minutes at the property line, 5,048 separate times;

    b.   exceeded 300 ppb, averaged over 30 minutes at the property, 1,025 times;

    c.   exceeded 2,0000 ppb on many nights;

    d.   reached a maximum of 2,904 ppb;

    e.   averaged (including all zero measurements) 171 ppb;

    f.   were significantly greater than Weston's H2S measurements collected within the BAL Community, often by several orders of magnitude, thus proving the BAL exceedances originated from the Landfill.

246.    The Envirosuite data confirms that the Landfill routinely emits elevated H2S plumes on a regular basis.

**ACUA Repeatedly Fails to Immediately Notify NJDEP, as Required by Law, of Excessive H2S Emission Events, Which is a Serious Violation of the APCA and Title V Permit**

247.    The ACUA has a duty under the APCA and its Title V Permit to immediately notify the NJDEP whenever it has a release of air contaminants, which due to their quantity or concentration either "poses a potential threat to public health" or "might reasonably result in citizen complaints."[135]

248.    Despite the ACUA's detection of thousands of elevated H2S readings indicating releases of H2S in a quantity and concentration which poses a potential threat to public health

---

[135] N.J.S.A 26 :2C-19.e; Title V Permit, Section B.2.

and which might reasonably result in citizen complaints, and the purpose of the Envirosuite system to enable realtime modeling of offsite impacts so that warnings can be issued, the *ACUA has never once notified NJDEP of the elevated H2S readings detected by its new H2S monitoring system*.

249.    *Each and every failure of the ACUA to notify the NJDEP of elevated H2S readings from the H2S monitoring system is a violation of its Title V permit*.

250.    *The ACUA's failure to notify NJDEP of the elevated emissions of H2S from the Landfill places BAL and other communities impacted by the Landfill's H2S emissions at risk.*

251.    For example, on the evening of January 2, 2024, the Landfill experienced large H2S releases which inundated BAL and other communities east of the landfill and resulted in 21 separate odor complaints to the NJDEP.  The H2S concentrations were so elevated that the ShopRite on the White Horse Pike in Absecon—6,000 feet from the Landfill's back gate—was evacuated by the fire department.

252.    According to Weston's data, between 5:00 PM and 7:00 PM that night H2S readings within BAL averaged 131 ppb.

253.    According to the ACUA's data, the contemporaneous H2S readings from the ACUA's new H2S monitors detected an average H2S concentration near the landfill's back gate (Monitor 3 located in the direction of BAL and the Absecon ShopRite) of **866 ppb.**

254.    The ACUA management knew from their real-time data generated by the H2S monitors, which the ACUA management receive on their mobile telephones, that the H2S emissions on the evening of January 2nd was going to impact downwind communities.

255.    The below graph comes from the Gee Report and overlays the ACUA's East monitor readings with the data collected within the BAL community on the night of January 2nd:



256.    Despite this information, the ACUA failed to notify NJDEP of the elevated H2S readings.

257.     *The ACUA has never notified the NJDEP of any of the thousands of elevated H2S readings detected by the Envirosuite H2S monitors, which includes data clearly indicating a release of air contaminants in a quantity or concentration which poses a potential threat to public health, welfare or the environment and which might reasonably result in citizen complaints*.

258.     The ACUA's failure to immediately notify the NJDEP of the Landfill's repeated releases of extremely elevated plumes of H2S is an egregious and knowing violation of the APCA, which denies impacted communities the protections afforded by law.

259.     In an internal ACUA email, Mr. DeNafo admitted the Landfill was the source of the odors which impacted BAL and closed the ShopRite the previous night: "I'm not sure we need the tutorial to know we have odors by ShopRite … Envirosuite shows monitor 3 pretty high yesterday at 5:30PM with wind directed towards shoprite."

260.     The ACUA's failure to notify NJDEP meant that downwind communities could not be alerted to the plume of landfill gas heading their way and concerned citizens—many of whom called into the NJDEP Hotline to report the malodors—were kept in the dark about the elevated H2S pollution being emitted by the Landfill that night.

261.     In the below Google Earth aerial figure, the prevailing winds at the Landfill over the period between 2020 and 2024 are shown in relation to all of the known sensitive receptors surrounding the Landfill, including the residential zones, childcare facilities,

churches, and schools.[136]  As is evident from the figure nearly all of the sensitive receptors

surrounding the Landfill are located to the east in the same direction as the prevailing winds.



**The ACUA Concealing the H2S Monitoring Data from the NJDEP
in Violation of the APCA and SWDA**

262.    Based upon internal ACUA documents obtained under OPRA, ACUA

management has concealed the existence of its Envirosuite H2S monitoring system from the

NJDEP and the communities being impacted by the Landfill's persistent violations of the 30

ppb standard.

---

[136]Iowa State University, Environmental Mesonet, Custom Wind Rose, Atlantic City International Airport
Metereological Station, 2020-2024 (Bar Convention is "Engineering" meaning the wind bars point in direction
wind is blowing toward).

263.    On the morning of January 3, 2024, the morning after 21 odor complaints were submitted to the NJDEP Hotline and the Absecon ShopRite was evacuated due to odors, the NJDEP contacted Mr. Conover, to request information about the cause of the odors and what the ACUA was doing to monitor the landfill's H2S emissions.

264.    Immediately following NJDEP's contact, an email exchange between Mr. DeNafo and Mr. Conover indicated that they agreed they would not inform NJDEP of the H2S monitoring data showing elevated emissions of H2S, despite Mr. DeNafo's acknowledgment that the Landfill was the source of the odors which impacted BAL and closed the ShopRite the previous night: "I'm not sure we need the tutorial to know we have odors by ShopRite. . . Envirosuite shows monitor 3 pretty high yesterday at 5:30PM with wind directed towards shoprite."[137]

265.    Despite the significant urgency called for by the evident public health concerns, Mr. Conover did not respond to NJDEP's inquiry until January 4th: "Sorry for the delayed response to your request for a summary of the ACUA Odor Monitoring Program and site update. Yesterday my calendar was full of meetings."[138]

266.    In his email to NJDEP, Mr. Conover referred only to the ACUA's manually collected fence line data and made no mention of the new Envirosuite monitoring data which showed that landfill H2S emissions were extremely elevated on the evening of January 2nd.

267.    ACUA management have continued to deceive the public ever since.  Mr. DeNafo repeatedly has pointed to the manually collected fence line monitoring results as

---

[137] Email, DeNafo to Conover, et al., Jan. 3, 2024.
[138] Email from Conover to NJDEP F. Curio, Jan. 4, 2024.

evidence the Landfill is not emitting H2S above the 30 ppb standard and the residents have no cause for health concerns.

268.    On January 11, 2024, Mr. DeNafo and Mr. Conover both appeared before the Absecon City Council where they presented the bogus fence line monitoring results as evidence the Landfill was meeting the 30 ppb standard and posed no health risk to Absecon residents. They made no mention of the new Envirosuite H2S monitors showing extremely elevated H2S emissions.

269.    In a February 2, 2024 email to the Mayor of Galloway Township, Mr. DeNafo once again referred to the bogus fence line data as evidence the Landfill was compliant with the 30 ppb standard and thus posed no health risk to residents.  Once again, Mr. DeNafo made no mention of the Envirosuite data showing extremely high H2S concentrations.

270.    In a February 19, 2024 email to the father of a young girl who survived cancer but has breathing difficulties exacerbated by the ongoing exposures to the landfill's emissions, Mr. DeNafo asserted the Landfill was compliant with the 30 ppb standard and that the H2S "levels that someone might experience [sic] the landfill offsite are not dangerous . . ."[139] Again, Mr. DeNafo made no mention of the Envirosuite data showing extremely high H2S concentrations.

271.    On February 20, 2024, Mr. DeNafo appeared before the Atlantic County Commissioners where he again showed a graph of the once per day manual fence line H2S data showing no exceedances of the 30 ppb standard and again claimed that this data proved

---

[139] Email from DeNafo to Duntley, Feb. 12, 2024.

there is no health threat. Again, Mr. DeNafo made no mention of the new Envirosuite H2S monitoring data showing the opposite.

### Since at Least 2014 ACUA Management Has Known that BAL Residents are Being Exposed to Landfill H2S Emissions Which Pose an Acute Health Risk

272.     ACUA management, including Mr. Dovey, Mr. DeNafo, and Mr. Conover, along with the ACUA's air quality consultants, Trinity Consultants, have known the Landfill's H2S emissions regularly exceed 30 ppb within the BAL Community for at least 10 years but have concealed this knowledge from the BAL Community.

273.     As discussed above, landfills which dispose of C&D, such as the Landfill, generally emit more H2S emissions than landfills which do not.

274.     Over its first ten years of its operation the Landfill was restricted to accepting only C&D waste (Type 13) and dry industrial waste (Type 27) and was prohibited from accepting "municipal solid waste" or "MSW."

275.     Throughout much of the 1990's, the ACUA filled the Landfill predominantly with C&D waste originating outside Atlantic County, pursuant to long-term Inter-District Agreements entered into with Mercer, Somerset, Cape May, and Hunterdon Counties.

276.     All of the C&D waste generated in these counties was transported to the Landfill for disposal, while all of the putrescible waste generated in Atlantic County was collected by the ACUA, consolidated at the ACUA transfer station, and then transported to other landfills for ultimate disposal.

277.     This arrangement proved to be highly lucrative for the ACUA, because it was able to charge a premium for the disposal of C&D waste.

278.     However, much of the Landfill's capacity was consumed by waste generated outside of Atlantic County.

279.     The Landfill continues to this day to accept a disproportionate amount of C&D waste from outside of Atlantic County. Roughly thirty (30) percent of the waste disposed at the Landfill is C&D waste.

280.     Landfills that comingle putrescible waste and C&D waste, including the Landfill, generate more H2S.[140]

281.     In 2000, the NJDEP authorized the ACUA to accept putrescible waste for disposal at the Landfill, which is regularly consolidated and commingled with the C&D waste during storage in the Transfer Station and disposal at the Landfill.

282.     To avoid the expense of buying soil cover, the Landfill uses C&D waste as daily cover over putrescible waste, a practice which further exacerbates the generation of H2S.[141]

283.     Landfills which use porous cover materials, such as sand and sludge incinerator ash, as temporary and intermediate cover over the waste buried in the landfill are "wetter" than

---

[140] USEPA, Draft Update, AP 42 Section 2.4 Municipal Solid Waste Landfills, p. 2.4-3 (Oct. 2008).
[141] NJDEP Inspection Report, Nov. 16, 2005; ACUA Bird Control and Deterrent Plan (June 2022), p. 2 ("Waste is covered by 6 inches of soil or other non-food containing waste (i.e. bulky, *construction & demolition* or dry industrial waste) or by approved alternative daily cover (ADC)."

landfills which use regular soil, because rainwater readily infiltrates through sand and penetrates into the buried waste.

284.     Landfills which contain large quantities of C&D, putrescible waste and water mixed with those wastes, including the Landfill, produce much more H2S.

285.     In late 2012, the ACUA's monthly testing of the collected gas produced by the Landfill indicated that the concentration of H2S was increasing.

286.     The large quantity of C&D waste disposed in the Landfill, coupled with the ACUA's practice of using C&D waste as daily cover material and allowing rainwater to infiltrate through the cover, was producing much higher concentrations of H2S in the collected gas.

287.     At the same time, the BAL Community began to experience a significant increase in intrusions of H2S from the Landfill into the community, with 27 odor complaints recorded by the NJDEP Hotline between January 2013 and February 2014.[142]

288.     The ACUA was in continuous violation of its Title V Permit emissions limitations for H2S, which at that time included an instantaneous maximum concentration in Landfill gases of 1,700 ppm, 12-month rolling average concentration in Landfill gases of 1,000 ppm, and annual restriction on the amount of fugitive H2S emissions (i.e. the H2S that is emitted by the Landfill and not collected and treated by the Landfill's gas collection and

---

[142] Email from NJDEP's R. Wormley to NJDEP's M. Toogood, February 6, 2014.

treatment system) of 12.9 tons/year.[143] The 12.9 tons/year emissions limit still applies to the Landfill.

289.    On January 4, 2013, Mr. DeNafo and Mr. Conover met with NJDEP to request that NJDEP issue a new Title V permit to increase these H2S emissions limits based upon the data confirming that the concentration of H2S in the gas collected by the Landfill was rising, and causing the landfill to violate its existing Title V permit emissions limitation for H2S.[144]

290.    In February 2013, NJDEP notified the ACUA that the Landfill's disposal of C&D waste posed a risk of elevated fugitive emissions of H2S and a threat to public health and directed the ACUA to consider implementing a number of corrective actions to reduce its H2S emissions, including:

  a.  Monitor for odors *and H2S near the landfill surface, at the property line, and in off-site ambient air*;

  b.  Do not accept C&D fines that contain large amounts of gypsum wall board;

  c.  *Reduce other sources of gypsum, wallboard accepted at the landfill*;

  d.  Re-evaluate the design of the gas collection and treatment system;

  e.  Expand and improve the gas collection system if needed;

  f.  Ensure the combustion capacity is sufficient;

  g.  Add flares as needed;

  h.  Add sulfur removal equipment to the landfill gas collection/treatment system;

  i.  Re-evaluate the waste sequencing plan and timing of final cover placement;

---

[143] ACUA, Deviation Report, NJDEP Form 200-B-Testing & Monitoring, Description of Noncompliance.
[144] ACUA (Trinity Consultants), Minor Air Permit Modification Application, March 2013.

j.  Develop action levels and associated corrective action responses based on odor *and H2S monitoring results*;

k.  Evaluate use of additional cover material, cover products and/or neutralizing agents;

l.  *Plan for community and emergency responder communications*; and

m.  *Address worker protection during normal operations and in the future in the event of the need to disrupt the landfill ( e.g. excavation activities, confined spaces) that might expose a worker to high concentrations of landfill gas, especially H2S.* (emphasis added).[145]

291.  At that time, the H2S concentration measured in various of the Landfill's gas collection wells exceeded 5,000 ppm and averaged around 2,000 ppm at the flare used to burn the collected gas.[146]

292.  In March 2013, the ACUA submitted an application to NJDEP, which proposed to increase the Landfill's permitted H2S emissions. The application was certified by Mr. Dovey as the Responsible Official and Mr. Conover, as an Individual with Direct Knowledge.[147]

293.  The ACUA's application contained a First-Level Health Risk Assessment to evaluate the health impacts associated with the Landfill's increased H2S emissions, which was required by NJDEP's regulations.[148]

294.  The ACUA's risk assessment concluded there was no elevated risk posed by the increased H2S emissions and therefore there was no need for any further risk analysis.

---

[145] NJDEP Letter to ACUA, Feb. 25, 2013.
[146] ACUA Map of Landfill gas Well Locations with H2S Values, December 12, 2014; ACUA, 2014 01 to 06 Deviation reports 200 B form _1700 H2S Limit
[147] ACUA (Trinity Consultants), Minor Air Permit Modification Application, March 2013.
[148] Ibid.

However, the ACUA failed to identify what sensitive receptors were included in the risk screening.[149]

295.    The ACUA also assumed that 85% of all of the H2S emitted by the Landfill was captured by the gas collection and control system.[150]

296.    After reviewing the ACUA's First-Level Risk Screening, the NJDEP asked the ACUA to specifically identify which sensitive receptors it had evaluated in its First-Level Risk Assessment. The ACUA replied that there were six:

      a.   Kid Academy Child Care (101 Morton Ave, Absecon, NJ 08201);

      b.   Kidz Campus & Play Café (682 White Horse Pike, Absecon, NJ 08201);

      c.   Pleasantville Middle School (801 Mill Road, Pleasantville, NJ 08232);

      d.   Pleasantville High School(701 Mill Road, Pleasantville, NJ 08232);

      e.   Holy Spirit High School(500 S. New Road, Absecon, NJ 08201); and

      f.   All God's Children (515 S. Mill Road, Absecon, NJ 08201).[151]

297.    ***Incredibly, despite dozens of odor complaints from the BAL Community—the closest sensitive receptor to the Landfill—the ACUA had completely omitted BAL from the First-Level Risk Assessment used to support its proposed increase in the permitted level of H2S emissions from the Landfill***.

---

[149] Ibid; *see also* NJDEP, Second Level Risk Assessment and Odor Impact Analysis, ACUA, PI # 70506 (June 25, 2013).
[150] Ibid, Exhibit A Emission Calculations
[151] Email from R. Supriya, Trinity Consultants to NJDEP, June 21, 2013.

298.    The NJDEP then decided to conduct its own Second-Level Risk Assessment—a more detailed risk assessment—using the same 6 sensitive receptors.

299.    On June 24, 2014, the NJDEP completed it's Second-Level Risk Assessment, which used certain assumptions tending to minimize the predicted offsite impacts to sensitive receptors of the Landfill's fugitive emissions of H2S, including assuming that such emissions would occur: (a)  uniformly across the entire Landfill surface; and (b) at a constant rate of 0.000001055 lb/hr/ft2.[152]

300.    Even despite these assumptions, NJDEP's risk assessment found that the off-site impacts from the Landfill's H2S emissions exceeded the short-term reference concentration of 42 ug/m3 by three and one-half (3.5) times and would pose elevated risks at two of the daycare facilities, the Kidz Campus and All God's Children.

301.    NJDEP's risk assessment revealed that the children at the Kidz Campus Preschool, located in the same Northeast direction as BAL but about 4,900 feet further, and the All God's Children Daycare located about 3,200 feet east of the Landfill, would be exposed to Landfill H2S emissions exceeding the risk threshold. The modeled 1-hour impact was 69.6 ug/m3 at the Kidz Campus and 66.1 ug/m3 at All God's Children, which both exceed the hazard quotient of 1.0—the level of exposure at which people suffer injury.[153]

302.    On July 2, 2013, the NJDEP provided the ACUA with its risk assessment.

---

[152] NJDEP Second Level Risk Assessment and Odor Impact Analysis for Atlantic County Utilities Authority Landfill; Egg Harbor Township, Atlantic County; PI # 70506, Permit Activity # BOP130001 (June 25, 2013), Table 1 Health Impact of H2S Emissions and Table 3 Sensitive Receptor Health Risk and Odor Impact Assessment.
[153] Ibid.

303.     Given that BAL was much closer to the Landfill and in the same direction as the Kidz Campus Preschool where the model demonstrated exposures to H2S well above the hazard quotient, it was obvious the Residents were being exposed to H2S concentrations at even greater concentrations far above the short-term hazard quotient.

304.     On July 10, 2013, the NJDEP wrote to Mr. Conover at the ACUA with a series of questions about the ACUA's assumptions in connection with its increased H2S emissions.[154]

305.     NJDEP asked the ACUA to explain how it derived the estimated 85% capture efficiency for the Landfill's gas collection system and why it had excluded from the risk assessment "the over 55 community that is adjacent to the ACUA facility . . . [which the ACUA] *will need to re-evaluate using this additional sensitive receptor*."[155]

306.     On July 25, 2013, the ACUA wrote to NJDEP to urge "there should be no reason for the NJDEP to perform a short-term risk assessment … the landfill has not been the subject of recent odor or nuisance complaints … ACUA currently operates the landfill GCCS [gas collection and control system] in compliance with the extensive requirements of both NSPS Subpart WWW Standards of Performance for Municipal Solid Waste Landfills and NESHAP Subpart AAAA National Emission Standards for Hazardous Air Pollutants: Municipal Solid Waste Landfills . . . and the absence of odor complaints at the facility are clear indicators that *the existing NJDEP approved short-term limits are more than adequate to*

---

[154] Email from NJDEP's H. Baist to G. Conover, July 10, 2013.
[155] Ibid.

*ensure public health and happiness and that the requested updates to the long-term limits pose*

*no risk (as modeled by the NJDEP).*[156]

307.    Each of these claims was untrue and remain so today.  The Landfill: (i) was not

in compliance with the federal *Landfill NSPS* or the *Landfill NESHAP;*[157] (ii) had excessive

fugitive Landfill gases emissions (i.e. methane > 500 ppm) at 14 separate locations (thus the

GCCS capture efficiency was significantly below 85%);[158] (iii) was continuously violating its

instantaneous concentration limit for H2S in Landfill gases;[159] and (iv) was the subject of

multiple odor complaints by BAL.[160]

308.    On August 14, 2013, the NJDEP's Ram Shah, the Engineer in the NJDEP

Bureau of Solid Waste Permitting responsible for overseeing the Landfill's compliance with its

SWF Permit, wrote to Mr. Conover requesting any H2S monitoring at the Landfill, and

suggesting that the ACUA may be required to implement "an ambient air monitoring and/or

soil gas monitoring at the perimeter of the Landfill."[161]

309.    As discussed more fully below, in December 2023, the ACUA finally installed

an ambient air monitoring system at the perimeter of the Landfill.

---

[156] Trinity Consultants Memo to NJDEP, "NJDEP Second Level Risk Assessment and Odor Impact Analysis" (July 25, 2013).
[157] *See* USEPA, *In re: Atlantic County Utilities Authority, Complaint No. CAA-02-2015-1212* (Sept. 30, 2015) (USEPA inspection on December 17 & 18, 2013, determined that the ACUA was not conducting fugitive emission monitoring correctly, that the methods used generated false results, and that the Landfill actually had failed to control fugitive emissions of Landfill gas at 14 different locations at the Landfill).
[158] SCS Field Services to ACUA, January 8, 2014,
[159] NJDEP Inspection Summary Report for ATLANTIC COUNTY UTILITIES AUTHORITY LANDFILL - Activity Number SUB 140001 (Inspection Jan. 1, 2013 to May 27, 2015) (finding that the ACUA was exceeding the instantaneous H2S concentration  permit limit of </= 1,700 ppm in September 2013 (2000 ppm), October 2013 (2000 ppm), November 2013 (2000 ppm), and December 2013 (2000 ppm) in violation of its Title V Permit.
[160] ACUA to NJDEP, Dec. 12, 2012 (Noting odor complaints for past few weeks).
[161] Email from NJDEP R. Shah to G. Conover, Aug 14, 2013.

310.    On September 9, 2013, NJDEP's Bureau of Technical Services—the air quality

modeling group within NJDEP—wrote to the ACUA again:

> During our conversation this afternoon, we discussed the air dispersion
> modeling and risk assessment the Bureau of Technical Services (BTS)
> conducted in association with the air permit application submitted by
> ACUA. **_Results showed high health impact from H2S fugitive emissions._**
> We had shared an early version (dated June 25, 2013) of our assessment
> summary memo with you, and you had provided responses on July 25,
> 2013. With this email, we are again reaching out to you so we could work
> together to address the health risk issues. Mr. Harry Baist of the Bureau of
> Air Permits will invite ACUA representatives for a meeting to discuss all
> relevant issues. (emphasis added).[162]

311.    More than a year passed without the ACUA performing the necessary risk

assessment. During that time, the odor problems in BAL worsened.

312.    The Residents' repeated exposures to fugitive Landfill gas emissions prompted

the NJDEP to initiate a program of nighttime odor surveillance using a Jerome handheld meter

to confirm the extent of Landfill gas odors and H2S emissions in excess of 30 ppb beyond the

fence line of the Landfill:

> In response to odor complaints received regarding Atlantic County Utilities
> Authority Landfill located in Egg Harbor Township in Atlantic County over the
> course of the year, Southern Air staff will be proactively conducting odor surveys
> in the area surrounding the landfill. Since January 2013 there have been twenty
> three complaints from five different addresses, with nine complaints lodged
> during January 2014. The complaints typically are received after hours and have
> not been verified to date. Between the hours of 6-9 pm on February 3, 10,17, and
> 24, 2014, staff will conduct odor surveys at eleven predetermined locations
> around the landfill. The purpose of this surveillance is to determine if odors do
> exist at night and if so does the Standard Operating Procedure on record with
> Trenton Dispatch require modification so that the NJDEP can better proactively
> address the complaints.[163]

---

[162] Email from NJDEP's Y Zhang to ACUA's J. Coffey, "Risk Assessment of ACUA Landfill," Sept. 9, 2013.
[163] NJDEP's R. Wormley to NJDEP's V. Giordano re: "Atlantic County Landfill" (Jan. 30, 2014).

313.    Between February and April 2014, the NJDEP conducted several nighttime odor surveillance investigations, in and around the BAL Community which confirmed the Landfill's emissions of H2S were impacting the Community.

314.    On the night of February 6, 2014, using a Jerome meter, the NJDEP investigator detected H2S concentrations of 83, 73, 65, 52 ppb within BAL more than 730 feet from the Landfill fence line. The highest H2S concentration, 83 ppb, was detected at the entrance to BAL about 2,500 feet beyond the Landfill fence line.[164]

315.    On the night of March 11, 2014, NJDEP performed another odor surveillance investigation which detected H2S concentrations of 97, 91, 90, 78, 75, 71, 64 ppb in and around the BAL Community, variously described as "acrid sulfur like odor . . . more offensive –like walking into a wall of rotten odor suddenly. . . extremely objectionable odor–can almost taste." [165]

316.    On the night of March 24, 2014, NJDEP performed another odor surveillance investigation, which detected H2S concentrations of 74 and 50 ppb within BAL along West Del Ray Lane, described as "strong landfill gas odor."[166]

317.    After the NJDEP's H2S surveillance investigation confirmed significant concentrations of H2S in the BAL Community, NJDEP again requested the ACUA conduct another risk assessment and specifically to include BAL. NJDEP required that the risk

---

[164] NJDEP (Toogood) to NJDEP (Wormley) re: ACUA Area Odor Surveillance Update Feb 14, 2014
[165] NJDEP ACUA Landfill Gas Odor Surveillance Data, Feb. 6, 2014–March 24, 2014.
[166] NJDEP ACUA Landfill Gas Odor Surveillance Data, Feb. 6, 2014–March 24, 2014.

assessment pay "[s]pecial attention … to receptors in area considered to be sensitive, such as at nearby residences, hospitals, schools, and parks … nursing homes … and day care centers."[167]

318.    The ACUA acknowledged that it would include BAL in the risk assessment.[168]

319.    When the ACUA finally completed the risk assessment in March 2015, it revealed that children at the nearby Kids Academy located about 5,000 feet more distant from the Landfill in the same Northeasterly direction as BAL would be exposed to H2S levels almost twice the short-term hazard quotient, which is the level at which adverse health effects are expected, which was 84.9 ppb.[169]

320.    Incredibly, while the text of the ACUA's 2015 Risk Assessment represented that it had included "Beezer Homes Gatherings at Bel Are Lakes" and six other sensitive receptors in the analysis, this was untrue.[170] The BAL community was omitted from the published risk assessment results even though the results showed that children at the Kids Academy located in the same wind direction from the Landfill but 5,000 feet further away would be exposed to H2S concentrations above the threshold for acute health risks.

321.    The following image from the Risk Assessment illustrates the ACUA's actions:

---

[167] NJDEP, *Technical Manual 1003 Guidance on Risk Assessment for Air Contaminant Emissions* (Nov. 18, 2009), Sec. 2.1
[168] Email from NJDEP to ACUA, July 21, 2014.
[169] ACUA 2015 Risk Assessment.
[170] NJDEP, 1-hr SO2 Impact, n. 2 & n. 6, H2S Second Level Risk Assessment and H2S Odor Impact Analysis for Atlantic County Utilities Authority Landfill; Egg Harbor Township, Atlantic County; PI# 70506, Permit Activity# BOP130001 (March 10,2015).



322. Thus, instead of including BAL, the closest residential units to the Landfill, the ACUA Risk Assessment removed BAL from the assessment and replaced it with "LAESch-D5" (the Leeds Avenue Elementary School) located over 9,000 feet from the Landfill. *See* Sensitive Receptor D5 on the above map.

323. Despite the findings of the Risk Assessment, in several meetings with members of the BAL Community to discuss the ongoing H2S problems, one on October 30, 2014 and another on February 18, 2015, ***the ACUA management, including Mr. Dovey, and Mr. Conover made no mention of the risk assessment and affirmatively represented that the Residents had no cause to be concerned about the gases they were inhaling.***

324. Despite the findings of the Risk Assessment, the NJDEP allowed the ACUA to continue operating the Landfill in the same manner and without requiring the ACUA to

implement meaningful measures to reduce fugitive emissions of H2S, such as by prohibiting the ACUA from accepting C&D waste containing gypsum wall board, re-evaluating the waste sequencing plan and timing of final cover placement, or using additional cover material.[171]

325.    The only measure NJDEP required the ACUA to implement as additional control to limit fugitive H2S emissions, which was imposed on the ACUA as a condition to resolving NJDEP's enforcement action for H2S violations, was the development of the Odor Management Plan, which included H2S monitoring at the Landfill fence line.

326.    The Gee Report, Section 8.2, documents that the Odor Management Plan did not reduce fugitive H2S emissions at all.

327.    Since 2017, the ACUA's Title V Permit has required Landfill workers to collect an H2S reading using a Jerome Meter at the Landfill property line once per day at a single location to verify the Landfill's compliance with the 30 ppb standard.[172]

328.    The ACUA directs its landfill workers to collect the H2S samples in the morning, hours after the nightly landfilling activities are finished. Never once have the workers collected an H2S sample during the nighttime landfilling activities.

329.    Nor have the landfill workers ever documented an exceedance of the 30 ppb H2S standard.

---

[171] NJDEP Letter to ACUA, Feb. 25, 2013.
[172] Title V Permit, Ref.#33 at 127.

**The ACUA often points to the lack of any evidence of an exceedance of the 30 ppb standard as evidence the Landfill is operating within the 30 ppb standard and poses no threat to public health.**

330.    According to the Gee Report, malodor complaints have risen precipitously since the ACUA finished building the second of three massive 60-foot retaining walls which raised the elevation where waste is disposed at the landfill, making it easier for landfill gas to travel off-site.

331.    The retaining walls also created a "bathtub" landfill which generates more landfill leachate—contaminated water that is a major source of malodors—which the landfill was never designed to safely manage in the huge volume now produced.

332.    The landfill is filled with contaminated leachate, which is an ongoing source of H2S emissions and associated odors.

**The Landfill's Nighttime Operation is the Primary Source of H2S Emissions**

333.    According to the Gee Report, Section 7.0, the primary source of excess fugitive H2S emissions is the nightly landfilling activity. Each night the ACUA loads, hauls, dumps, spreads, and compacts about 1,000 tons of waste stored in the Transfer Station. Fifty truck trips. Twenty (20) tons per load.

334.    Putrescible waste generally begins to decay within a few hours of being placed in a container. As it decomposes, putrescible waste generates malodors, including H2S.

335.    Pursuant to the Atlantic County Solid Waste Plan, all of the putrescible waste generated within Atlantic County must be transported to the ACUA's Transfer Station ("Transfer Station or "TS") for storage and eventual disposal at the Landfill.

336.    Accordingly, putrescible waste from across Atlantic County, much of it sitting in dumpsters for multiple days before being picked-up, is then stored in the TS for many more hours or even days before it is disposed at the Landfill at night.

337.    By the time the putrescible waste is disposed at the Landfill, it may be more than a week old and highly malodorous.

338.    The ACUA owns and operates a fleet of heavy-duty diesel trucks and bulldozers to accomplish its waste disposal operation.  The putrescible waste stored in the TS is loaded onto reticulated dump trucks and transported to the working face of the Landfill where they dump the waste.  Bulldozers then spread the putrescible waste out over the surface of the Landfill, and then dive over it repeatedly to crush the waste and compact it.

339.    All of this activity must take place at least one hour after sundown and be completed at least one hour before sunrise, pursuant to Condition 41 of the Landfill's SWF Permit.[173]

340.    A significant fraction of fugitive H2S emitted by landfills occurs at the working face.

---

[173] SWF Permit, Condition 41.

341.    Without the ability to bury its putrescible waste at night, the ACUA would have to transfer all of this waste to another landfill and this would cost more money.

342.    The Landfill accepts a wide variety of different solid wastes for disposal, including putrescible waste, also known as Municipal Solid Waste ("MSW") ("Type 10"), Bulky Waste ("Type 13"), Construction and Demolition ("C&D") Waste ("Type 13C"), Vegetative waste ("Type 23"), Animal and food processing wastes ("Type 25"), Dry Industrial Waste ("Type 27"),  Asbestos or Asbestos-containing Waste ("Type 27A"),  and Incinerator Ash or Ash-Containing Waste ("Type 27I").

343.    The Landfill charges a "tipping" fee for the disposal of waste in the Landfill. The Landfill receives $85.77/ton for putrescible waste and $111.83/ton for C&D waste.

344.    Roughly sixty (60) percent of the waste disposed at the Landfill is MSW.

345.    Roughly thirty (30) percent of the waste disposed at the Landfill is C&D waste.

**The Landfill's Nighttime Operations is a Clear Violation of the SWMA**

346.    The Landfill is one of the only MSW landfills in the world to operate primarily at night, a condition NJDEP imposed on the Landfill in 2000 to allow the Landfill to accept putrescible waste for disposal.

347.    Until 2000, all the putrescible waste generated in Atlantic County was consolidated at the ACUA's Transfer Station and then transferred to private waste haulers for disposal at landfills outside of Atlantic County.

348.     Until 2000, the Landfill was prohibited from accepting any putrescible waste because putrescible waste attracts large numbers of flocking birds, including seagulls and starlings, which pose a threat to aircraft landing and taking off from the nearby Atlantic City International Airport ("ACIA").

349.     The ACUA's nighttime landfilling operation is a clear violation of a 1981 amendment to the SWMA, which prohibits a landfill located within 1,000 feet of residential zone from operating at night:

> Notwithstanding the provisions of P.L.1970, c. 40 (C. 48:13A-1 et seq.) *or any other law, rule or regulation to the contrary*, *no solid waste disposal facility located in or within 1000 feet of any area zoned residential*, other than a resource recovery facility, a baling facility and its related operations, a transfer station, or a recycling facility, shall be operated on any day before 7:00 a.m. or after 7:00 p.m.; provided, however, the department, upon finding that the public health, safety or welfare so requires, is authorized to exempt any solid waste disposal facility from the provisions of this supplementary act.[174]

350.     There are two areas within 1,000 feet of the Landfill zoned residential.  BAL is located approximately 240 feet from the Northeastern boundary of the Landfill. Another senior retirement community, called "Ocean Club," is under construction on 275 acres approximately 600 feet from the northwestern property boundary of the Landfill across the Garden State Parkway. The Ocean Club will be a 657 unit planned age restricted community.

351.     There is no record of NJDEP ever having formally exempted the Landfill from the SWMA prohibition of nighttime landfills within 1,000 feet of residential zones.

---

[174] N.J.S.A. 13:1E-15.1. Hours of operation; facility within 1000 feet of residential zone.

352.   The continued operation of the Landfill at night is a violation of law.

353.   Nor is there any basis for NJDEP to find the public health, safety or welfare requires the ACUA to dispose of putrescible waste at the Landfill at night.  The ACUA is able to send its putrescible waste to other landfills, albeit perhaps at increased cost.

354.   Increased cost does not go to health, safety or welfare.

**The Operations of the Landfill Poses an Increased Risk to Jet Aircraft Taking Off and Landing at ACIA in Violation of RCRA and the SWMA**

355.   The Landfill only operates at night because it is located too close to the ACIA, less than 10,000 feet away.

356.   Putrescible waste is about 60 percent of all of the waste disposed of at the Landfill, which in 2023 was 303,100 tons.

357.   The Landfill disposes of putrescible waste only at night to avoid attracting birds. Daytime disposal of putrescible waste attracts foraging birds which pose a catastrophic risk to aircraft taking off and landing at ACIA

358.   On any given day, a MSW landfill in a coastal region like Atlantic County, will attract hundreds to thousands of scavenging birds, including seagulls and European starlings, which feed on the organic matter in the waste.

359.   Longstanding FAA, Air National Guard, and USEPA regulations generally prohibit the siting of municipal solid waste landfills within 10,000 feet of civilian airports and

within 15,000 feet of military airports because landfills attract birds which pose a grave threat to aircraft safety due to potential collisions and engine entrainment.[175]

360.    When it first sought NJDEP approval to build the Landfill in the late 1980's, the FAA Office of Aviation Research, Airport and Aircraft Safety R&D Division, which studies bird strike risks to aircraft, opposed the Landfill as did the NJDEP.

361.    The proposed site for the Landfill was less than 10,000 feet from Runway 13 at ACIA, a facility used by commercial and military aircraft.

362.    MSW landfills have a long history of attracting flocking birds, including starlings and seagulls, which have caused fatal crashes of jet aircraft.

363.    USEPA subsequently issued regulations governing the siting and operation of municipal solid waste landfills, which require Landfills located within 10,000 feet of jet aircraft airports affirmatively to demonstrate that their operations do not pose a "bird hazard":

> Owners or operators of new MSWLF units, *existing MSWLF units*, and lateral expansions that are located within 10,000 feet (3,048 meters) of any airport runway end used by turbojet aircraft or within 5,000 feet (1,524 meters) of any airport runway end used by only piston-type aircraft *must demonstrate that the units are designed **and operated** so that the MSWLF unit does not pose a bird hazard to aircraft. . .  For purposes of this section . . . **Bird hazard means an increase in the likelihood of bird/aircraft collisions that may cause damage to the aircraft or injury to its occupants**.* (emphasis added).[176]

---

[175] *See* FAA Order 5200.5, *FAA Guidance Concerning Sanitary Landfills On Or Near Airports* (October 16, 1974); FAA, Adv. Circ. 5200.5A, *Waste Disposal Sites on or Near Airports* (January 31, 1990); FAA, Adv. Circ. 150/5200-34A Part 6 *Construction or Establishment of Landfills Near Public Airports* (Jan. 26, 2006); FAA Adv. Circ. 150/5200-33C Part 5, *Hazardous Wildlife Attractants on or near Airports* (Feb. 21, 2020).
[176] 40 C.F.R. 258.10 (Airport Safety).

364.     NJDEP's *Specific Disposal Regulations for Sanitary Landfills* also prohibit the continued operation of a landfill within 10,000 feet of airport determined "to present a real or potential attraction for birds, *until an effective deterrent plan is implemented*." (emphasis added).[177]

365.     In an attempt to overcome FAA and NJDEP opposition, the ACUA submitted a proposed bird deterrent plan which it argued would adequately mitigate the risks to aircraft posed by birds that would be attracted to the proposed Landfill. The Air National Guard and the U.S. Department of Agriculture objected, arguing that the Landfill still would attract birds posing an unreasonable safety risk to flying aircraft.[178]

366.     The very next year, the ACUA again applied for approval to site the Landfill in the exact same location. To overcome the concerns about birds the ACUA offered to restrict the operation of the Landfill to the nighttime when birds supposedly are not active.[179]

367.     Once again, the FAA and Air National Guard 177th Fighter Wing opposed the "nighttime landfill." According to the Commander of the 177th Fighter Wing, the increased risk to operating aircraft posed by birds attracted to the Landfill cannot be mitigated:

> I seriously doubt the [single engine on an F-16] would be able to take a bird strike and keep on operating . . . *Every normal landing puts us over the landfill. If you approve this landfill plan, then you've raised the risk of catastrophe to myself and my men and I can't accept that.*"[180]

---

[177] N.J.A.C. 7:26-2A.4(k).
[178] *See In the Matter of Certain Amendments to the Adopted and Approved Solid Waste Management Plan of the Atlantic County Solid Waste Management District*, (December 13, 1988).
[179] *See In the Matter of Certain Amendments to the Adopted and Approved Solid Waste Management Plan of the Atlantic County Solid Waste Management District*, (July 25, 1989).
[180] Atlantic City Press, 'Birds: County Plan for landfill dismissed" (July 11, 1989).

*we cannot compromise on air safety. My responsibility to the adjutant general and the governor is not only the safety of my people – on the maintenance of the equipment we've been doing – but safety of the residents of the county on the ground. And if anything goes on that increases or creates a danger to the people on the ground as well as my aircrew, I can't compromise. And as been said, we have checked with our Air Force experts; and we know of no method which will assure that no birds will be attracted to this landfill site. This is something that the Air Force has studied for many, many years, and they've tried many, many different techniques.* (emphasis added).[181]

368.    The FAA's Office of Aviation Research, Airport and Aircraft Safety R&D Division, which oversees wildlife hazard research and management of the National Wildlife Strike Database,[182] *specifically noted that it was unaware of any bird deterrent plan ever successfully eliminating an existing bird problem. It further noted that in 1973 it had determined that a bird hazard already existed at the FAA Technical Center and that constructing a landfill so close to ACY would only serve to increase the bird hazard.*[183]

369.    The NJDEP agreed and rejected the plan, concluding it "was not viable."[184]

370.    The NJDEP's Division of Solid Waste Management also objected to the ACUA's proposal to rely upon nighttime landfilling and daytime bird deterrence as a means to prevent birds, finding that even the slightest deviation from such plans increased the risk of a disaster:

> The Division remains unconvinced that soaring birds will not be attracted to the daylight activities at the proposed facility regardless of the anticipated lack of food. *Any form of attraction of soaring birds to the proposed site will result in an increased risk of a bird aircraft strike hazard across the flight path of departing and incoming aircraft on runway 13-31 and the proposed parallel*

---

[181] Atlantic City Press, 'Aviation spokesmen review objections to landfill' (Aug. 13, 1989).
[182] See https://www.faa.gov/about/office_org/headquarters_offices/ang/offices/tc.
[183] *See In the Matter of Certain Amendments to the Adopted and Approved Solid Waste Management Plan of the Atlantic County Solid Waste Management District*, (December 13, 1988).
[184] *See In the Matter of Certain Amendments to the Adopted and Approved Solid Waste Management Plan of the Atlantic County Solid Waste Management District*, (December 13, 1988).

*runway as delineated in the Atlantic City International Airport Master Plan (which is to be completed in the near future), thereby creating a hazard.* It is the Division's understanding that this particular airport, commonly referred to as the Atlantic City International Airport, not only serves as a major commercial airport in Southern New Jersey, but also plays a large role in the United States' defense in the region. *To adversely impact such a major facility is not only detrimental to nearby residents, but also to those citizens that the facility seeks to protect. Further, the Division remains unconvinced that the technology of night landfilling and daylight activities conducted within a building is a proven technology and that birds will be deterred. The Department's charge is to ensure to the public, with a high degree of certainty, that operational plans and proposals at any solid waste facility can be successfully implemented.* ***This plan's success, however, is dependent upon the operators' continued strict adherence to the permit conditions. Operator-dependent plans are certainly not fail-safe; therefore, the Division is unwilling to approve the ACUA's plan which may, upon even the slightest deviation from the standard procedure, cause a serious aircraft accident.*** (emphasis added).[185]

371.    Based upon these and other adverse comments, the NJDEP again rejected the ACUA's proposed new landfill but left open the possibility for a "limited use" landfill accepting only non-putrescible waste—Types 13 (bulky waste including construction and demolition waste) and 27 (dry industrial waste)—waste types not containing organic matter that attracts birds.[186]

372.    In 2000, the ACUA convinced NJDEP to allow disposal of putrescible waste—MSW--at the Landfill by demonstrating that nighttime landfilling of waste did not attract birds and that a bird deterrence and control plan would prevent flocking birds from congregating at or near the Landfill during the day, including at BAL.

---

[185] *See In the Matter of Certain Amendments to the Adopted and Approved Solid Waste Management Plan of the Atlantic County Solid Waste Management District*, (Sept. 5, 1989).
[186] *See In the Matter of Certain Amendments to the Adopted and Approved Solid Waste Management Plan of the Atlantic County Solid Waste Management District*, (Sept. 5, 1989).

373.    USEPA regulations promulgated under Subtitle D of RCRA governing the design and operation of MSW landfills, to which the Landfill is subject, and FAA policy, both prohibit the siting of any MSW landfill or expansion of any such landfill within 10,000 feet of any airport serving jet aircraft unless the landfill owner affirmatively demonstrates that the landfill is designed and operated to "not pose a bird hazard to aircraft . . . [defined as] *an increase in the likelihood of bird/aircraft collisions.*"[187]

374.    NJDEP's regulations also prohibit the continued operation of a landfill within 10,000 feet of airport determined "to present a real or potential attraction for birds, until an effective deterrent plan is implemented."[188]

375.    Accordingly, the Landfill initially was prohibited from accepting MSW for disposal. Throughout the 1990's all of the MSW generated in Atlantic County was collected by the ACUA, consolidated at the ACUA transfer station, and then transported to other landfills for ultimate disposal.

376.    When Absecon rezoned the land where BAL was eventually constructed in 2000, the Landfill had been operating since inception in 1992 as a "limited use" landfill authorized by its NJDEP solid waste facility permit to accept only non-putrescible wastes.

377.    Putrescible waste also is a source of food for birds, which they can detect from miles away based on the odor.

---

[187] 40 C.F.R. 258.10 (Airport Safety); FAA, Advisory Circular No: 150/5200-33C, *Hazardous Wildlife Attractants on or near Airports.*
[188] N.J.A.C. 7:26-2A.4(k).

378.    In 2000, while the City of Absecon was rezoning the undeveloped land where BAL now sits for use as Senior Citizen Housing, the Chairman of the Absecon Zoning Board was Chris Seher, a man with multiple hats.

379.    In addition to chairing the Absecon Zoning Board, Mr. Seher also served as the Vice Chair of the ACUA. In addition, he was the Manager of the FAA Office of Aviation Research, Airport and Aircraft Safety R&D Division, the FAA office responsible for studying bird strike risks to aircraft and evaluating whether the Landfill posed such risks.

380.    While the City of Absecon was rezoning the undeveloped land next to the Landfill for use as Senior Citizen Housing, in the Fall of 2000, the ACUA was convincing the FAA and the NJDEP to allow the Landfill to accept putrescible waste, notwithstanding the risks of attracting birds.

381.    The ACUA's proposed solution to address the bird risk was to switch the Landfill's operations from daytime to the nighttime, when flocking birds are not present, and to implement a stringent bird control and deterrence plan to prevent birds from flocking at the Landfill and surrounding areas during the day.

382.    However, the FAA continued to oppose the disposal of putrescible waste at the Landfill: "The reason we oppose it [the continued nighttime landfilling of putrescible waste] is we don't know whether it's sustainable or not. Our wildlife biologists tell us sometimes it takes up to five years to develop a feeding area for birds."[189]

---

[189] See In the Matter of Certain Amendments to the Adopted and Approved Solid Waste Management Plan of the Atlantic County Solid Waste Management District, p. 5 (Oct 21, 1999).

383.    In late 2000, the NJDEP authorized the ACUA to accept putrescible waste on condition that the Landfill would only operate at night and would strictly implement and execute a Bird Deterrence and Control Plan ("Bird Plan") to prevent flocks of birds from congregating during the day at the Landfill or nearby housing subdivisions.

384.    The NJDEP's approval was contingent upon the ACUA making an annual demonstration that its Bird Plan remained effective:

> the FAA, as noted above, continues to have concerns whether nighttime landfilling of putrescible solid waste is a sustainable activity. *Therefore, the DEP considers it prudent to re-evaluate the results of nighttime landfilling on an annual basis.* Consequently, within Section C. of this certification, the Department approves with modification nighttime landfilling of putrescible waste contingent upon the submission to the DEP on an annual basis of an administrative action (pursuant to N.J.A.C. 7:26-6.ll(b)l0) which reports on the results of this activity and the identification of any problems.  .  . The County Plan inclusion of the continued nighttime landfilling of municipal solid waste at the ACUA landfill located in Egg Harbor Township, Atlantic County is approved with modification. Specifically, as noted within Section B., *continued nighttime landfilling of putrescible waste is approved with modification contingent upon submission to the DEP on an annual basis of an administrative action which reports on the results of this activity and the identification of any problems. Therefore, the decision to continue to approve nighttime landfilling of municipal waste will be annually re-evaluated with the first such report due one year from the date of this certification.* (emphasis added). [190]

385.    Annual review of the effectiveness of the Bird Plan is a condition of the Landfill's Solid Waste Facility permit, which requires the ACUA annually to submit a report on the results of continued nighttime landfilling of putrescible waste *and the identification of any problems* and authorizes the NJDEP to suspend the ACUA's MSW landfilling activity for, *inter alia*: (a) failure to immediately cover waste under any circumstances; (b) failure to submit

---

[190] *See In the Matter of Certain Amendments to the Adopted and Approved Solid Waste Management Plan of the Atlantic County Solid Waste Management District*, p. 5 (Oct 21, 1999).

an annual report that includes the results of continued nighttime landfilling of putrescible waste and the identification of any problems; and (c) changes to the bird monitoring and deterrent plan without NJDEP approval.[191]

386.     In April 2000, Congress enacted legislation declaring with respect to landfills receiving putrescible waste that:

> collisions between aircraft and birds have resulted in fatal accidents . . . landfills near airports pose a potential hazard to aircraft operating there because they attract birds . . . *even if the landfill is not located in the approach path of the airport's runway, it still poses a hazard because of the birds' ability to fly away from the landfill and into the path of oncoming planes*. (emphasis added).[192]

## Pollution Violations of the Landfill

### *Pollution Violations*

387.     The Gee Report provides an in-depth analysis of the ACUA's exceedance of the 30 ppb fence line standard throughout the BAL Community.

388.     Although the ACUA's own H2S emission monitoring has never detected an H2S exceedance at its fence line, numerous measurements taken with a calibrated Jerome J605 meter inside the BAL community prove that the ACUA is regularly exceeding its regulatory limit of H2S beyond the landfill fence line.

---

[191] SWF Permit, Condition 83.
[192] *See* WENDELL H. FORD AVIATION INVESTMENT AND REFORM ACT FOR THE 21ST CENTURY, 2000 Enacted H.R. 1000, 106 Enacted H.R. 1000, 114 Stat. 61, 106 P.L. 181, 2000 Enacted H.R. 1000, 106 Enacted H.R. 1000, Sec. 503. LANDFILLS INTERFERING WITH AIR COMMERCE.

389.    Between October 9, 2023 and January 23, 2024, the Landfill violated the fence line standard more than 285 times.[193]

390.    Over the 82 day monitoring period, the Landfill violated the H2S property line standard on 52 individual days.[194]

391.    4,476 sampling events detected elevated H2S concentrations, with 1,611 (36%) greater than 30 ppb and 417 (9.3%) greater than 100 ppb.[195]

392.    Elevated concentration were detected 33.4% of the time.

393.    The duration of continuously elevated H2S concentrations ranged from 40 minutes up to 36 hours 9 minutes.

394.    The highest peak concentration of H2S at BAL was 1,766 ppb.

395.    The below table 6-1 illustrates the Gee Report's investigative analysis with a breakdown of the readings within the BAL Community.

---

[193] Gee Report, p. 1-2 thru 1-3.
[194] Gee Report, p. 1-2 thru 1-3.
[195] Gee Report, p. 1-2 thru 1-3.

| | **Table 6-1** | | | | | |
| | **Periods of Continuous Hydrogen Sulfide Exposure[1]** | | | | | |
| | **Location 3 - Backyard of 70 Delray Lane, Absecon, NJ** | | | | | |
| **Date and Start Time[2] of Continuous Exposure** | **Duration[3] of Continuous H$_2$S Exposure (minutes)** | **Duration[3] of Continuous H$_2$S Exposure (hrs:min.)** | **Peak H$_2$S Conc. (ppb)** | **Average Exposure Conc. During Period (ppb)** | **No. of 30 Minute Ave. H$_2$S Conc. > 30 ppb[4]** | **See Plot No.[5,6]** |
|---|---|---|---|---|---|---|
| 11/2/23 20:20 | 159 | 2:39 | 379 | 39.1 | 2 | 1 |
| 11/3/23 0:50 | 270 | 4:30 | 203 | 24.3 | 2 | 2 |
| 11/4/23 23:27 | 123 | 2:03 | 16.53 | 7.8 | None | 3 |
| 11/5/23 19:32 | 138 | 2:18 | 199 | 42.2 | 1 | 4 |
| 11/7/23 15:03 | 457 | 7:37 | 138 | 33.7 | 5 | 5 |
| 11/8/23 20:44 | 346 | 5:46 | **1,766** | 134.5 | 4 | 6 |
| 11/11/23 18:35 | 105 | 1:45 | 77.99 | 33.3 | 1 | 7 |
| 11/13/23 18:47 | 443 | 7:23 | 146 | 33.5 | 2 | 8 |
| 11/15/23 18:30 | 370 | 6:10 | 52.89 | 24.1 | 3 | 9 |
| 11/16/23 3:00 | 350 | 5:50 | 28.94 | 15.1 | None | 10 |
| 11/16/23 21:57 | 593 | 9:53 | 1,346 | 50.8 | 4 | 11 |
| 11/23/23 16:20 | 410 | 6:50 | 102.9 | 28.7 | 6 | 12 |
| 11/24/23 17:30 | 100 | 1:40 | 109.6 | 28.6 | 2 | 13 |
| 11/25/23 19:10 | 120 | 2:00 | 36.37 | 7.9 | None | 14 |
| 11/27/23 23:20 | 630 | 10:30 | 84.21 | 30.9 | 10 | 15 |
| 11/28/23 23:10 | 210 | 3:30 | 17.58 | 9.3 | None | 16 |
| 11/29/23 4:20 | 60 | 1:00 | 16.17 | 6.6 | None | 17 |
| 11/29/23 10:40 | 1,649 | 27:29 | 178 | 29.2 | 14 | 18 |
| 11/30/23 20:00 | 960 | 16:00 | 190 | 26.8 | 5 | 19 |
| 12/2/23 17:53 | 327 | 5:27 | 504 | **151.9** | 7 | 20 |
| 12/4/23 22:50 | 180 | 3:00 | 55.61 | 13.6 | None | 21 |
| 12/5/23 2:30 | 80 | 1:20 | 28.81 | 10.0 | None | 22 |
| 12/5/23 5:50 | 130 | 2:10 | 119.6 | 18.4 | 1 | 23 |
| 12/7/23 3:20 | 169 | 2:49 | 118.4 | 19.4 | 1 | 24 |
| 12/7/23 7:10 | 1,669 | 27:49 | 1,141 | 50.7 | 12 | 25 |
| 12/8/23 19:00 | 950 | 15:50 | 232 | 41.8 | 13 | 26 |
| 12/9/23 20:10 | 180 | 3:00 | 11.52 | 5.0 | None | 27 |
| 12/12/23 12:10 | 1,285 | 21:25 | 293 | 26.0 | 9 | 28 |
| 12/13/23 17:05 | 290 | 4:50 | 59.17 | 11.4 | None | 29 |
| 12/14/23 3:55 | 100 | 1:40 | 138 | 31.1 | 1 | 30 |
| 12/14/23 16:30 | 1,070 | 17:50 | 437 | 63.0 | 23 | 31 |
| 12/15/23 15:55 | 490 | 8:10 | 232 | 56.2 | 8 | 32 |
| 12/20/23 18:05 | 210 | 3:30 | 255 | 38.2 | 2 | 33 |
| 12/23/23 20:30 | 40 | 0:40 | 11.49 | 5.9 | None | 34 |
| 12/24/23 10:35 | 155 | 2:35 | 48.22 | 15.0 | 1 | 35 |

| Date and Start Time[2] of Continuous Exposure | Duration[3] of Continuous $H_2S$ Exposure (minutes) | Duration[3] of Continuous $H_2S$ Exposure (hrs:min.) | Peak $H_2S$ Conc. (ppb) | Average Exposure Conc. During Period (ppb) | No. of 30 Minute Ave. $H_2S$ Conc. > 30 ppb[4] | See Plot No.[5,6] |
|---|---|---|---|---|---|---|
|  | **Table 6-1 (Continued)** **Periods of Continuous Hydrogen Sulfide Exposure** **Location 3 - Backyard of 70 Delray Lane, Absecon, NJ** |
| 12/24/23 22:45 | 155 | 2:35 | 263 | 22.4 | 1 | 36 |
| 12/29/23 11:25 | 115 | 1:55 | 11.79 | 7.6 | None | 37 |
| 12/29/23 13:30 | 635 | 10:35 | 360 | 43.5 | 9 | 38 |
| 12/30/23 5:00 | 1,245 | 20:45 | 85.87 | 23.9 | 12 | 39 |
| 12/31/23 6:00 | 205 | 3:25 | 252 | 34.8 | 1 | 40 |
| 12/31/23 16:45 | 1,070 | 17:50 | 363 | 69.8 | 19 | 41 |
| 1/2/24 17:40 | 235 | 3:55 | 391 | 82.2 | 6 | 42 |
| 1/2/24 23:35 | 100 | 1:40 | 18.83 | 7.6 | None | 43 |
| 1/3/24 4:50 | 65 | 1:05 | 73.9 | 14.1 | None | 44 |
| 1/3/24 7:15 | 85 | 1:25 | 45.01 | 10.8 | None | 45 |
| 1/3/24 15:20 | 990 | 16:30 | 524 | 109.9 | 21 | 46 |
| 1/7/24 22:15 | 145 | 2:25 | 28.86 | 13.0 | None | 47 |
| 1/8/24 3:00 | 109 | 1:49 | 60.76 | 15.3 | None | 48 |
| 1/8/24 5:10 | 230 | 3:50 | 168 | 28.3 | 3 | 49 |
| 1/8/24 17:35 | 810 | 13:30 | 344 | 43.3 | 12 | 50 |
| 1/10/24 14:20 | 2,169 | **36:09** | 199 | 27.0 | 17 | 51 |
| 1/13/24 20:05 | 755 | 12:35 | 89.6 | 17.1 | 2 | 52 |
| 1/14/24 11:05 | 164 | 2:44 | 13.94 | 7.5 | None | 53 |
| 1/15/24 9:10 | 160 | 2:40 | 24.73 | 10.1 | None | 54 |
| 1/15/24 16:50 | 45 | 0:45 | 14.01 | 6.4 | None | 55 |
| 1/17/24 22:10 | 955 | 15:55 | 215 | 53.9 | 17 | 56 |
| 1/18/24 16:35 | 205 | 3:25 | 111.74 | 33.1 | 2 | 57 |
| 1/18/24 23:50 | 305 | 5:05 | 26.12 | 8.6 | None | 58 |
| 1/22/24 10:15 | 1,569 | 26:09 | 898 | 79.8 | 19 | 59 |
| 1/23/24 18:25 | 655 | 10:55 | 57.62 | 13.5 | 1 | 60 |

| Emission begins before sunset | Emission includes during an entire day |
|---|---|
| Emission continues after sunrise | Emission includes before sunset and after sunrise |

Notes:
1. Highest values for duration, peak concentration, average exposure concentration and number of exceedances of the 30-minute, 30 ppb property line standard and are in bold red font.
2. Military time.
3. Durations shown start at the first detection of H2S date and military time and end with the last detection of H2S.
4. All measurements were made approximately three feet above the ground surface using a Jerome J605.
5. Number of individual 30-minute periods where the average H2S concentration exceeded 30 ppb.
6. See Attachment C for time plots of H2S emissions.

**The ACUA Regularly Conducts Landfill "Disruption" Activities
in Violation of NJDEP Regulations**

*Disruption Standards*

396.    NJDEP solid waste regulations require a permit for any excavation, disruption, relocation or removal of any deposited material from either an active, terminated, or closed sanitary landfill, because the excavation and disturbance of decomposing waste emits H2S and other Landfill gas posing a threat to human health.[196]

397.    A disruption permit imposes a myriad of protective measures to control odors, dust, fires, rodents, insects, blowing litter, surface water run-on and erosion,.

*Disruption Violations*

398.    Between 2019 and 2020, the ACUA overfilled eight-acres of Cells #7, #3, #4, #5 at the top of the Landfill to an elevation exceeding 145 feet, the maximum elevation permitted by the ACUA's Solid Waste Facility Permit.

399.    Beginning in 2021 and at all times material hereto, the ACUA has been engaged in a massive excavation project to remove waste from the eight overfilled areas. Heavy duty earthmovers have been excavating through the cap into the mass of decomposing waste and relocating that waste to other areas of the Landfill without a disruption permit.

400.    The Landfill excavation project created a second working face for the Landfill primarily within Cell #7 to lower the overfilled area.

---

[196] See N.J.A.C. 7:26-2A.8.(j).

401.    NJDEP solid waste regulations require written approval of disruptions prior to any excavation, disruption, relocation or removal of any deposited material from either an active, terminated, or closed sanitary landfill.[197]

402.    ACUA did not make an application for a disruption permit or receive written approval from NJDEP to begin any type of disruption.[198]

403.    Without a permit to impose protective measures to control odors, dust, fires, rodents, insects, blowing litter, surface water run-on and erosion, the Landfill is in violation of the Solid Waste Management Act.

404.    The ACUA's repeated disruptions of the cap to regrade the overfilled area, coupled with ongoing landfill operations at the working face of the Landfill, is generating large amounts of Landfill gas, including fugitive H2S emissions, in violation of New Jersey regulations, State and Federal laws, the SWF Permit, and the Title V Permit.

*Bird Control Standards*

405.    USEPA regulations require landfills located within 10,000 feet of jet aircraft airports affirmatively demonstrate that they do not pose a "bird hazard."

406.    Bird hazards are defined as, "an increase in the likelihood of bird/aircraft collisions that may cause damage to the aircraft or injury to its occupants."[199]

---

[197] See N.J.A.C. 7:26-2A.8.(j).
[198] See N.J.A.C. 7:26-2A.8(j)1; NJDEP Inspection Summary Report for ATLANTIC CNTY SLF & TRANSFER STATION - Activity Number BCI 230002 (March 2, 2023) ("Was written approval obtained prior to disruption of the landfill? . [N.J.A.C. 7:26-2A.8(j)1]? Compliance Status: No).
[199] 40 C.F.R. 258.10 (Airport Safety).

407.    Longstanding Federal Aviation Administration ("FAA"), Air National Guard, and USEPA policies generally prohibit the siting of municipal solid waste landfills within 10,000 feet of civilian airports and within 15,000 feet of military airports because landfills attract birds which pose a grave threat to aircraft safety due to potential collisions and engine entrainment.[200]

408.    NJDEP's *Specific Disposal Regulations for Sanitary Landfills* also prohibits the continued operation of a landfill within 10,000 feet of an airport if the landfill "present[s] a real or potential attraction for birds, *until an effective deterrent plan is implemented*." (emphasis added).[201]

*Bird Plan Violations*

409.    The SWP requires the ACUA to strictly adhere to the requirements of its Bird Control and Deterrent Plan ("Bird Plan") to ensure there is no increased risk posed to jet aircraft taking off and landing at the ACIA, and to prevent birds from becoming vectors that place surround communities at risk.

410.    The evidence overwhelming demonstrates that the ACUA is in violation of the Bird Plan, which has increased the risk to aircraft at ACIA and has exposed BAL residents to pathogens originating from the Landfill.

---

[200] *See* FAA Order 5200.5, *FAA Guidance Concerning Sanitary Landfills On Or Near Airports* (October 16, 1974);
FAA, Adv. Circ. 5200.5A, *Waste Disposal Sites on or Near Airports* (January 31, 1990); FAA, Adv. Circ. 150/5200-34A Part 6 *Construction or Establishment of Landfills Near Public Airports* (Jan. 26, 2006); FAA Adv. Circ. 150/5200-33C Part 5, *Hazardous Wildlife Attractants on or near Airports* (Feb. 21, 2020).
[201] N.J.A.C. 7:26-2A.4(k).

411.    The Gee Report documents that the ACUA is in continuous violation of its Bird Plan because it routinely allows putrescible waste to remain exposed at the Landfill during the day, fails to deter gulls which roost in the BAL Community, and fails to interdict starlings which congregate at the Landfill each of which creates a bird hazard.

412.    The ACUA's latest annual bird data report prepared by the ACUA's bird consultant, LGL Ltd., which the ACUA must annually submit to NJDEP as a condition of its SWF Permit, confirms and admits  that the Landfill routinely leaves waste uncovered and exposed during the day, which has caused a significant increase in flocking gulls at the Landfill, a condition which clearly poses an increased risk to aircraft:

> *The ACUA Biologists have now conducted gull control during 26 autumn periods (15 September to 14 December). During those periods, the numbers of control events per day averaged 2.6. The numbers of control events per day in the autumn 2022 and 2023 respectively, were 5.8 and 8.4, much higher than the long-term average of 2.6 (New Table 5). During the previous five years (2016-2020), the number of control events averaged only 1.8 per day. . . .(p. 9)*
> *Over the years, there have been many days when it has not been necessary forthe ACUA biologists to fire any pyrotechnics at gulls (New Table 7). During the most recent 13 autumns there has been an average of 22.5 days without pyrotechnics per autumn period. There were only 9 such days during the autumn of 2023, less than half of the long-term autumn average. For the entire year of 2023, there were only 22 days with no pyrotechnics required compared to the longterm average over the 12 years of 82.2 days per year (New Table 7), about a quarter of the long-term average. . . (p. 13).*

> *Although there were no exceedences during the autumn of 2023, there were several findings of concern. These were increases in control effort that were required to maintain control. These concerns continue from the summer period. During the summer of 2023, there were major increases in numbers of control events per day (18.4 in 2023 compared to 5.8 overall in summer) and shots per day (33.4 in 2023 compared to 10.1 overall in summer) (New Table 5). . . (p. 19).*

> *The data demonstrate that very intensive control effort has been needed in summer and fall of 2021, 2022, and 2023. This raises the question of why there*

*were so many more control events in summer and fall of 2023. The Offsite
Survey did not indicate that there had been an increase in the numbers of gulls in
the area. Review of the gull control data (New Appendix Table 3) indicates that
there were many instances of "exposed garbage" listed as the cover type for a
high proportion of the listed control events. This suggests that spilled and
exposed waste continues to be a problem at the landfill. . . (p. 19)."*[202]

413.    Accordingly, the ACUA's own bird consultant, LGL, has concluded that the
ACUA routinely leaves MSW exposed, which is attracting very large increases of gulls during
the day.

414.    As documented by the Gee Report, the evidence also demonstrates that the
ACUA does not even attempt to disperse gulls at BAL or starlings at the Landfill, which are
both clear violations of the Bird Plan.

415.    Birds are attracted to the Landfill and congregate at BAL repetitively depositing
significant amounts of excrement that contains bacteria, fungi, viruses and parasites. Proven
transmission from bird to human has been demonstrated for 10 of these pathogens, a violation
of the SWF Permit.

416.    There is significant evidence that birds pose a significant risk to aircraft at
ACIA. Since 2019, there have been at least four serious aircraft-bird collisions at ACIA:

   a.  On November 12, 2019, at night, the pilot of a Spirit Airlines passenger jet
       collided with flock of geese 3 miles from ACY at an elevation of 1,200 feet.
       Several birds were ingested through #2 engine. The collision cracked the
       radome, dented the fuselage, and destroyed the engine.[203]

---

[202]LGL Ltd., NIGHT DISPOSAL OF MUNICIPAL SOLID WASTE AT THE ACUA LANDFILL – 312
MONTH REPORT: 15 December 1997 to 14 December 2023 (January 23, 2024)
[203] FAA Wildlife Strike Database, Incident No. 972082 (Nov. 12, 2019).

b. On January 30, 2020, at dusk, a corporate aircraft taking-off from ACY collided with a flock of seagulls. Multiple birds hit the nose and several thuds could be heard.[204]

c. On March 30, 2021, in daylight, shortly after take-off a Spirit passenger jet collided with a flock of double-crested cormorants at an elevation of 3,000 feet and was forced to make an emergency landing.[205]

d. On October 2, 2021, at dusk, another Spirit passenger jet ingested a 9-pound bald eagle during take-off, igniting the engine and forcing the pilot to abort the take-off and make an emergency evacuation of passengers, several of whom were injured.[206]

e. On July 24, 2022, another Spirit passenger jet had to abort take-off after striking 5 crows.[207]

417.   In addition to the conclusive findings made by LGL, the ACUA's bird consultant, the NJDEP inspection reports also document that the ACUA routinely violates the Bird Plan by conducting daytime landfilling activities and failing to cover waste:

a. **June 2021:** During this inspection it was immediately noted that the landfill has a number of issues in need of immediate address. Among these issues are two problems that were noted on the last inspection as out compliance as well as a number of new issues. The LF maintenance vehicle service ramp that was showing signs of trash breakthrough during the last inspection is now composed entirely of exposed waste. **There were 30-50 birds ranging in size from starlings to turkey vultures picking through the waste.** . . **On the top of the landfill there are two long berms of 6' high cover dirt and exposed waste.** Per Jim Coffey, **the landfill is short-staffed.** This appears to have resulted in non-compliance. . . **outstanding new violations related to exposed waste, insufficient cover, degradation of landfill surfaces, failure to pick windblown waste, and waste attracting birds to the landfill. . . Failure to maintain grade, thickness and integrity of intermediate and final cover. Areas of intermediate cover in multiple locations on the slopes as well as the top of the landfill showed significant exposed waste. . . Failure to use appropriate daily and intermediate cover materials; not maintaining sufficient quantity of**

---

[204] Ibid. Incident No. 975195 (Jan. 30, 2020).
[205] Ibid. Incident No. 1310141 (March 30, 2021); "Spirit airplane damaged during bird strike returns to AC", Lite 96.9 WFPG, March 31, 2021.
[206] FAA Wildlife Strike Database, Incident No. 1280874 (Oct. 2, 2021); "Bald eagle caught in Spirit Airlines engine led to fire on Atlantic City runway in 2021," Courier Post, Aug. 11, 2022.
[207] FAA Wildlife Strike Database, Incident No. 1292554 (July 24, 2022).

**cover at site; not maintaining standby supply of cover within boundaries. . . Failure to minimize the propagation and harborage of insects, rodents, and birds. Exposed waste from improperly constructed ramps, excavated waste piles, and erosion has attracted a significant number of birds. During this inspection a single bird deterrent pyrotechnic was used to drive laughing gulls away from the working face.** (emphasis added).[208]

b.   **October 2021:** This facility has multiple outstanding issues that remain unresolved . . .The out of compliance issues largely remain out of compliance. **There is still exposed waste on the landfill top which is material pulled out and scraped back from the construction operations. The material must be covered with proper cover material until such time as the construction activities cease and it can be returned to the proper location within the landfill. . . . Facility must properly grade and cover the landfill surfaces to prevent harborage of insects, birds, and rodents as well as contain leachate and prevent the escape of methane to the atmosphere.** (emphasis added).[209]

c.   **November 2021:** Outstanding compliance issues from the last few inspection remain mostly out of compliance, though improved from previous visits. . . . **The berms of mixed soil and waste on top of the landfill were being actively covered during my inspection, but remain largely exposed. The intermediate cover in this area is also insufficient and needs to be shored up as waste is visible through the layer. The washout of the sideslope facing the Parkway remains unaddressed. . . All waste must be properly covered. . . All areas of ponding must be properly filled and graded to prevent stagnation of water and excess infiltration to the leachate recovery system. . . Ensure that all measures to prevent the propagation of insects, rodent, and birds are controlled on site. Cover all exposed waste to reduce presence of animals looking for food.** (emphasis added).[210]

d.   **February 2022: During this inspection it was noted that all outstanding compliance issues at the landfill remain out of compliance, though some showed improvement.** The side slopes are slightly better covered than on the last visit, but visible waste remains. There are still significant washouts between the phase 1 wall and the raincap. Windblown litter is present on all sides of the landfill indicating that it has not been properly picked recently. There is a small pile of windblown waste at the base of the fence at the

---

[208] Inspection Summary Report for ATLANTIC CNTY SLF & TRANSFER STATION - Activity Number BCI 210003 (June 1, 2021).
[209] NJDEP Inspection Summary Report for ATLANTIC CNTY SLF & TRANSFER STATION - Activity Number BCI 210006 (Oct. 19, 2021).
[210] Inspection Summary Report for ATLANTIC CNTY SLF & TRANSFER STATION - Activity Number BCI 210007 (Nov. 22, 2021).

phase 1 wall which needs to be hauled up to the working face and buried. **There were 20 to 30 seagulls circling the working face on this visit. No pyrotechnics or other means of dispersal were used while the inspector was on site. Long berms of excavated waste and cover are still present on the top of the landfill. No effort has been made to properly landfill this material. Exit interview for the inspection was conducted on 2/18/22 as all senior landfill staff were already gone for the day when the inspection concluded.** (emphasis added).[211]

418.    Seagulls and starlings have been attracted to the Landfill, and ACIA has already noted these birds pose a significant risk to aircraft.[212]

419.    The ACUA's Bird Plan specifically directs the Landfill staff to kill starlings, gulls, geese, and vultures whenever they are observed to be engaged in behaviors posing a risk to aircraft, such as congregating at nearby housing developments.[213]

420.    Flocks of gulls attracted to the Landfill routinely roost on the roofs of BAL homes, where they monitor Landfill activities looking for feeding opportunities. The picture below is a true and accurate picture of seagulls roosting on the roofs of BAL homes.

---

[211] Inspection Summary Report for ATLANTIC CNTY SLF & TRANSFER STATION - Activity Number BCI 220002 (Feb. 17, 2022).
[212] ACY Wildlife Hazard Management Plan (April 2017) Section.
[213] Bird Plan at 5.



421.    Residents have observed hundreds of gulls flying back and forth from the
Landfill, where the gulls forage for food in the uncovered waste at the Landfill.

422.    These gulls then transport waste, bacteria, and other harmful substances directly
back to the BAL community.

423.    The ACUA's 2022 Bird Plan even acknowledged that the Landfill attracts
flocks of seagulls which roost on the rooftops of BAL buildings **with no ACUA deterrence**, a
total contravention of its mandate to use take permits to kill gulls engaged in "repeated travel
to and from area attractions such as nearby housing developments…:"

a. "[L]arge housing development on property adjacent to the landfill has attracted loafing gulls. A Beazer Homes community known as 'The Gatherings at Bel Air Lakes' began construction in 2005. **Since that time, gulls have perched on the rooftops of these houses during the daytime with an unrestricted view of the landfill and are undeterred by the controllers due to the fact that this location is on private property.**" (emphasis added).[214]

424. The ACUA has been aware of this problem as far back as 2009:

a. "Because of the increased risks created by gulls loafing on the roof tops at the adjacent Beazer Homes sub-division, it is important that the ACUA participate in a multi-agency approach to solving this problem. It is probable that ACUA will need to be the technical lead on this effort."[215]

425. In 2010, despite the ACUA's knowledge that the roosting birds in the rooftops of BAL were directly caused by the Landfill, posed a risk to aircraft, and were contaminating BAL buildings with excrement, it was still unwilling to address the problem:

a. Gulls continue to roost in numbers at Beazer leaving the unfortunate residue of large amounts of excrement which is easily viewed from the landfill and straddles the roof-line on most of these buildings. **The building closest to the landfill receives the most excrement which indicates that gulls are still attentive to landfill activities. This residue –accumulated over six years - must be a contributing factor whenever foul odors are detected by Beazer residents. Since these are not by any means 'our' gulls we are reluctant to engage in costly, off-property deterrence activities without willing partners in the effort.** (emphasis added).[216]

426. In 2015, the ACUA's resident biologist, reported to the ACUA Board that flocks of gulls on the roofs of BAL remained a problem:

a. "**A significant factor affecting the amount of control effort during recent winter periods has been the problem caused by gulls loafing on the rooftops of the houses in the Beazer Homes subdivision immediately NNE of the landfill.** Several hundred primarily Herring Gulls use these rooftops on a daily basis. The location provides ideal loafing habitat for the

---

[214] Bird Plan (2022).
[215] LGL Letter to ACUA, Oct 9, 2009.
[216] Report to ACUA Board of Directors, December 7, 2010.

gulls because the rooftops are elevated and provide unlimited horizontal visibility for the gulls while loafing there undisturbed. The location is close to the Atlantic City Reservoir which provides freshwater for bathing and drinking. Loafing on these rooftops ceases during periods when the Atlantic City Reservoir is frozen. **From this elevated vantage point, gulls periodically investigate the landfill, thereby requiring control effort."** (emphasis added).[217]

## COUNT I: RCRA 42 U.S.C. § 6972(a)(1)(B)

427.    Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

428.    RCRA authorizes any person to sue any person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]" 42 U.S.C. § 6972(a)(1)(B).

429.    The waste placed into the Landfill by the ACUA is solid waste as defined in 42 U.S.C. § 6903(27).

430.    Defendant, ACUA, is an owner or operator of a solid waste treatment, storage, or disposal facility under their permit with NJDEP for Solid Waste Facility Permit, ID No. 143392, Permit Code SWF210001 (Approval Date Oct. 17, 2022).

431.    Defendant operates the facility at 6700 Delilah Road, Egg Harbor Township, New Jersey 08234.

---

[217] ACUA, Bird Control July 2015.

432.    The facility contributed to and continues to contribute to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste.

433.    ACUA's continued acceptance, handling, storage, and disposal of solid waste in a negligent manner, which is emitting noxious gases and other harmful emissions in excess of applicable standards, causes and continues to cause imminent and substantial endangerment to the health or the environment.

434.    Neither USEPA nor NJDEP has commenced or is diligently prosecuting a civil or criminal action, is engaging in a removal action, has incurred costs to initiate Remedial Investigation and Feasibility Study, has obtained a court order or issued an administrative order for a removal action, or is proceeding with a remedial action to redress the asserted endangerment, as described in 42 U.S.C. § 6972(b)(2)(B), (C).

435.    As a result of the foregoing, the Plaintiffs' have been harmed.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

a.  Grant a preliminary injunction that requires the ACUA, at its sole cost and expense to:

   i.   Immediately cease construction of the retaining wall and efforts to expand the Landfill to preserve the status quo;

   ii.  Immediately cease landfilling of putrescible waste to eliminate continuing exposures to emissions of H2S in violation of mandatory applicable health-based standards applicable to the Landfill, and to eliminate a continuing Bird Hazard in violation of mandatory applicable operational regulations and standards prohibiting any increase in threats to aircraft;

   iii. Immediately initiate the process for permanent closure and capping of the Landfill, and installation of a complete gas collection and control system to eliminate excess emissions of landfill gas, including violations of the above-referenced standards for H2S emissions, and to eliminate Bird Hazards;

iv.   Expand the ACUA's existing Envirosuite Landfill Gas Monitoring System pursuant to N.J.A.C. 7:26-2A.7(f)4 and N.J.A.C. 7:26-2A.8(h)12, by adding an Envirosuite monitor to the Pleasant Avenue gate of the Landfill (if a monitor is not already located there) plus three additional monitors within the BAL community at the following locations: (1) In the backyard of 70 W. Delray Lane Absecon, New Jersey; (2) 25 Ables Run Drive Absecon, New Jersey; and (3) 74 Ables Run Drive, Absecon, New Jersey. Defendants also shall provide Plaintiffs with access to the Envirosuite system data in real-time to monitor the Landfill's compliance with the mandatory health-based standard for H2S and other hazardous gases emitted by the Landfill, and to receive advance warning of imminent intrusions of landfill gas plumes into the BAL community;

v.   Pay stipulated penalties to the United States and to the State of New Jersey calculated based upon the criteria set forth in NJDEP's penalty regulations for sanitary landfills, N.J.A.C. 7:27A-3.5(e) (taking into account the severity of the violation) and N.J.S.A. 26:2C-8.52b (allowing consideration of the seriousness of the violation) for any exceedances of H2S health-based thresholds according to the following concentrations:

| **Odor Threshold** | **Violation Amount**[218] |
|---|---|
| **Over 30 ppb** averaged over any 30 minute period at the Landfill Property Line Standard--N.J.A.C. 7:27-7.3 | $2,000 per violation |
| **Over 30 ppb** averaged over any 30 minute period in the BAL Community (meaning the property line standard is already exceeded) | $4,000 per violation |
| **Over 70 ppb** averaged over any 30 minute period - The acute minimum risk level from the ATSDR | $10,000 per violation |
| **Over 140 ppb** averaged over any 30 minute period | $30,000 per violation |

vi.   Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or as needed, provide reasonable access to the Landfill, Transfer Station, and other operations at the ACUA solid waste complex by John Gee or another qualified solid waste consultant selected by Plaintiffs to observe transfer station and landfilling operations.

---

[218] A violation is each 30-minute period that a violation occurs.

      vii.    Perform a forensic investigation of the MSE wall conducted by John Gee, or another qualified engineer selected by Plaintiffs, to design and install an MSE wall monitoring and alert system for selected municipal emergency management personnel.

     viii.    Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or as needed, provide John Gee or another qualified consultant selected by Plaintiffs, to:

         a.   Review and evaluate all H2S data collected by ACUA as part of its Odor Management Plan and its Envirosuite monitoring system (collected from both the existing monitoring stations and the new stations to be installed within the BAL community);

         b.   Evaluate the effectiveness of remedial measures implemented to minimize the generation of H2S emissions and to provide recommendations for improvements or additional measures; and

         c.   Participate in all communications by and between the NJDEP, ACUA and their consultants regarding proposed workplans, evaluation of air data collected, evaluation of effectiveness of remedial measures taken to minimize generation of H2S emissions, etc.

      ix.    To the extent that permanent closure, capping, and installation of a gas collection system does not resolve the continuing H2S emissions exceedances, complete a comprehensive investigation of the Landfill's design and operations to identify the cause and origin of the excessive H2S emissions and to identify any remedial measures to eliminate the H2S exceedances.

      x.    Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, fully implement the Bird Control Plan.

      xi.    Reimburse Plaintiffs' for all reasonable attorney's fees and expert costs and related expenses incurred to bring this action.

b.  assess the ACUA civil penalties under RCRA, 42 U.S.C. §§ 6928(g), 6973(b) and 6972(a);

c.  award Plaintiffs their litigation costs, reasonable attorney fees, and expert witness fees incurred in prosecuting this action, pursuant to 42 U.S.C. § 6972(e); and

d.  order such other relief as the Court may deem just and proper.

## COUNT II: RCRA 42 U.S.C. § 6972(a)(1)(A)

436.    Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

437.    Title 42 U.S.C. § 6972(a) and (a)(1)(A) provides:

> any person may commence a civil action on his own behalf against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter;

*See* 42 U.S.C. § 7002(a)(1)(A).

438.    Plaintiffs are "person[s]" as defined in § 6903(15) of RCRA.

439.    The waste placed into the Landfill by the ACUA is solid waste as defined in 42 U.S.C. § 6903(27).

440.    Plaintiffs have provided Defendant with notice of the endangerment alleged in this Complaint and of their intent to bring this action against the ACUA as required by 42 U.S.C. § 6972(b)(2)(A).

441.    Neither USEPA nor NJDEP has commenced or is diligently prosecuting a civil or criminal action, is engaging in a removal action, has incurred costs to initiate Remedial Investigation and Feasibility Study, has obtained a court order or issued an administrative order for a removal action, or is proceeding with a remedial action to redress the asserted endangerment, as described in 42 U.S.C. § 6972(b)(2)(B), (C).

442.    The ACUA maintains a Solid Waste Facility Permit ("SWF Permit")

SWF190001.

443.    The ACUA is in violation of numerous provisions of their SWF Permit as

detailed *supra*.

444.    The ACUA is in violation of numerous provisions of their SWF Permit's Bird

Control and Deterrent Plan provisions as detailed *supra*.

445.    As a result of the Defendant's violations of RCRA and their SWF Permit,

Defendants have caused Plaintiffs' harm.

446.    As authorized by the Federal Civil Penalties Inflation Adjustment Act of 1990,

as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of

2015, the statutory maximum penalties are as follows:

    a.  $87,855 per day of noncompliance for each violation under RCRA pursuant

        to 42 U.S.C. §§ 6928(g) and 6972(a).

Wherefore, Plaintiffs respectfully request that this court enter a judgment in favor of the
Plaintiffs and:

    a.  Grant a preliminary injunction that requires the ACUA, at its sole cost and expense
        to:

        i.   Immediately cease construction of the retaining wall and efforts to expand the
             Landfill to preserve the status quo;

        ii.  Immediately cease landfilling of putrescible waste to eliminate continuing
             exposures to emissions of H2S in violation of mandatory applicable health-
             based standards applicable to the Landfill, and to eliminate a continuing Bird
             Hazard in violation of mandatory applicable operational regulations and
             standards prohibiting any increase in threats to aircraft;

iii.   Immediately initiate the process for permanent closure and capping of the Landfill, and installation of a complete gas collection and control system to eliminate excess emissions of landfill gas, including violations of the above-referenced standards for H2S emissions, and to eliminate Bird Hazards;

iv.   Expand the ACUA's existing Envirosuite Landfill Gas Monitoring System pursuant to N.J.A.C. 7:26-2A.7(f)4 and N.J.A.C. 7:26-2A.8(h)12, by adding an Envirosuite monitor to the Pleasant Avenue gate of the Landfill (if a monitor is not already located there) plus three additional monitors within the BAL community at the following locations: (1) In the backyard of 70 W. Delray Lane Absecon, New Jersey; (2) 25 Ables Run Drive Absecon, New Jersey; and (3) 74 Ables Run Drive, Absecon, New Jersey. Defendants also shall provide Plaintiffs with access to the Envirosuite system data in real-time to monitor the Landfill's compliance with the mandatory health-based standard for H2S and other hazardous gases emitted by the Landfill, and to receive advance warning of imminent intrusions of landfill gas plumes into the BAL community;

v.   Pay stipulated penalties to the United States and to the State of New Jersey calculated based upon the criteria set forth in NJDEP's penalty regulations for sanitary landfills, N.J.A.C. 7:27A-3.5(e) (taking into account the severity of the violation) and N.J.S.A. 26:2C-8.52b (allowing consideration of the seriousness of the violation) for any exceedances of H2S health-based thresholds according to the following concentrations:

| Odor Threshold | Violation Amount[219] |
|---|---|
| **Over 30 ppb** averaged over any 30 minute period at the Landfill Property Line Standard--N.J.A.C. 7:27-7.3 | $2,000 per violation |
| **Over 30 ppb** averaged over any 30 minute period in the BAL Community (meaning the property line standard is already exceeded) | $4,000 per violation |
| **Over 70 ppb** averaged over any 30 minute period - The acute minimum risk level from the ATSDR | $10,000 per violation |
| **Over 140 ppb** averaged over any 30 minute period | $30,000 per violation |

vi.   Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or

---

[219] A violation is each 30-minute period that a violation occurs.

as needed, provide reasonable access to the Landfill, Transfer Station, and other operations at the ACUA solid waste complex by John Gee or another qualified solid waste consultant selected by Plaintiffs to observe transfer station and landfilling operations.

vii.   Perform a forensic investigation of the MSE wall conducted by John Gee, or another qualified engineer selected by Plaintiffs, to design and install an MSE wall monitoring and alert system for selected municipal emergency management personnel.

viii.   Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or as needed, provide John Gee or another qualified consultant selected by Plaintiffs, to:

   a.   Review and evaluate all H2S data collected by ACUA as part of its Odor Management Plan and its Envirosuite monitoring system (collected from both the existing monitoring stations and the new stations to be installed within the BAL community);

   b.   Evaluate the effectiveness of remedial measures implemented to minimize the generation of H2S emissions and to provide recommendations for improvements or additional measures; and

   c.   Participate in all communications by and between the NJDEP, ACUA and their consultants regarding proposed workplans, evaluation of air data collected, evaluation of effectiveness of remedial measures taken to minimize generation of H2S emissions, etc.

ix.   To the extent that permanent closure, capping, and installation of a gas collection system does not resolve the continuing H2S emissions exceedances, complete a comprehensive investigation of the Landfill's design and operations to identify the cause and origin of the excessive H2S emissions and to identify any remedial measures to eliminate the H2S exceedances.

x.   Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, fully implement the Bird Control Plan.

xi.   Reimburse Plaintiffs' for all reasonable attorney's fees and expert costs and related expenses incurred to bring this action.

b.   assess the ACUA civil penalties under RCRA, 42 U.S.C. §§ 6928(g) and 6972(a);

c.   award Plaintiffs their litigation costs, reasonable attorney fees, expert witness fees incurred in prosecuting this action, pursuant to 42 U.S.C. § 6972(e); and

d.   order such other relief as the Court may deem just and proper.

## COUNT III: VIOLATIONS OF THE CLEAN AIR ACT

447.   Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

448.   Title 42 U.S.C. § 7604(a)(1) provides that:

> Any person may commence a civil action on his [or her] own behalf (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

449.   An "emission standard or limitation" includes any "standard, limitation, or schedule established under any permit issued pursuant to title V or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f).

450.   The ACUA's NJDEP, Air Pollution Control Operating Permit, Permit Activity Number BOP210001 (also known as Title V Permit) requires the Landfill to comply with a number of federal air pollution regulations and State regulations, which also are incorporated into New Jersey's State Implementation Plan ("SIP") under the CAA.

451.   For all the reasons set forth above, the ACUA facility has exceeded and continues to exceed emissions limitations contained within the NJDEP, Air Pollution Control Operating Permit.

452.    On multiple occasions, the ACUA facility has exceeded H2S limits of 30 ppb at the fence line, and is in violation of the annual Title V Permit emissions limitations for H2S, VOCs, and methane.

453.    Plaintiffs have provided Defendant with notice of the endangerment alleged in this Complaint and of their intent to bring this action against the ACUA as required by 42 U.S.C. § 7604(b).  A true and correct copy of the Notice is attached hereto as Exhibit A and incorporated herein by reference.

454.    Defendants' failure to comply with the Clean Air Act and their Air Pollution Control Operating Permit have caused the Plaintiffs to be harmed.

455.    Neither USEPA nor NJDEP has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order. 42 U.S.C. § 7604(b)(1)(B).

456.    As authorized by the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, the statutory maximum penalties are as follows:

   a.   $117,468 per day for each violation under the CAA pursuant to 7413(b) & (e) and 7604(a) & (g).

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

   a.   Grant a preliminary injunction that requires the ACUA, at its sole cost and expense to:

127

i.      Immediately cease construction of the retaining wall and efforts to expand the Landfill to preserve the status quo;

ii.     Immediately cease landfilling of putrescible waste to eliminate continuing exposures to emissions of H2S in violation of mandatory applicable health-based standards applicable to the Landfill, and to eliminate a continuing Bird Hazard in violation of mandatory applicable operational regulations and standards prohibiting any increase in threats to aircraft;

iii.    Immediately initiate the process for permanent closure and capping of the Landfill, and installation of a complete gas collection and control system to eliminate excess emissions of landfill gas, including violations of the above-referenced standards for H2S emissions, and to eliminate Bird Hazards;

iv.     Expand the ACUA's existing Envirosuite Landfill Gas Monitoring System pursuant to N.J.A.C. 7:26-2A.7(f)4 and N.J.A.C. 7:26-2A.8(h)12, by adding an Envirosuite monitor to the Pleasant Avenue gate of the Landfill (if a monitor is not already located there) plus three additional monitors within the BAL community at the following locations: (1) In the backyard of 70 W. Delray Lane Absecon, New Jersey; (2) 25 Ables Run Drive Absecon, New Jersey; and (3) 74 Ables Run Drive, Absecon, New Jersey. Defendants also shall provide Plaintiffs with access to the Envirosuite system data in real-time to monitor the Landfill's compliance with the mandatory health-based standard for H2S and other hazardous gases emitted by the Landfill, and to receive advance warning of imminent intrusions of landfill gas plumes into the BAL community;

v.      Pay stipulated penalties to the United States and to the State of New Jersey calculated based upon the criteria set forth in NJDEP's penalty regulations for sanitary landfills, N.J.A.C. 7:27A-3.5(e) (taking into account the severity of the violation) and N.J.S.A. 26:2C-8.52b (allowing consideration of the seriousness of the violation) for any exceedances of H2S health-based thresholds according to the following concentrations:

| **Odor Threshold** | **Violation Amount**[220] |
|---|---|
| **Over 30 ppb** averaged over any 30 minute period at the Landfill Property Line Standard--N.J.A.C. 7:27-7.3 | $2,000 per violation |
| **Over 30 ppb** averaged over any 30 minute period in the BAL Community (meaning the property line standard is already exceeded) | $4,000 per violation |

---

[220] A violation is each 30-minute period that a violation occurs.

| **Over 70 ppb** averaged over any 30 minute period - The acute minimum risk level from the ATSDR | $10,000 per violation |
|---|---|
| **Over 140 ppb** averaged over any 30 minute period | $30,000 per violation |

    vi.    Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or as needed, provide reasonable access to the Landfill, Transfer Station, and other operations at the ACUA solid waste complex by John Gee or another qualified solid waste consultant selected by Plaintiffs to observe transfer station and landfilling operations.

    vii.    Perform a forensic investigation of the MSE wall conducted by John Gee, or another qualified engineer selected by Plaintiffs, to design and install an MSE wall monitoring and alert system for selected municipal emergency management personnel.

    viii.    Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or as needed, provide John Gee or another qualified consultant selected by Plaintiffs, to:

        a.    Review and evaluate all H2S data collected by ACUA as part of its Odor Management Plan and its Envirosuite monitoring system (collected from both the existing monitoring stations and the new stations to be installed within the BAL community);

        b.    Evaluate the effectiveness of remedial measures implemented to minimize the generation of H2S emissions and to provide recommendations for improvements or additional measures; and

        c.    Participate in all communications by and between the NJDEP, ACUA and their consultants regarding proposed workplans, evaluation of air data collected, evaluation of effectiveness of remedial measures taken to minimize generation of H2S emissions, etc.

    ix.    To the extent that permanent closure, capping, and installation of a gas collection system does not resolve the continuing H2S emissions exceedances, complete a comprehensive investigation of the Landfill's design and operations to identify the cause and origin of the excessive H2S emissions and to identify any remedial measures to eliminate the H2S exceedances.

      x.     Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, fully implement the Bird Control Plan.

      xi.    Reimburse Plaintiffs' for all reasonable attorney's fees and expert costs and related expenses incurred to bring this action.

b.  assess the ACUA civil penalties under RCRA, 42 U.S.C. §§ 6928(g) and 6972(a) CAA, 7413(b) & (e) and 7604(a) & (g); CWA, 33 U.S.C. §§ 1319(d) and 1365(a);

c.  award Plaintiffs their litigation costs, reasonable attorney fees, and expert witness fees incurred in prosecuting this action, pursuant to 42 U.S.C. § 7604(d);

d.  establish a fund to enhance the public health or the environment to assess the health impact of BAL residents in accordance with 42 U.S.C. 7604(g)(2); and

e.  order such other relief as the Court may deem just and proper.

## COUNT IV: 42 U.S.C. § 1983 VIOLATION

457.    Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

458.    To bring a § 1983 claim, "a [ ] plaintiff [must] prove two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011).

459.    Each Plaintiff has been deprived of their property as a direct and proximate result of the violations detailed herein, including exposure to H2S and other landfill gases which have deprived Plaintiffs of the value of their homes.

460.    Plaintiffs have been deprived of their liberty as a direct and proximate result of the violations detailed herein, including exposure to H2S and other landfill gases which confine Plaintiffs to their homes and damage their health.

461.    Plaintiffs held and continuously hold a protected property interest under state and federal statutory authority and constitutional law in their ownership of their properties and the attendant rights of use and enjoyment of their real property.

462.    Plaintiffs held and continuously hold a protected liberty interest under state and federal statutory authority and constitutional law in their right to freely come and go from their properties and the attendant rights to freely use and enjoy their real property and the common areas of the BAL Community.

463.    Plaintiffs are "person[s] within the jurisdiction" of the State of New Jersey within the meaning of 42 U.S. § 1983.

464.    Matthew DeNafo, in his individual or personal capacity, is a "person" within the meaning of 42 U.S.C. § 1983.

465.    Gary Conover, in his individual or personal capacity, is a "person" within the meaning of 42 U.S.C. § 1983.

466.    Richard Dovey, in his individual or personal capacity, is a "person" within the meaning of 42 U.S.C. § 1983.

467.    At all times relevant to this complaint, Matthew DeNafo, Gary Conover, and Richard Dovey, were acting under the color of state law including statutes, regulations, customs, and/or usages of Atlantic County and/or the State of New Jersey.

468.    Mr. DeNafo, Mr. Conover, and Mr. Dovey subjected Plaintiffs, or caused them to be subjected, to the deprivations of their rights, privileges, and immunities secured by the Constitution and laws.

469.    The actions of Mr. DeNafo, Mr. Conover, and Mr. Dovey in subjecting Plaintiffs, or causing them to be subjected, to the deprivations of their property rights shocks the conscience as detailed *supra*.

470.    Mr. DeNafo, Mr. Conover, and Mr. Dovey personally directed, or had actual knowledge of and acquiesced in, the imposition, compulsion, or coercion in the violation of the property interests of Plaintiffs.

471.    Mr. DeNafo, Mr. Conover, and Mr. Dovey recklessly or callously disregarded, or were completely indifferent to, the property rights of Plaintiffs.

472.    The New Jersey Solid Waste Management Act (N.J.S.A. 13:1E-1 *et seq.*) established a comprehensive system for the management of solid waste in New Jersey. This system including the creation of a Solid Waste Management Plan to be formed in each county.

473.    The New Jersey Legislature specifically explained the policy behind the Solid Waste Management Act as, "the collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest; that the health, safety and welfare of the people of this State require efficient and reasonable solid

waste collection and disposal service or efficient utilization of such waste." N.J.S.A. § 13:1E-2(a).

474.    The Solid Waste Management Act requires that each county must develop and implement a comprehensive solid waste management plan. N.J.S.A. § 13:1E-2(2).

475.    In June 24, 1982, the Atlantic County Board of Chosen Freeholders designated the Atlantic County Utilities Authority as an agency charged with the implementation of the Atlantic County Solid Waste Management Plan.

476.    On August 6, 1996, the Atlantic County code stated, "the Atlantic County Utilities Authority … is [ ] an agency and instrumentality of the County exercising public and essential government functions, subject to the provision of N.J.S.A. 40:41A-30…" ATLANTIC COUNTY, N.J. ATLANTIC COUNTY CODE, Article XII, § 4-65(A) (1996).

477.    "The Atlantic County Utilities Authority is hereby designated as the County agency having responsibility for implementing the Atlantic County Solid Waste Management Plan and the Atlantic County Recycling Plan." ATLANTIC COUNTY, N.J. ATLANTIC COUNTY CODE, Article XII, § 4-71(A) (1988).

478.    As a result of the foregoing the Mr. DeNafo, Mr. Dovey, and Mr. Conover have caused the Plaintiffs' harm.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

   a.   award Plaintiffs compensatory damages consistent with the violation of their property rights;

b.  award Plaintiffs punitive damages consistent with the reckless or callous disregard for Plaintiffs' rights;

c.  award Plaintiffs their reasonable attorney fees and expert witness fees incurred in pursuing this action pursuant to 42 U.S.C. §§ 1988(b), (c); and

d.  order such other relief as the Court may deem just and proper.

## COUNT V: THE NEW JERSEY ENVIRONMENTAL RIGHTS ACT AND SOLID WASTE MANAGEMENT ACT

479.    Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

480.    Plaintiffs are entitled to relief pursuant to the New Jersey Environmental Rights Act ("ERA"), which provides that:

> "[a]ny person may commence a civil action in a court of competent jurisdiction against any other person alleged to be in violation of any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment. The action may be for injunctive or other equitable relief to compel compliance with a statute, regulation or ordinance, or to assess civil penalties for the violation as provided by law. The action may be commenced upon an allegation that a person is in violation, either continuously or intermittently, of a statute, regulation or ordinance, and that there is a likelihood that the violation will recur in the future." N.J.S.A. § 2A:35A-1 *et. seq.*

481.    A "person" is defined in the ERA to include "the State, any political subdivision of the State and any agency or instrumentality of the State or any political subdivision of the State." N.J.S.A. § 2A:35A-3(a).

482.     The State of New Jersey regulates sanitary landfills pursuant to the Solid Waste

Management Act, N.J.S.A. 13:1e-1 et seq. and Chapter 7:26 of the New Jersey Code, N.J.A.C.

7:26 et seq

483.     Pursuant to N.J.S.A. 13:1E-103, every owner or operator of a sanitary landfill

facility *shall be jointly and severally liable for the proper operation* and closure of the facility,

as required by law, *and for any damages, no matter by whom sustained, proximately resulting*

*from the operations* or closure.

484.     The ACUA's operations of the Landfill repeatedly and continuously emits

noxious odors containing elevated concentrations of H2S, which are the proximate cause of

damages to BALHOA and the BAL Residents for which the ACUA is jointly and severally

liable.

485.     On information and belief, the violation of the RCRA and the SWMA constitute

"knowing violations."

486.     As a result of the Defendant's violation of the RCRA and Solid Waste

Management Act, the Plaintiffs have been harmed.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the
Plaintiffs and:

   a.  Grant a preliminary injunction that requires the ACUA, at its sole cost and expense
        to:

      i.  Immediately cease construction of the retaining wall and efforts to expand the
            Landfill to preserve the status quo;

     ii.  Immediately cease landfilling of putrescible waste to eliminate continuing
            exposures to emissions of H2S in violation of mandatory applicable health-
            based standards applicable to the Landfill, and to eliminate a continuing Bird

Hazard in violation of mandatory applicable operational regulations and standards prohibiting any increase in threats to aircraft;

iii.   Immediately initiate the process for permanent closure and capping of the Landfill, and installation of a complete gas collection and control system to eliminate excess emissions of landfill gas, including violations of the above-referenced standards for H2S emissions, and to eliminate Bird Hazards;

iv.   Expand the ACUA's existing Envirosuite Landfill Gas Monitoring System pursuant to N.J.A.C. 7:26-2A.7(f)4 and N.J.A.C. 7:26-2A.8(h)12, by adding an Envirosuite monitor to the Pleasant Avenue gate of the Landfill (if a monitor is not already located there) plus three additional monitors within the BAL community at the following locations: (1) In the backyard of 70 W. Delray Lane Absecon, New Jersey; (2) 25 Ables Run Drive Absecon, New Jersey; and (3) 74 Ables Run Drive, Absecon, New Jersey. Defendants also shall provide Plaintiffs with access to the Envirosuite system data in real-time to monitor the Landfill's compliance with the mandatory health-based standard for H2S and other hazardous gases emitted by the Landfill, and to receive advance warning of imminent intrusions of landfill gas plumes into the BAL community;

v.   Pay stipulated penalties to the United States and to the State of New Jersey calculated based upon the criteria set forth in NJDEP's penalty regulations for sanitary landfills, N.J.A.C. 7:27A-3.5(e) (taking into account the severity of the violation) and N.J.S.A. 26:2C-8.52b (allowing consideration of the seriousness of the violation) for any exceedances of H2S health-based thresholds according to the following concentrations:

| **Odor Threshold** | **Violation Amount**[221] |
|---|---|
| **Over 30 ppb** averaged over any 30 minute period at the Landfill Property Line Standard--N.J.A.C. 7:27-7.3 | $2,000 per violation |
| **Over 30 ppb** averaged over any 30 minute period in the BAL Community (meaning the property line standard is already exceeded) | $4,000 per violation |
| **Over 70 ppb** averaged over any 30 minute period - The acute minimum risk level from the ATSDR | $10,000 per violation |
| **Over 140 ppb** averaged over any 30 minute period | $30,000 per violation |

---

[221] A violation is each 30-minute period that a violation occurs.

vi.    Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or as needed, provide reasonable access to the Landfill, Transfer Station, and other operations at the ACUA solid waste complex by John Gee or another qualified solid waste consultant selected by Plaintiffs to observe transfer station and landfilling operations.

vii.    Perform a forensic investigation of the MSE wall conducted by John Gee, or another qualified engineer selected by Plaintiffs, to design and install an MSE wall monitoring and alert system for selected municipal emergency management personnel.

viii.    Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or as needed, provide John Gee or another qualified consultant selected by Plaintiffs, to:

    a.    Review and evaluate all H2S data collected by ACUA as part of its Odor Management Plan and its Envirosuite monitoring system (collected from both the existing monitoring stations and the new stations to be installed within the BAL community);

    b.    Evaluate the effectiveness of remedial measures implemented to minimize the generation of H2S emissions and to provide recommendations for improvements or additional measures; and

    c.    Participate in all communications by and between the NJDEP, ACUA and their consultants regarding proposed workplans, evaluation of air data collected, evaluation of effectiveness of remedial measures taken to minimize generation of H2S emissions, etc.

ix.    To the extent that permanent closure, capping, and installation of a gas collection system does not resolve the continuing H2S emissions exceedances, complete a comprehensive investigation of the Landfill's design and operations to identify the cause and origin of the excessive H2S emissions and to identify any remedial measures to eliminate the H2S exceedances.

x.    Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, fully implement the Bird Control Plan.

xi.    Reimburse Plaintiffs' for all reasonable attorney's fees and expert costs and related expenses incurred to bring this action.

b.  award Plaintiffs their litigations costs, reasonable attorney fees, and expert witness fees incurred in pursuing injunction relief pursuant to N.J.S.A. § 35A-10(a);

c.  assess the ACUA civil penalties under SWMA, N.J.A.C. 7:26; and

d.  order such other relief as the Court may deem just and proper.


## COUNT VI: THE NEW JERSEY ENVIRONMENTAL RIGHTS ACT AND THE NEW JERSEY AIR POLLUTION CONTROL ACT

487.  Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

488.  Plaintiffs are entitled to relief pursuant to the ERA, which provides that:

> "[a]ny person may commence a civil action in a court of competent jurisdiction against any other person alleged to be in violation of any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment. The action may be for injunctive or other equitable relief to compel compliance with a statute, regulation or ordinance, or to assess civil penalties for the violation as provided by law. The action may be commenced upon an allegation that a person is in violation, either continuously or intermittently, of a statute, regulation or ordinance, and that there is a likelihood that the violation will recur in the future." N.J.S.A. § 2A:35A-1 *et seq.*

489.  A "person" is defined in the ERA to include "the State, any political subdivision of the State and any agency or instrumentality of the State or any political subdivision of the State." N.J.S.A. § 2A:35A-3(a).

490.  Pursuant to the delegation provisions of the CAA, NJDEP is responsible for regulating the emission of pollutants to the ambient environment of the State of New Jersey in

138

accordance with the CAA and the New Jersey Air Pollution Control Act, N.J.S.A. 26:2C-1 et

seq. and Chapter 7:27 of the New Jersey Code, N.J.A.C. 7:27-1 et seq.

491.    Plaintiffs have provided Defendant with notice of the endangerment alleged in

this Complaint and of their intent to bring this action against the ACUA as required by

N.J.S.A. § 2A:35A-11. A true and correct copy of the Notice is attached hereto as Exhibit A

and incorporated herein by reference.

492.    Defendant, through its operation of the ACUA facility, has violated both the

APCA and the CAA, and it has impaired the environment by violating its Title V permit and

causing emissions from their facility in excess of their emission limits.

493.    On information and belief, the violation of the CAA and APCA constitute

"knowing violations."

494.    As a result of the foregoing, the Plaintiffs' have been harmed.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the
Plaintiffs and:

    a.  Grant a preliminary injunction that requires the ACUA, at its sole cost and expense
to:

        i.  Immediately cease construction of the retaining wall and efforts to expand the
Landfill to preserve the status quo;

        ii.  Immediately cease landfilling of putrescible waste to eliminate continuing
exposures to emissions of H2S in violation of mandatory applicable health-
based standards applicable to the Landfill, and to eliminate a continuing Bird
Hazard in violation of mandatory applicable operational regulations and
standards prohibiting any increase in threats to aircraft;

        iii.  Immediately initiate the process for permanent closure and capping of the
Landfill, and installation of a complete gas collection and control system to

eliminate excess emissions of landfill gas, including violations of the above-referenced standards for H2S emissions, and to eliminate Bird Hazards;

iv.   Expand the ACUA's existing Envirosuite Landfill Gas Monitoring System pursuant to N.J.A.C. 7:26-2A.7(f)4 and N.J.A.C. 7:26-2A.8(h)12, by adding an Envirosuite monitor to the Pleasant Avenue gate of the Landfill (if a monitor is not already located there) plus three additional monitors within the BAL community at the following locations: (1) In the backyard of 70 W. Delray Lane Absecon, New Jersey; (2) 25 Ables Run Drive Absecon, New Jersey; and (3) 74 Ables Run Drive, Absecon, New Jersey. Defendants also shall provide Plaintiffs with access to the Envirosuite system data in real-time to monitor the Landfill's compliance with the mandatory health-based standard for H2S and other hazardous gases emitted by the Landfill, and to receive advance warning of imminent intrusions of landfill gas plumes into the BAL community;

v.    Pay stipulated penalties to the United States and to the State of New Jersey calculated based upon the criteria set forth in NJDEP's penalty regulations for sanitary landfills, N.J.A.C. 7:27A-3.5(e) (taking into account the severity of the violation) and N.J.S.A. 26:2C-8.52b (allowing consideration of the seriousness of the violation) for any exceedances of H2S health-based thresholds according to the following concentrations:

| Odor Threshold | Violation Amount[222] |
|---|---|
| **Over 30 ppb** averaged over any 30 minute period at the Landfill Property Line Standard--N.J.A.C. 7:27-7.3 | $2,000 per violation |
| **Over 30 ppb** averaged over any 30 minute period in the BAL Community (meaning the property line standard is already exceeded) | $4,000 per violation |
| **Over 70 ppb** averaged over any 30 minute period - The acute minimum risk level from the ATSDR | $10,000 per violation |
| **Over 140 ppb** averaged over any 30 minute period | $30,000 per violation |

vi.   Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or as needed, provide reasonable access to the Landfill, Transfer Station, and other operations at the ACUA solid waste complex by John Gee or another qualified

---

[222] A violation is each 30-minute period that a violation occurs.

solid waste consultant selected by Plaintiffs to observe transfer station and landfilling operations.

vii.    Perform a forensic investigation of the MSE wall conducted by John Gee, or another qualified engineer selected by Plaintiffs, to design and install an MSE wall monitoring and alert system for selected municipal emergency management personnel.

viii.    Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, or as needed, provide John Gee or another qualified consultant selected by Plaintiffs, to:

    a.    Review and evaluate all H2S data collected by ACUA as part of its Odor Management Plan and its Envirosuite monitoring system (collected from both the existing monitoring stations and the new stations to be installed within the BAL community);

    b.    Evaluate the effectiveness of remedial measures implemented to minimize the generation of H2S emissions and to provide recommendations for improvements or additional measures; and

    c.    Participate in all communications by and between the NJDEP, ACUA and their consultants regarding proposed workplans, evaluation of air data collected, evaluation of effectiveness of remedial measures taken to minimize generation of H2S emissions, etc.

ix.    To the extent that permanent closure, capping, and installation of a gas collection system does not resolve the continuing H2S emissions exceedances, complete a comprehensive investigation of the Landfill's design and operations to identify the cause and origin of the excessive H2S emissions and to identify any remedial measures to eliminate the H2S exceedances.

x.    Until such time that the Landfill is closed and operating in consistent compliance with all applicable permit conditions, regulations, and standards, fully implement the Bird Control Plan.

xi.    Reimburse Plaintiffs' for all reasonable attorney's fees and expert costs and related expenses incurred to bring this action.

b.  award Plaintiffs their litigations costs, reasonable attorney fees, and expert witness fees incurred in pursuing injunction relief pursuant to N.J.S.A. § 35A-10(a);

c.  assess the ACUA civil penalties under APCA, N.J.A.C. § 7:27A-3.10; and

d.  order such other relief as the Court may deem just and proper.

## COUNT VII: COMMON LAW NEGLIGENCE

495.     Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

496.     The actions by the Defendant of causing illegal emissions and discharges were the direct and proximate result of negligence, carelessness, and/or acts or omissions of the Defendant because it:

      a.   knew or should have known that the illegal emissions or discharges would migrate onto Plaintiffs' Real Property;

      b.   knew or should have known that the illegal landfill mining operation would create excessive Landfill gas emissions that harm the Plaintiffs' Real Property and health;

      c.   knew or should have known that the Landfill was emitting unsafe levels of H2S into the BAL community and poisoning Plaintiffs;

      d.   knew or should have known that the ineffective bird control plan is causing damage to Plaintiffs' Real Property;

      e.   violated the statutes listed set forth with respect for each of the previous Counts; and

      f.   committed or caused such other negligent acts or omissions which may be revealed through discovery.

497.     Defendant owed a duty to foreseeable owners, users, and tenants of any properties onto which the effluent or hydrogen sulfide flowed, including Plaintiffs, to exercise due care in the handling, storage, and discharge of all Landfill gas released as a result of the Defendant's conduct.

498.    The New Jersey Air Pollution Control Act, Solid Waste Management Act, Water Pollution Control Act and other regulations set forth the standard of care required of the Defendant. <u>Steinberg v. Sahara Sam's Oasis, LLC</u>, 142 A.3d 742, 752 (N.J. 2016).

499.    Defendant breached the duty owed to Plaintiffs in that they negligently and carelessly failed to exercise due care with respect to the generation, storage, treatment, and/or disposal of waste.

500.    As a direct and proximate result of the aforesaid negligence, carelessness and/or negligent acts or omissions on the part of the Defendant, their contractors, agents, servants, and/or employees, the illegal emissions and effluent and result damages referred to *supra* occurred causing injury to Plaintiffs and Plaintiffs' Real Property.

501.    Pursuant to the New Jersey Tort Claims Act §59:4-2, Defendant:

[I]s liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

(a) a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

(b) a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

502.    A dangerous condition is defined as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1(a).

503.    Actual notice is defined in the statute as, "A public entity shall be deemed to have actual notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. 59:4-3(a).

504.    Constructive notice is defined as:

A public entity shall be deemed to have constructive notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. N.J.S.A. 59:4-3(b).

505.    Defendant had actual or constructive knowledge of a dangerous condition present on their property injuring Plaintiffs' through risk assessments, odor complaints, bird visibility on rooftops, violations of various emission standards set forth in their Title V and SWF Permit, and other conditions detailed *supra*.

506.    Defendant's actions constitute intentional wrongdoing or wanton and willful disregard for Plaintiffs' rights.

507.    Plaintiffs have provided Defendant with notice of the claims alleged in this Complaint and of their intent to bring this action against the ACUA as required by N.J.S.A. § 2A:35A-11. A true and correct copy of the Notice is attached hereto as Exhibit A and incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

      a.  award monetary damages to Plaintiffs' to compensate them for their Real Property value depreciation and medical expenses;

     b.   award reasonable attorneys' fees pursuant to N.J.S.A. § 59:9-5;

     c.   award expert witness fees not to exceed $100.00 pursuant to N.J.S.A. § 59:9-5;

     d.   award punitive damages; and

     e.   order such other relief as the Court may deem just and proper.

## COUNT VIII: COMMON LAW GROSS NEGLIGENCE

508.    Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

509.    The actions by the Defendant of causing illegal emissions and discharges were the direct and proximate result of the Defendant's thoughtless disregard to the consequences of their actions because Defendant:

     a.   knew or should have known that the illegal emissions or discharges would migrate onto Plaintiffs' Real Property;

     b.   knew or should have known that the illegal landfill mining operation would create excessive Landfill gas emissions that harm the Plaintiffs' Real Property and health;

     c.   knew or should have known that the Landfill was emitting unsafe levels of H2S into the BAL community and poisoning Plaintiffs;

     d.   knew or should have known that the ineffective bird control plan is causing damage to Plaintiffs' Real Property;

     e.   violated the statutes listed set forth with respect for each of the previous Counts;

     f.   committed or caused such other negligent acts or omissions which may be revealed through discovery.

510.    Defendant owed a duty to foreseeable owners, users, and tenants of any properties onto which the effluent or hydrogen sulfide flowed, including Plaintiffs, to exercise

due care in the handling, storage, and discharge of all Landfill gas released as a result of the Defendant's conduct.

511.   The New Jersey Air Pollution Control Act, Solid Waste Management Act, Water Pollution Control Act and other specific regulations set forth the standard of care required of the Defendant. Steinberg v. Sahara Sam's Oasis, LLC, 142 A.3d 742, 752 (N.J. 2016).

512.   Defendant breached the duty owed to Plaintiffs in that they negligently and carelessly failed to exercise due care with respect to the generation, storage, treatment, and/or disposal of waste.

513.   As a direct and proximate result of the aforesaid gross negligence, thoughtless disregard and/or negligent acts or omissions on the part of the Defendant, their contractors, agents, servants, and/or employees, the illegal emissions and effluent and result damages referred to *supra* occurred causing injury to Plaintiffs and Plaintiffs' Real Property.

514.   Pursuant to the New Jersey Tort Claims Act §59:4-2, Defendant:

[I]s liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

(a) a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

(b) a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

515.    A dangerous condition is defined as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1(a).

516.    Actual notice is defined in the statute as, "A public entity shall be deemed to have actual notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. 59:4-3(a).

517.    Constructive notice is defined as:

A public entity shall be deemed to have constructive notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. N.J.S.A. 59:4-3(b).

518.    Defendant had actual or constructive knowledge of a dangerous condition present on their property injuring Plaintiffs' through risk assessments, odor complaints, bird visibility on rooftops, violations of various emission standards set forth in their Title V and SWF Permit, and other conditions detailed *supra*.

519.    Defendant's actions constitute intentional wrongdoing or wanton and willful disregard for Plaintiffs' rights.

520.    Plaintiffs have provided Defendant with notice of the claims alleged in this Complaint and of their intent to bring this action against the ACUA as required by N.J.S.A. § 2A:35A-11. A true and correct copy of the Notice is attached hereto as Exhibit A and incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

  a. award monetary damages to Plaintiffs' to compensate them for their Real Property value depreciation and medical expenses;

  b. award reasonable attorneys' fees pursuant to N.J.S.A. § 59:9-5;

  c. award expert witness fees not to exceed $100.00 pursuant to N.J.S.A. § 59:9-5;

  d. award punitive damages; and

  e. order such other relief as the Court may deem just and proper.

## COUNT IX: COMMON LAW NUISANCE

521. Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

522. The illegal emissions and discharges constitute a deprivation of Plaintiffs' private use and enjoyment of their land.

523. The periodic discharge and emission of large volumes of Hydrogen Sulfide onto the Plaintiff's Real Property is unreasonable.

524. Defendant's wrongful acts, if allowed to continue, will decrease the value of the Plaintiffs' Real Property further and constitute a continuing nuisance. The injury and damage proximately caused thereby will be irreparable, and the depreciation in value of the Plaintiffs' Real Property will occasion the necessity for suits from time to time to collect damages from Defendant that may hereinafter accrue, both from depreciation in property value and for any further damage to Plaintiffs' Real Property by reason of the continuance of the periodic emission and discharge of Hydrogen Sulfide onto the Plaintiffs' Real Property.

148

525.     Plaintiffs have no adequate remedy at law for the injury or damage caused by the Defendant's acts and omissions.

526.     The injury and damages suffered by Plaintiffs from the continuation by the Defendant of the nuisance complained of greatly outweigh any hardship to the Defendant resulting from the nuisance.

527.     Pursuant to the New Jersey Tort Claims Act §59:4-2, Defendant:

[I]s liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

(a) a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

(b) a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

528.     A dangerous condition is defined as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1(a).

529.     Actual notice is defined in the statute as, "A public entity shall be deemed to have actual notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. 59:4-3(a).

530.     Constructive notice is defined as:

A public entity shall be deemed to have constructive notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. N.J.S.A. 59:4-3(b).

531.    Defendant had actual or constructive knowledge of a dangerous condition present on their property injuring Plaintiffs' through risk assessments, odor complaints, bird visibility on rooftops, violations of various emission standards set forth in their Title V and SWF Permit, and other conditions detailed *supra*.

532.    Plaintiffs have provided Defendant with notice of the claims alleged in this Complaint and of their intent to bring this action against the ACUA as required by N.J.S.A. § 2A:35A-11. A true and correct copy of the Notice is attached hereto as Exhibit A and incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

      a.    award monetary damages to Plaintiffs' to compensate them for their Real Property value depreciation and medical expenses;

      b.    award reasonable attorneys' fees pursuant to N.J.S.A. § 59:9-5;

      c.    award expert witness fees not to exceed $100.00 pursuant to N.J.S.A. § 59:9-5; and

      d.    order such other relief as the Court may deem just and proper.

## <u>COUNT X: COMMON LAW TRESPASS</u>

533.    Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

534.   The flow of emissions from the Landfill onto the Real Property of the Plaintiffs' constitutes a trespass onto the Plaintiff's Real Property.

535.   As a result of the Defendant's complete mismanagement of the Landfill, Defendant has willfully, recklessly, knowingly, and intentionally released leachate and emissions from the Landfill onto Plaintiff's Real Property.

536.   Due to the Defendant's willful, reckless, knowing, and intentional conduct, the value of the Plaintiff's Real Property has been impaired to the Plaintiff's detriment.

537.   Defendant's willful, reckless, knowing, and intentional actions constituted a trespass on the Plaintiffs' Real Property without the right or authority to do so.

538.   By reason of the Defendant's conduct, Plaintiff has been deprived of the use and possession of certain portions of the Plaintiffs' Real Property to Plaintiff's detriment.

539.   Pursuant to the New Jersey Tort Claims Act §59:4-2, Defendant:

[I]s liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

(a) a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

(b) a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

540.    A dangerous condition is defined as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1(a).

541.    Actual notice is defined in the statute as, "A public entity shall be deemed to have actual notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. 59:4-3(a).

542.    Constructive notice is defined as:

> A public entity shall be deemed to have constructive notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. N.J.S.A. 59:4-3(b).

543.    Defendant had actual or constructive knowledge of a dangerous condition present on their property injuring Plaintiffs' through risk assessments, odor complaints, bird visibility on rooftops, violations of various emission standards set forth in their Title V and SWF Permit, and other conditions detailed *supra*.

544.    Plaintiffs have provided Defendant with notice of the claims alleged in this Complaint and of their intent to bring this action against the ACUA as required by N.J.S.A. § 2A:35A-11. A true and correct copy of the Notice is attached hereto as Exhibit A and incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

a.   award monetary damages to Plaintiffs' to compensate them for their Real Property value depreciation;

b.   award reasonable attorneys' fees pursuant to N.J.S.A. § 59:9-5;

c.   award expert witness fees not to exceed $100.00 pursuant to N.J.S.A. § 59:9-5; and

d.   order such other relief as the Court may deem just and proper.


**COUNT XI: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

545.   Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

546.   The actions by the Defendant of causing illegal emissions and discharges were the direct and proximate result of negligence, carelessness, and/or acts or omissions of the Defendant because it:

a.   knew or should have known that the illegal emissions or discharges would migrate onto Plaintiffs' Real Property;

b.   knew or should have known that the illegal landfill mining operation would create excessive Landfill gas emissions that harm the Plaintiffs' Real Property and health;

c.   knew or should have known that the Landfill was emitting unsafe levels of H2S into the BAL community and poisoning Plaintiffs;

d.   knew or should have known that the ineffective bird control plan is causing damage to Plaintiffs' Real Property;

e.   violated the statutes listed set forth with respect for each of the previous Counts;

f.   committed or caused such other negligent acts or omissions which may be revealed through discovery.

547.   Defendant owed a duty to foreseeable owners, users, and tenants of any properties onto which the effluent or hydrogen sulfide flowed, including Plaintiffs, to exercise

due care in the handling, storage, and discharge of all Landfill gas released as a result of the Defendant's conduct.

548.    The New Jersey Air Pollution Control Act, Solid Waste Management Act, Water Pollution Control Act and other specific regulations set forth the standard of care required of the Defendant. <u>Steinberg v. Sahara Sam's Oasis, LLC</u>, 142 A.3d 742, 752 (N.J. 2016).

549.    Defendant breached the duty owed to Plaintiffs in that they negligently and carelessly failed to exercise due care with respect to the generation, storage, treatment, and/or disposal of waste.

550.    As a direct and proximate result of the aforesaid negligence, carelessness and/or negligent acts or omissions on the part of the Defendant, their contractors, agents, servants, and/or employees, the illegal emissions and effluent and result damages referred to *supra* occurred causing severe emotional distress to the Plaintiffs.

551.    Pursuant to the New Jersey Tort Claims Act §59:4-2, Defendant:

[I]s liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

(a) a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

(b) a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

154

552.    A dangerous condition is defined as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1(a).

553.    Actual notice is defined in the statute as, "A public entity shall be deemed to have actual notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. 59:4-3(a).

554.    Constructive notice is defined as:

A public entity shall be deemed to have constructive notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. N.J.S.A. 59:4-3(b).

555.    Defendant had actual or constructive knowledge of a dangerous condition present on their property injuring Plaintiffs' through risk assessments, odor complaints, bird visibility on rooftops, violations of various emission standards set forth in their Title V and SWF Permit, and other conditions detailed *supra*.

556.    Plaintiffs have provided Defendant with notice of the claims alleged in this Complaint and of their intent to bring this action against the ACUA as required by N.J.S.A. § 2A:35A-11. A true and correct copy of the Notice is attached hereto as Exhibit A and incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

155

    f.   award monetary damages to Plaintiffs' to compensate them for the severe emotion distress and medical expenses;

    g.   award reasonable attorneys' fees pursuant to N.J.S.A. § 59:9-5;

    h.   award expert witness fees not to exceed $100.00 pursuant to N.J.S.A. § 59:9-5; and

    e.   order such other relief as the Court may deem just and proper.

## COUNT XII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

557.    Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

558.    The Defendant knew and continues to know the emissions of H2S and leachate into the flows into Plaintiff's property. The Defendant maintains knowledge through regular odor complaints, town hall meetings, investigations from NJDEP due to odor investigations, and other information detailed *supra*.

559.    The Defendant's conduct is so outrageous in character and extreme in degree that they have been knowingly exposing an environmental justice community to elevated levels of H2S well-above any permitted emission standard.

560.    The Defendant's actions have caused significant emotional distress to Plaintiff's due to isolating them from their family, distress about the fate of their health and property, waking them up in the middle of the night trying to catch their breath, and a myriad of other impacts detailed *supra*.

561.    The emotional distress Plaintiffs suffer is so severe that no reasonable person could be expected to endure it.

562.    Pursuant to the New Jersey Tort Claims Act §59:4-2, Defendant:

[I]s liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

(a) a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

(b) a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

563.    A dangerous condition is defined as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1(a).

564.    Actual notice is defined in the statute as, "A public entity shall be deemed to have actual notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. 59:4-3(a).

565.    Constructive notice is defined as:

A public entity shall be deemed to have constructive notice of a dangerous condition within the meaning of subsection b. of section 59:4-2 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. N.J.S.A. 59:4-3(b).

566.    Defendant had actual or constructive knowledge of a dangerous condition present on their property injuring Plaintiffs' through risk assessments, odor complaints, bird

157

visibility on rooftops, violations of various emission standards set forth in their Title V and SWF Permit, and other conditions detailed *supra*.

567.    Plaintiffs have provided Defendant with notice of the claims alleged in this Complaint and of their intent to bring this action against the ACUA as required by N.J.S.A. § 2A:35A-11. A true and correct copy of the Notice is attached hereto as Exhibit A and incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

     a.   award monetary damages to Plaintiffs' to compensate them for the severe emotion distress and medical expenses;

     b.   award reasonable attorneys' fees pursuant to N.J.S.A. § 59:9-5;

     c.   award expert witness fees not to exceed $100.00 pursuant to N.J.S.A. § 59:9-5; and

     f.   order such other relief as the Court may deem just and proper.

## COUNT XIII: COMMON LAW FRAUD/MISREPRESENTATION

568.    Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

569.    The ACUA, Mr. DeNafo, Mr. Dovey, and Mr. Conover provided to Plaintiffs false information and/or omitted material facts in connection with, among other things, the health risks posed by the Landfill's emissions of landfill gas, including H2S.

570.    Plaintiffs reasonably relief upon the false information and/or omissions provided by said Defendants.

571.   Plaintiffs' reliance upon false information and/or omissions was foreseeable.

572.   The said Defendants' actions proximately caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

a.   award Plaintiffs compensatory, consequential, and incidental damages;

b.   award Plaintiffs punitive damages; and

c.   order such other relief as the Court may deem just and proper.

## COUNT XIV: INVERSE CONDEMNATION

573.   Plaintiffs re-allege the preceding paragraphs and incorporate them herein by reference.

574.   The ACUA is a public agency of Atlantic County, New Jersey.

575.   Plaintiffs have been deprived of all or substantially all of the beneficial use of the totality of their property as a result of the ACUA's actions.

576.   Both the United States and New Jersey Constitution prohibit the ACUA from taking Plaintiffs' property, temporarily or permanently, without payment of just compensation for the period of deprivation.

577.   Plaintiffs have been deprived of all or substantially all beneficial use of their property based upon regular odor events.

578.   Plaintiffs cannot use or enjoy any segment of their property during an odor event.

159

579.   As a proximate result of the ACUA's conduct, Plaintiffs have been injured as set forth *supra*.

WHEREFORE, Plaintiffs respectfully request that this court enter a judgment in favor of the Plaintiffs and:

   a.   award Plaintiffs compensatory damages for the taking of Plaintiffs' property; and

   b.   order such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand trial by jury in this action of all issues so triable with the undersigned acting as designated Trial Counsel.

Dated: May 23, 2024

                              COZEN O'CONNOR

               By:   /s/ Peter Fontaine_____
                     Peter J. Fontaine
                     Lawrence F. Walker
                     Matthew J. Coughlin
                     1010 Kings Highway S.
                     Cherry Hill, New Jersey 08034
                     Phone: (856) 910-5000
                     Email: pfontaine@cozen.com
                            lwalker@cozen.com
                            matthewcoughlin@cozen.com

                     *Attorneys for Plaintiffs*

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not the subject of other actions.

Dated: May 23, 2024

<div style="margin-left:50%">

COZEN O'CONNOR

By:   /s/ Peter Fontaine_____
       Peter J. Fontaine

*Attorney for Plaintiffs*

</div>

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GATHERINGS AT BEL AIRE LAKES HOMEOWNERS' ASSOCIATION, INC., *et al.* | : : : |
| Plaintiffs, | : : |
| | : Civil Action No. _____ |
| vs. | : |
| | : JURY TRIAL DEMANDED |
| ATLANTIC COUNTY UTILITIES AUTHORITY, MATTHEW DENAFO, RICHARD DOVEY, and GARY CONOVER Defendants. | : : : : |

**VERIFICATION**

I, Peter J. Fontaine, hereby declare and verify that I am a plaintiff in the above-captioned action and have authorized the filing of the foregoing complaint. I verify under penalty of perjury that the facts set forth in the complaint are true and correct to the best of my information, knowledge, and belief.


DATED: May 23, 2024                              /s/Peter J. Fontaine

                                                 Peter J. Fontaine